UNITED STATES DISTRICT COURT
DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 8:10-CV-00102 |
| v. | ) ) | |
| RAJNISH K. DAS and STORMY L. DEAN, | ) ) ) | |
| Defendants. | ) | |

# EXHIBIT A

# TO

# INDEX OF EVIDENTIARY MATERIALS IN SUPPORT OF THE MOTION IN LIMIME TO EXCLUDE OR LIMIT THE EXPERT TESTIMONY OF STEVEN L. HENNING

**EXPERT REPORT**

**OF**

**STEVEN L. HENNING, Ph.D., CPA**


**SECURITIES AND EXCHANGE COMMISSION,**
**Plaintiff**

**v.**

**RAJNISH K. DAS and STORMY L. DEAN, Defendants**

**(CASE NO. 8:10-CV-00102-LSC-FG3)**

**May 6, 2011**

**EXPERT REPORT**
**OF**
**STEVEN L. HENNING, Ph.D., CPA**

**SECURITIES AND EXCHANGE COMMISSION,**
**Plaintiff**

**v.**

**RAJNISH K. DAS and STORMY L. DEAN, Defendants**

**(CASE NO. 8:10-CV-00102-LSC-FG3)**

**May 6, 2011**

## A. INTRODUCTION

I have been retained by the U.S. Securities and Exchange Commission (SEC) in the above-referenced matter as an expert witness regarding accounting and financial reporting issues in certain annual and quarterly SEC filings, Forms 10-K and Forms 10-Q, respectively, and proxy statements of infoUSA Inc. (now InfoGroup Inc.) (Info or the Company).

I began my career in public accounting in 1983 and I am a licensed Certified Public Accountant in Wisconsin and New York. My background includes experience in public accounting, private industry, academia, and at the SEC. I am a partner at Marks Paneth & Shron LLP (MP&S), a public accounting and business consulting firm. Since 2004, I have practiced as an accounting expert in litigation matters that address allegations of improper financial reporting, and I have assisted domestic and foreign companies with financial and regulatory reporting matters, including compliance with internal control requirements and conducting investigations on behalf of audit committees related to suspected management and employee fraud. MPS employs approximately 400 professionals, some 25 of whom work in the litigation services practice under my

1

direction, including a number who have attained the Certified Fraud Examiner (CFE) designation. Attached to this report are the following exhibits:

- a copy of my curriculum vitae (Exhibit A);

- a listing of cases in which I have testified as an expert at trial or by deposition during the past four years (Exhibit B);

- a listing of all publications that I have authored or co-authored within the preceding ten years (Exhibit C);

- a summary of the hourly rates charged for work on this engagement (Exhibit D);

- a listing of materials I considered in the formation of my opinions (Exhibit E), in addition to the materials cited directly in this report.

I am performing this expert witness engagement in accordance with the AICPA's *Statement on Standards for Consulting Services: Definitions and Standards.* These standards require me to be impartial, intellectually honest, and free of conflicts of interest. In performing my work I have applied the requirements of U.S. generally accepted accounting principles (GAAP), generally accepted auditing standards (GAAS) and SEC regulations. In addition, I have experience in working with companies on the types of expenses that are widely considered to constitute perquisite compensation and related party transaction disclosures and other matters covered in this report. This experience was obtained as a member of the NASDAQ Listing Qualifications Panel, as an academic fellow in the Office of the Chief Accountant at the SEC and as a consultant to public companies.

This report describes my work to date and summarizes the opinions I have formed at this time and the bases for these opinions. Prior to the time I testify at deposition or trial, I may review additional documents and deposition testimony that are provided to me, as well as reports of other experts. Therefore, the opinions expressed herein may change as a result of my review of additional documents or deposition testimony. Accordingly, I reserve the right to supplement, update or otherwise modify this report at a later date.

## B. SUMMARY OF OPINIONS

Based on the work to date, I have formed the following opinions with respect to Info's accounting for and reporting of perquisites and related party transactions involving Vinod Gupta, Info's former chief executive officer (CEO) and chairman of the board of directors during fiscal year 2003 through fiscal year 2006:

1. Info's Forms 10-K for the fiscal years ended December 31, 2003 through December 31, 2006, and its annual proxy statements for those same years, were materially false and misleading as a result of not fully disclosing the compensation of Mr. Gupta for each of these periods. Specifically, Mr. Gupta received undisclosed perquisite compensation in the amount of $2,153,700 in 2003, $2,178,700 in 2004, $1,858,700 in 2005, and $1,320,500 in 2006.

2. The related party transaction disclosures in Info's Forms 10-K for fiscal years 2003, 2004 and 2005, and Form 10-Q for the quarter ended September 30, 2004, were materially false and misleading and related party transactions involving Mr. Gupta and his entities were not presented in accordance with GAAP in the financial statements contained in those SEC filings.

3

3. As chief financial officers (CFOs) and signers of the SEC reports, Messrs. Das and Dean (collectively, the Defendants) had the obligation to ensure the accuracy of the Company's financial statements. Indeed, during their respective tenures as CFO at Info, each prepared and reviewed Info's Forms 10-K, Forms 10-Q and proxy statements during the periods mentioned above. The Defendants had the opportunity and obligation to correct the misstatements and material understatements, and failed to properly disclose the compensation received by Mr. Gupta. In addition, Messrs. Das and Dean failed to correct and accurately report and disclose the actual amounts of related party transactions of the Company.

4. As a result of Messrs. Das and Dean's failure to comply with both GAAP and SEC disclosure requirements, Info's Forms10-K and proxy statements referenced therein for fiscal years 2003 through fiscal year 2006, and its Form 10-Q for the quarter ended September 30, 2004, were materially false and misleading.

## C. BASES FOR OPINION

The bases for my opinions are discussed on the following pages under the following captions:

1. Company Background and Roles of Messrs. Das and Dean
2. Management's Responsibility for Financial Reporting
3. Understatement and Improper Disclosure of Perquisites
4. GAAP Violations Regarding Related Party Transactions
5. Materiality of the Improper Disclosures

Steven L. Henning

4

### 1.   Company Background and Roles of Messrs. Das and Dean

Background on Info.

      Info was formed in 1972, in Omaha, Nebraska.  It is "a provider of business and consumer databases for sales leads, mailing lists, direct marketing, database marketing, e-mail marketing and market research solutions.  The Company's database powers the directory services of some of the top Internet traffic-generating sites.  Customers use the Company's products and services to find new customers, grow their sales, and for other direct marketing, telemarketing, customer analysis and credit reference purposes."[1] The company had originally operated under the name American Business Information (ABI), a company that provided sales leads for and marketing information about businesses. Info became a public company in 1996 and was traded on the National Association of Securities Dealers Automated Quotations (NASDAQ). In 1998, the company changed its name to infoUSA Inc., and then again in 2008 changed its name to InfoGROUP Inc. ABI was founded by Vinod Gupta.  Mr. Gupta was Info's CEO and chairman from the time he brought the company public, through an initial public offering in 1996, through August 2008 when he resigned from the Company. In 2010, Info was acquired by CCMP Capital Advisors, which took the company private.

SEC Investigation

      In late 2007, Info formed a Special Litigation Committee to conduct an internal investigation into allegations made in the civil complaint, *In re infoUSA, Inc. Shareholders Litigation*, and in response to an SEC informal investigation.  As part of the informal investigation, the SEC requested the voluntary production of documents

---

[1] InfoGROUP, Inc, Form 10-K for the year ended December 31, 2009, p.1.

concerning related party transactions, expense reimbursements, other corporate

expenditures and certain trading in the Company's securities. Form 10-K/A (Amendment

No. 3), for fiscal year ended December 31, 2008 states:

> The requested documents the Company voluntarily provided during the
> course of the investigation related to expense reimbursements and other
> corporate expenditures for Vinod Gupta, former chief executive officer of
> the Company. Specifically, the documents included Company records
> related to Mr. Gupta's credit card expenses which were reimbursed by the
> Company, country club expenses paid by the Company, and non-
> commercial flight costs paid by the Company for Mr. Gupta. (p. 3)

I understand that the SEC also took testimony as part of its investigation, from

numerous witnesses employed by Info, members of the Info Board of Directors, and

outside professionals doing work for Info. At the conclusion of the investigation, I

understand that the Company, Mr. Gupta and Dr. Vasant Raval, the chair of the Info audit

committee, entered into settlements with the SEC. The SEC then filed suit against

Messrs. Das and Dean in this civil action for which I was hired as an expert witness.

### Roles of Messrs. Das and Dean

<u>Rajnish K. Das</u>

Mr. Das was Info's chief financial officer (CFO) from September 2003 through

December 2005. In January 2006, he assumed a new role as a senior vice president of

strategic planning and was involved with business development and mergers and

acquisitions. During his role as CFO, Mr. Das was responsible for Info's accounting

function and financial statements, accuracy of financial reporting and internal controls.[2] As

---

[2] See Rules 13b2-1 and 13b2-2 of the *General rules and regulations promulgated under the Securities Exchange Act of 1934* and Section 13(b)(2) of the *Securities Exchange Act of 1934*. Internal control is a process that is designed to provide reasonable assurance regarding the achievement of objectives related to the effectiveness and efficiency of operations, the reliability of financial reporting, and compliance with applicable laws and regulations. (Committee of Sponsoring Organizations of the Treadway Commission (COSO), *Internal Control - Integrated Framework* (1992), Executive Summary.)

CFO, Mr. Das certified Info's third quarter financial statement for fiscal year 2003; each of its quarterly financial statements for fiscal years 2004 and 2005; and its year end financial statements for fiscal years 2003 and 2004. Das signed Info's Forms 10-K and 10-Q while he served as CFO, including the 2003 and 2004 Forms 10-K and the third quarter 2004 Form 10-Q. Das was terminated by Info in July 2006.

Prior to joining Info, Mr. Das worked in investment banking as a vice president for Ladenburg Thalmann & Co. Inc., from April 2002 to August 2003. From June 2000 to September 2001, Mr. Das was a vice president at Bear, Stearns & Co. Inc., where he was an investment banker covering the wireless software industry. In 1999, he attained a Series 63 license. Mr. Das was a vice president at ING Barings LLC from February 1998 to May 2000, where he had investment banking responsibilities covering the direct marketing industry. Mr. Das served as an associate investment banker at Brenner Securities Corporation from July 1996 to January 1998. During 1996, he attended and completed a six week intensive executive program at Stanford University and earned a SEP diploma. Also in 1996, he attained the Series 7 professional license. He was an analyst in the M&A department at Smith Barney Inc. from 1993 to 1995. From 1995 to 1996, Mr. Das worked in the Corporate Strategic Planning department at PepsiCo, Inc., analyzing its international beverage portfolio. Mr. Das graduated with a bachelor of science degree in economics with a concentration in finance and multi-national management from The Wharton School of the University of Pennsylvania in 1993.[3]

Stormy L. Dean

Mr. Dean began employment with Info -- called ABI at the time -- in August 1995, and, except during the period from October 2003 to August 2004, Mr. Dean was

---

[3] Rajnish K. Das investigative testimony, June 9. 2009, pp. 19-27.

employed at Info or its predecessors until October 2009, when he was terminated. Mr. Dean served as CFO of the Company from January 1999 to August 1999, January 2000 through October 2003, and from February 2006 until he effectively became executive vice president/general manager of database group sales in December 2008. Mr. Dean, in his role as CFO, was responsible for Info's accounting function and financial statements, accuracy of financial reporting and internal controls. As CFO, Mr. Dean certified Info's first and second quarter financial statements for fiscal year 2003; each of its quarterly amended financial statements for 2005;[4] each of its quarterly financial statements for fiscal year 2006; and its year-end financial statements for fiscal years 2005 and 2006. As CFO, Dean signed Info's 2005 and 2006 Forms 10-K.

In addition to his time as CFO, Mr. Dean was effectively the principal accounting officer of the Company beginning in December 2005, immediately prior to formally resuming his role as CFO in February 2006. Prior to that, he served as vice president of corporate services from August 2004 to December 2005. He was also corporate controller from September 1998 until January 2000. Mr. Dean served as the Company's tax director from August 1995 to September 1998. Mr. Dean earned both his bachelor degree in accounting and masters of business administration from the University of Nebraska at Omaha. He passed the CPA in exam in 1995.[5]

---

[4] Info issued new certifications pursuant to Section 302 of the Sarbanes Oxley Act of 2002, to conform with required wording, for Info's quarterly financial statements for the quarters ended March 31, 2005, June 30, 2005, and September 30, 2005. Mr. Dean signed these Section 302 certifications on February 21, 2006. The new certifications were filed as amendments to the original quarterly filings on February 23, 2006.
[5] Investigative testimony of Stormy L. Dean, June 16, 2009, pp. 32-54, and 108.

2.    **Management's Responsibility for Financial Reporting**

Messrs. Das and Dean were part of Info's management.  As discussed in section

1, each held the role of principal financial officer during their tenure at Info.  As found in

GAAP literature in Statements of Financial Accounting Standards (SFAS) No.57, *Related*

*Party Disclosures*, paragraph 24, management is defined as follows: [1]

> Management.  Persons who are responsible for achieving the objectives of
> the enterprise and who have the authority to establish policies and make
> decisions by which those objectives are to be pursued.  Management
> normally includes members of the board of directors, the chief executive
> officer, chief operating officer, vice presidents in charge of principal
> business functions (such as sales, administration, or finance), and other
> persons who perform similar policymaking functions.  Persons without
> formal titles also may be members of management.

GAAS explains that management is responsible for financial reporting.  AU

Section 110, *Responsibilities and Functions of the Independent Auditor* states:

> The financial statements are management's responsibility. The auditor's
> responsibility is to express an opinion on the financial statements.
> Management is responsible for adopting sound accounting policies and for
> establishing and maintaining internal control that will, among other things,
> initiate, authorize, record, process, and report transactions (as well as
> events and conditions) consistent with management's assertions embodied
> in the financial statements. The entity's transactions and the related assets,
> liabilities, and equity are within the direct knowledge and control of
> management. The auditor's knowledge of these matters and internal
> control is limited to that acquired through the audit. Thus, the fair
> presentation of financial statements in conformity with generally accepted
> accounting principles is an implicit and integral part of management's
> responsibility. (para. .03; footnote omitted)

Commentary on the role of auditor and management contained in an authoritative

SEC reference book is consistent:

> It is true that the independent accountant often recommends changes in, or
> assists in drafting, the statements and footnotes and may actually in the
> first instance physically prepare them.  It is, however, the management's

---

[1] SFASs are issued by The Financial Accounting Standards Board (FASB) and are the primary source of
GAAP.

responsibility to accept them as its own or revise them to state the facts in conformity with its own views and responsibilities.[2]

Similarly, the SEC states in Accounting Series Release No. 62:

> Financial statements filed for the registrant and its subsidiaries have been recognized by this Commission and by public accountants generally as representations of management upon whom rests the primary responsibility for their propriety and accuracy.[3]

Finally, AU Section 711, *Filings Under Federal Securities Statutes,* paragraph 01,

indicates that the SEC has stated:

> The fundamental and primary responsibility for the accuracy of information filed with the Commission and disseminated among the investors rests upon management. Management does not discharge its obligations in this respect by the employment of independent public accountants, however reputable. Accountants' certificates are required not as a substitute for managements' accounting of its stewardship, but as a check upon the accounting.[4]

Certification of Forms 10-K and Forms 10-Q

The Sarbanes Oxley Act of 2002 (SOX), enacted "to protect investors by

improving the accuracy and reliability of corporate disclosures made pursuant to the

securities laws, and for other purposes," requires the principal executive officer or

officers and the principal financial officer or officers of a company to certify to specific

responsibilities over financial reporting, disclosures, and internal control over financial

reporting.  SOX makes it clear that the principal officers (namely, the CEO and CFO) are

responsible for the company's publicly filed information, so that end users, who rely on

such information for decision making purposes, can have a higher level of comfort based

on the fact that the principal officers of the company were taking "ownership" of the

---

[2] Accountants SEC Practice Manual, H.L. Kellogg, CPA and M. Poloway, CPA, Commerce Clearing House, Inc., Chicago, Ill, 1971, Para. 2101, p. 181.
[3] Accountants SEC Practice Manual, H.L. Kellogg, CPA and M. Poloway, CPA, Commerce Clearing House, Inc., Chicago, Ill, 1971, Para. 2101, p. 181.
[4] 4 S.E.C. 721 (1939).

financial information. Three SOX-required certifications are particularly relevant to this report.

   1.     Title III - Corporate Responsibility - Section 302, *Corporate Responsibility for Financial Reports*, requires principle officers to certify, in both the company's Forms 10-Q and Forms 10-K, that they are responsible for disclosure controls and procedures and have evaluated and reported on such controls and procedures. SOX Section 302 became effective 30 days after the July 30, 2002, enactment of SOX. Info was required to comply with this certification beginning in its September 30, 2002 quarterly filing.

   The SEC has developed detailed rules for implementing Section 302:

> For purposes of the new rules, "disclosure controls and procedures" are defined as controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports filed or submitted by it under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms. "Disclosure controls and procedures" include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in its Exchange Act reports is accumulated and communicated to the issuer's management, including its principal executive and financial officers, as appropriate to allow timely decisions regarding required disclosure.[5] (Footnotes omitted)

   2.     Title IX - White Collar Crime Penalty Enhancements - Section 906, *Corporate Responsibility for Financial Reports*, requires that the principle officers certify, in both the company's Forms 10-Q and Forms 10-K, that the financial statements comply with applicable securities laws and fairly present the financial condition and

---

[5] SEC August 29, 2002 Release No. 33-8124 Certification of Disclosure in Companies' Quarterly and Annual Reports; see also SEC Release No. 33-8238, Final Rule: Management's Report on Internal Control Over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports, August 14, 2002.

results of operations of the company.  SOX Section 906 became effective on the day

SOX was enacted, July 30, 2002.

3.     Title IV - Enhanced Financial Disclosures - Section 404, *Management*

*Assessment of Internal Controls*, is only completed for the annual Form 10-K. Public

companies, whose fiscal year ended on or after November 15, 2004, were required to

report on management's assessment of its control over financial reporting in their Forms

10-K, near the section on management's discussion and analysis or immediately

preceding the financial statements. The report must include a statement that management

is responsible for establishing and maintaining an adequate internal control structure and

procedures for financial reporting. It also must contain an assessment of the effectiveness

of the internal control structure and procedures of the issuer for financial reporting for the

past fiscal year.

For example, Info's 2006 Form 10-K contained the following:

> **Management's Report on Internal Control over Financial Reporting**
>  Management...is responsible for establishing and maintaining "adequate
> internal control over financial reporting" for the Company as such term is
> defined in Exchange Act Rule 13a-15(f).
>
> Our management, including the Chief Executive Officer and Chief
> Financial Officer, has conducted an evaluation of the effectiveness of our
> internal control over financial reporting as of December 31, 2006, based
> on the criteria for effective internal control described in "Internal
> Control — Integrated Framework" issued by the Committee of Sponsoring
> Organizations of the Treadway Commission [COSO]. Based on its
> assessment, management concluded that our internal control over financial
> reporting was effective as of December 31, 2006.
>
>                      *     *     *
>
> **Evaluation of Disclosure Controls and Procedures**
>
> As of the end of the period covered by this report, we carried out an
> evaluation, under the supervision and with the participation of our

management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in the Exchange Act.
(P. 38)

The SEC staff issued a *Statement on Management's Report on Internal Control Over Financial Reporting*, on May 16, 2005, relating to Section 404 certification:

### B. The Purpose of Internal Control Over Financial Reporting

An overall purpose of internal control over financial reporting is to foster the preparation of reliable financial statements. Reliable financial statements must be materially accurate. Therefore, a central purpose of the assessment of internal control over financial reporting is to identify material weaknesses that have, as indicated by their very definition, more than a remote likelihood of leading to a material misstatement in the financial statements. While identifying control deficiencies and significant deficiencies represents an important component of management's assessment, the overall focus of internal control reporting should be on those items that could result in material errors in the financial statements.

The Report issued by COSO states:

The importance of the role of the chief accounting officer in preventing and detecting fraudulent financial reporting was emphasized in the Treadway Commission report: "As a member of top management, the chief accounting officer helps set the tone of the organization's ethical conduct; is responsible for the financial statements; generally has primary responsibility for designing, implementing and monitoring the company's financial reporting system; and is in a unique position regarding identification of unusual situations caused by fraudulent financial reporting". The report noted that the chief financial officer or controller may perform functions of a chief accounting officer.[6]

SOX Section 404 is more comprehensive than SOX Section 302 in its requirements in that management must identify the framework used to evaluate the

---

[6] Integrated Control- Integrated Framework, Committee of Sponsoring Organizations of the Treadway Commission (COSO), two volume edition, 1994, p.85.

internal controls, report on whether or not the internal control system is effective as of year end, and disclose any material weaknesses in the system.[7]

Mr. Das certified to SOX Sections 302 and 906 for info's third quarter financial statement for fiscal year 2003; SOX Sections 302 and 906 for each of its quarterly financial statements for fiscal years 2004 and 2005; SOX Section 302 and 906 for its year-end financial statements for fiscal year 2003; and Sox Sections 302, 906 and 404 for its year-end financial statements for fiscal year 2004.

Mr. Dean certified SOX Sections 906 for Info's first quarter financial statements for fiscal year 2003; SOX Sections 302 and 906 for Info's second quarter financial statements for fiscal year 2003; SOX Sections 302 for each of its quarterly amended financial statements for 2005;[8] SOX Sections 302 and 906 for each of its quarterly financial statements for fiscal year 2006; and SOX Sections 302, 906 and 404 for its year-end financial statements for fiscal years 2005 and 2006.

Each had an obligation to ensure that each statement that they certified was true and accurate. As will be discussed further in this report, that was not the case.

Required Reporting by the SEC

Public companies are required by the SEC to adhere to, among other things, rules and regulations regarding financial and non-financial reporting and disclosures and proxy solicitations. These rules are set forth in The Securities Act of 1933 and Securities Exchange Act of 1934 and regulations promulgated thereunder.  As a public company,

---

[7] See SEC Release No. 33-8238 Final Rule: Management's Report on Internal Control Over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports, June 5, 2003.
[8] Info issued new Section 302 certifications for Info's quarterly financial statements for the quarters ended March 31, 2005, June 30, 2005 and September 30, 2005. Mr. Dean signed these Section 302 certifications on February 21, 2006. The new certification was filed as an amendment to the original quarterly filing on February 23, 2006.

Info and its management had significant financial reporting obligations.  The National

Commission on Fraudulent Financial Reporting has stated:

> [W]hen a company raises funds from the public, that company
> assumes an obligation of public trust and a commensurate level of
> accountability to the public. . . . One of the most fundamental
> obligations of the public company is the full and fair public
> disclosure of corporate information, including financial results.[9]

The regulations governing the relevant public disclosures include Regulation S-X,

Regulation S-K, and Regulation 14A.

Regulation S-X

Regulation S-X requires, among other things, that Info's financial statements be

prepared in accordance with GAAP.  Regulation S-X contains the financial statement

presentation and disclosure requirements for SEC filings. Rule 1-01 of Regulation S-X

states:

> This regulation (together with the Financial Reporting Releases) sets forth
> the form and content of and requirements for financial statements required
> to be filed as a part of:
>
> (1) Registration statements under the Securities Act of 1933, except as
> otherwise specifically provided in the forms which are to be used for
> registration under this Act;
> (2) Registration statements under Section 12, annual or other reports under
> Sections 13 and 15(d), and proxy and information statements under
> Section 14 of the Securities Exchange Act of 1934, except as otherwise
> specifically provided in the forms which are to be used for registration and
> reporting under these sections of this Act....

As a public company, Info was bound by this regulation. As such, Info was

required to file an annual report on Form 10-K.[10]  Under Regulation S-X, Info was

required to have its financial statements prepared in conformity with GAAP.  GAAP is

---

[9] *Report of the National Commission on Fraudulent Financial Reporting,* October 1987, p. 5.
[10] Section 13(a) of the Exchange Act and Rule 13a-1 require all issuers with securities registered under
Section 12 of the Exchange Act to file annual reports with the SEC on Form 10-K.

defined in AU Section 411, *The Meaning of Present Fairly in Conformity With Generally Accepted Accounting Principles,* paragraph .02:[11]

> The phrase "generally accepted accounting principles" is a technical accounting term that encompasses the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. It includes not only broad guidelines of general application, but also detailed practices and procedures. Those conventions, rules, and procedures provide a standard by which to measure financial presentations.[12]

Info was also required to have its annual financial statements be audited in accordance with GAAS by independent and qualified accountants. KPMG LLP was Info's auditors for the periods addressed in my report.  KPMG acknowledged that the financial statements were the responsibility of Info's management, stating in each of the Forms10-K for fiscal years 2003 through fiscal 2006:

> ...These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits... We conducted our audits in accordance with auditing standards generally accepted in the United States of America....[13]

Regulation S-K

Info was also required to abide by the regulations covering nonfinancial disclosure found in Regulation S-K. Commentary on the regulation states:

> Although the disclosures required by Regulation S-K typically are described as nonfinancial, a number of the disclosures are related to financial statements or accounting records, e.g., quarterly financial data,

---

[11] The primary source of generally accepted auditing standards (GAAS) is the AICPA Codification of Statements on Auditing Standards, which has sections with the prefix AU. All references to authoritative literature in this Expert Report are to the authoritative literature that was applicable during the time period addressed in my report.
[12] In addition, the SEC has the authority to specify additional accounting requirements for financial statements filed with it.
[13] Info Form 10-K for year ended December 31, 2003, p. 42.

executive compensation, the ratio of earnings to fixed charges, and the five-year selected financial data.[14]

Two specific Regulation S-K disclosures are relevant to the issues here and will be discussed further in this report. These are: Regulation 229.402, Item 402 (Reg. 402), *Executive Compensation*; and Regulation 229.404, Item 404 (Reg. 404), *Certain Relationships and Related Transactions.*

Regulation 14A

The Regulation 14A (Reg. 14A) covers the rules regarding the solicitation of proxies under the Exchange Act of 1934. A proxy statement is the document or documents that contain a solicitation for proxies. Rule14a-6, "Filing Requirements," note 2 states, "The official responsible for the preparation of the proxy material should make every effort to verify the accuracy and completeness of the information required by the applicable rules."

Among the many requirements of the proxy rules, Schedule 14(a) of Reg. 14A, requires the issuer to disclose information required by Reg. 402 and Reg. 404.[15] Info filed proxy statements with the SEC during fiscal years 2003 through 2006.

Management's Responsibility for Proxy Statements

Messrs. Das and Dean, as Info's CFO, had responsibility for ensuring that the proxy statements issued during their tenure were accurate and not false and misleading. As previously stated, Messrs. Das and Dean certified their responsibility regarding SOX Sections 302, 906 and 404 in Info's Forms 10-K and Forms 10-Q, from fiscal year 2003 through fiscal year 2006. Their certifications included any documents referenced in those

---

[14] Accounting Research Manager, SEC Practice\07. SEC Rules, Regulations and Releases
  Regulation S-K Background, Contents, RegS-K.B.Disclosures.
[15] *SEC Handbook, Rules and Forms for Financial Statements and Related Disclosures*, As of December 2000, Commerce Clearing House, Inc., Chicago, IL. Pages 40,133-40,133-3.

forms that contained required information, such as the proxy statements. Info's Forms
10-K from fiscal years 2003 through fiscal year 2006 each incorporated the annual proxy
statements for certain required information. An example of such a reference in Info's
2006 Form 10-K:

> **Item 11.    Executive Compensation**
> Incorporated by reference to the information under the captions "Board
> Compensation," "Executive Compensation," and "Certain Transactions"
> in our definitive proxy statement for the 2007 Annual Meeting of
> Stockholders. (p. 41)

*    *    *

> **Item 13.    Certain Relationships and Related Transactions**
> Incorporated by reference to the information under the captions "Certain
> Transactions" in our definitive proxy statement for the 2007 Annual
> Meeting of Stockholders.
>
> The required information regarding corporate governance is incorporated
> by reference to the information under the caption "Board Meetings and
> Committees" in our definitive proxy statement for the 2007 Annual
> Meeting of Stockholders. (p. 41)

<u>Management's Representations</u>

Auditors are required by GAAS to obtain, at the end of their examination, written
representations from management regarding the propriety of important information
received, both orally and written, during for the audit. AU Section 333, *Management
Representation*, paragraph .09 states:

> The letter should be signed by those members of management with overall
> responsibility for financial and operating matters whom the auditor
> believes are responsible for and knowledgeable about, directly or through
> others in the organization, the matters covered by the representations.
> Such members of management normally include the chief executive
> officer and chief financial officer or others 'with equivalent positions in the
> entity.

Management representation letters reinforce the fact that management is responsible for the overall accuracy of the financial statements, and are accountable for its representations on which the auditors rely. Indeed, Info's auditors did rely upon the management representation letters. Alexi Wellman, KPMG audit partner for Info's 2004 through 2006 fiscal years, stated:

> Q  And what's the purpose of KPMG getting this
> representation letter from infoUSA?
> A  As part of our procedures, audit procedures, are
> reliance on representations we get from management in various
> areas, and this is to obtain that written representation from
> management.
> Q  And if you'd look at the fourth page of the letter,
> KPMG-18386, and look at Item 13, 13(a) specifically.
> Is Item 13(a) the management representation with
> respect to related-party transactions that you testified
> earlier about that KPMG relied on?
> A  Yes, it is.[16]

The relevant auditing standards are clear that the auditors rely on management representations in connection with their related party transactions work. AU Section 333, paragraph .03 provides:

> The auditor obtains written representations from management to
> complement other auditing procedures. In many cases, the auditor applies
> auditing procedures specifically designed to obtain evidential matter
> concerning matters that also are the subject of written representations. For
> example, after the auditor performs the procedures prescribed in section
> 334, *Related Parties,* even if the results of those procedures indicate that
> transactions with related parties have been properly disclosed, the auditor
> should obtain a written representation to document that management has
> no knowledge of any such transactions that have not been properly
> disclosed.

This auditing standard also states that specific representations regarding a variety of critical issues should be obtained when the auditor has performed an examination of a company's financial statements. Some of these representations are:

---

[16] Wellman testimony, September 9, 2009, pp. 140-141.

- Management's acknowledgment of its responsibility for the fair presentation in the financial statements of financial position, results of operations, and cash flows in conformity with generally accepted accounting principles.
- Management's belief that the financial statements are fairly presented in conformity with generally accepted accounting principles....
- Availability of all financial records and related data...
- Absence of unrecorded transactions....
- Management's acknowledgment of its responsibility for the design and implementation of programs and controls to prevent and detect fraud....[17]

In addition to obtaining representations about the propriety of financial statement disclosures, it is common for auditors to seek representations about the completeness and preparedness of the financial statements in conformity with GAAP, and that the relevant financial information was made available to them, by management.

Mr. Das signed Info's management representation letters to KPMG for fiscal year 2003 through fiscal year 2005. Mr. Dean signed Info's management representation letters to KPMG for 2004 through 2006.[18]

<u>Limitation on the Auditor's Responsibility</u>

The role of the auditor, whether performing an examination (audit) of a company's annual financial statement, or performing a review of its quarterly financial statements, is quite different than the role of the management in preparing those financial statements.

The responsibilities of auditors and management are stated in the independent auditor's report:

---

[17] AU Section 333.06.
[18] See Ex. 548 for the 2003 and 2002 fiscal years; Ex. 405 for the 2004 and 2003 fiscal years; Ex. 249 for the 2005 and 2004 fiscal years; and Ex. 250 for the 2006 and 2005 fiscal years. *Note*: all Exhibits (Exs) cited this report refer to Investigative Exhibits.

> These consolidated financial statements and the financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedule based on our audits. …An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion. [19]

This is consistent with AU Section 316, *Consideration of Fraud in a Financial Statement Audit*, para. 04:

> The auditor's responsibility is to express an opinion on the financial statements…. The auditor's knowledge of these matters [transactions, assets and liabilities] is limited to that acquired through the audit.[20]

The auditing literature further points out that:

> Although this section focuses on the auditor's consideration of fraud in an audit of financial statements, it is management's responsibility to design and implement programs and controls to prevent, deter, and detect fraud. That responsibility is described in section AU110.03 which states: "Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, initiate, record, process and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements."

The financial statements on which the auditor is opining is listed in the body of the auditor's report. AU Section 551, *Reporting on Information Accompanying the Basic Financial Statements in Auditor-Submitted Documents*, paragraph .02 states:

> The auditor's standard report covers the basic financial statements: balance sheet, statement of income, statement of retained earnings or changes in stockholders' equity, and statement of cash flows. The following presentations are considered part of the basic financial statements: descriptions of accounting policies, notes to financial statements, and schedules and explanatory material that are identified as being part of the basic financial statements.

---

[19] Info Form 10-K for year ended December 31, 2006, p. 46.
[20] AU Section 110.03.

The SEC does not require the registrant's independent accountant to audit any of the financial information that is disclosed under Regulation S-K, including disclosures under Reg. 402 and Reg. 404.

GAAS requires an independent auditor to perform very limited procedures on other financial data included in documents that contain audited financial statements. These limited procedures are explained in AU Section 550, *Other Information in Documents Containing Audited Financial Statements*, paragraph .04:[21]

> Other information in a document may be relevant to an audit performed by an independent auditor or to the continuing propriety of his report. The auditor's responsibility with respect to information in a document does not extend beyond the financial information identified in his report, and the auditor has no obligation to perform any procedures to corroborate other information contained in a document. However, he should read the other information and consider whether such information, or the manner of its presentation, is materially inconsistent with information, or the manner of its presentation, appearing in the financial statements. (Footnote omitted)

KPMG's audit report and the audited financial statements were included in each of Info's Forms 10-K. According to GAAS, KPMG was only required to <u>read</u> the information contained in the Form 10-K and note if there were any material difference from the financial statements on which they have opined. GAAS would have also required KPMG to only have read the proxy statements for which required disclosure, such as Regulation S-K's Items 402 and 404, was referenced in Info's Forms 10-K for

---

[21] This section is applicable only to other information contained in (*a*) annual reports to holders of securities or beneficial interests, annual reports of organizations for charitable or philanthropic purposes distributed to the public, and annual reports filed with regulatory authorities under the Securities Exchange Act of 1934 or (*b*) other documents to which the auditor, at the client's request, devotes attention." (para. 03).

fiscal years ended 2003 though 2006.  KPMG had no obligation to audit Info's proxy statement.

Auditor's Role in SOX Section 404

Section 404(b) of SOX states that the Form 10-K must contain a report issued by its auditor attesting to adequacy of the company's internal controls over financial reporting:

> [T]he audit report for the issuer shall attest to, and report on, the assessment made by the management of the issuer. An attestation made under this subsection shall be made in accordance with standards for attestation engagements issued or adopted by the Board. Any such attestation shall not be the subject of a separate engagement.[22]

Accordingly, starting in fiscal year 2004, Info was required to have its auditor attest to management's assessment of the effectiveness of the Company's internal control over financial reporting, including a statement as to whether the Company's internal control over financial reporting was effective.

However, the auditor's review of internal controls also relies heavily upon the Company's management.  The Public Company Accounting Oversight Board (PCAOB) Auditing Standard No. 2, *An Audit of Internal Control Over Financial Reporting Performed in Conjunction With an Audit of Financial Statements*, states:[23]

### Management's Responsibilities in an Audit of Internal Control Over Financial Reporting

20.    For the auditor to satisfactorily complete an audit of internal control over financial reporting, management must do the following:

---

[22] The AICPA defines an attestation engagement in one for which the auditor expresses a conclusion about the reliability of a written assertion that is the responsibility of another.

[23] The PCAOB was created by the Sarbanes Oxley Act of 2002 and is the regulator of auditors of public companies.

a. <u>Accept responsibility</u> for the effectiveness of the company's internal control over financial reporting;

b. Evaluate the effectiveness of the company's internal control over financial reporting using suitable control criteria;

c. Support its evaluation with sufficient evidence, including documentation; and

d. Present a written assessment of the effectiveness of the company's internal control over financial reporting as of the end of the company's most recent fiscal year. (Emphasis added; footnote omitted)

3.   **Understatement and Improper Disclosure of Perquisites**

From 2003 through 2006, Info's CEO, Vinod Gupta, received a significant number of perquisites and other personal benefits from the Company.

Regulations set forth by the SEC required Info to report the "perquisites and personal benefits" received by Mr. Gupta as additional compensation in its annual proxy statements and Forms 10-K filed with the SEC.[1]  Although Messrs. Das and Dean were aware of these various perquisites and personal benefits afforded to Mr. Gupta, each failed to ensure that the proper disclosures were made, making Info's public disclosures in each of those filings from 2003 through 2006 false and misleading.

What is a Perquisite?

Throughout the relevant period, SEC regulations clearly require the disclosure of perquisites and other personal benefits as part of executive compensation.[2] The SEC has declined to provide an explicit definition of "perquisites or other personal benefits," noting that any such definition would become outdated.[3]  Nonetheless, companies required to make such disclosures have developed standard ways of reporting such compensation, particularly with regard to the straight-forward categories of compensation at issue in this case.  Based on my experience with regard to executive compensation disclosure as a member of the NASDAQ Listing Qualifications Panel, as an academic fellow in the Office of the Chief Accountant at the SEC, and in a consulting role with

---

[1] Reg. 402

[2] SEC Release No. 33-6962, *Executive Compensation Disclosure*, (October 16, 1992) and SEC Release No. 33–8732A, *Executive Compensation and Related Person Disclosure*, (Aug. 29, 2006) [71 FR 53158]. These revisions were adopted on November 7, 2006 for Forms 8-K for triggering events that occur on or after November 7, 2006 and in Forms 10-K for fiscal years ending on or after December 15, 2006.

[3] Release Nos. 33-8732A, Executive Compensation and Related Person Disclosure, p. 73

3-1

public companies, I understand the types of expenses that are widely considered to constitute perquisite compensation.

Consistent with my understanding of the disclosure requirements, Info's own "Proxy and 10-K Questionnaire," which was distributed to the executive officers and directors of the Company each year, provides examples of personal benefits that would require reporting:

> [Such [personal] benefits, commonly referred to as "perks" would include a <u>company car</u> furnished to you that is used for personal purposes (including commuting), reimbursement of <u>club dues</u> (please indicate the name of the club, the amount reimbursed or paid by *info*USA and the percentage of club use attributable to business purposes), <u>housing and other living expenses</u>, personal <u>travel expenses</u> (including expenses for your spouse or members of your family), personal <u>legal, accounting, tax or medical advice or treatment</u>, special <u>life, health or medical reimbursement plans</u> not generally available to all salaried employees, special <u>bank accommodations</u> received because of Info activities, and the <u>use of *info*USA personnel</u> for personal purposes (such as for gardening, domestic services or maintenance of personal assets)....][4]

Further comments from Alan L. Beller, Director in the SEC's Division of Corporation Finance, in his October 20, 2004 speech outlined the principles behind identifying perquisites:

> We also fear that some companies are being overly creative when categorizing other items. <u>I'd suggest that a perk, by any other name, is still a perk,</u> and therefore must be considered for disclosure. When companies review their disclosure, they should give serious consideration to items that have previously been called business expenses (e.g. housing, security systems, cars etc.) but actually are perks. I don't think it is very difficult to determine whether or not something is a perk. <u>One question to ask that is not dispositive but may be useful is whether it is an expense that is available to employees generally on a non-discretionary basis, like</u>

---

[4] See Gupta's D&O Questionnaire for fiscal year 2003, Ex. 511 at InfoUSA 001442 – 43. It appears that Mr. Gupta's response to the question regarding perquisites was "See attached," yet there appears to be no attachment.

> reimbursement for the taxi across town for a meeting, or whether it
> is a benefit for which only a chosen few are eligible (or selected on
> a discretionary basis).[5]  (Emphasis added)

The Company's own documents and the examples of disclosures made by other

companies provide a clear outline of the expenditures requiring disclosure.  Considering

all of the guidance and acceptable practices, it is clear that the personal use of assets for

which Info reimbursed Mr. Gupta would require disclosure, as would the reimbursement

of personal expenditures not directly benefiting the Company.

On November 7, 2006 the SEC adopted amendments to Reg. 402.  With these

amendments the SEC did not modify what constitutes "perquisites or other personal

benefits," but provided additional guidance regarding factors that should be considered in

determining whether an item is a perquisite or other personal benefit:

- An item is not a perquisite or personal benefit if it is integrally
  and directly related to the performance of the executive's
  duties.
- Otherwise, an item is a perquisite or personal benefit if it
  confers a direct or indirect benefit that has a personal aspect,
  without regard to whether it may be provided for some
  business reason or for the convenience of the company, unless
  it is generally available on a non-discriminatory basis to all
  employees.[6]

This additional guidance from the SEC on what constitutes a "perquisite" was meant to

be consistent with the requirements prior to 2006[7] and, accordingly, it is appropriate to

---

[5] Beller, Alan L. "Speech by SEC Staff: Remarks Before Conference of the NASPP, The Corporate
Counsel and the Corporate Executive." San Francisco, CA. October 20, 2004.
[6] SEC 17 CFR PARTS 228, 229, 232, 239, 240, 245, 249 AND 274 [Release Nos. 33-8732A; 34-54302A;
IC-27444A; File No. S7-03-06] RIN 3235-AI80 Executive Compensation and Related Person Disclosure,
pp. 73-74.
[7] SEC Release 33-8732A, Executive Compensation and Related Person Disclosure, p.11.

rely on this guidance for the analysis of Mr. Gupta's perquisites for all of 2003 through 2006.

It may sometimes be difficult to determine whether certain types of payments made to or on behalf of an executive constitute perquisite compensation requiring disclosure. However, none of the payments at issue here – personal use of private aircraft and a yacht, country club memberships, among others – provide such difficulty. The reimbursements to Mr. Gupta and the payments Info made on his behalf that are discussed herein were widely understood at the time to constitute perquisite compensation that required disclosure by Info as executive compensation.

Required SEC Regulation Disclosure

The SEC requires that "clear, concise, and understandable" disclosures regarding executive compensation to be reported within a company's annual report on Form 10-K.[8] While the particularities of the SEC's disclosure requirements were expanded in 2006, the overall requirements remain fundamentally the same. Reg. 402 specifies the inclusion of all compensation awarded to, earned by, or paid to executive officers and directors by any person in exchange for services rendered to the company and its subsidiaries.

Prior to 2006, the SEC indicated that perquisites and other personal benefits fell within the category of "other compensation" and required separate disclosure and explanation "unless the aggregate amount of such compensation is the lesser of either $50,000 or 10% of the total annual salary and bonus reported for the named executive

---

[8] Reg. 402(a)(2).