officer."[9]  A description was only required when the value of one of these additional

compensation items exceeded 25% of the total perquisites and other personal benefits.[10]

The SEC then revised Reg. 402 in 2006 by lowering the threshold for reporting

perquisites and other personal benefits to $10,000, requiring the identification of each

item type and a footnote or narrative disclosure, for those items whose value exceeds the

greater of $25,000 or 10% of the total perquisites and other personal benefits.[11]

The SEC's amendments to Regulation S-K also changed the interplay between

Item 402 on executive compensation and Item 404, which discusses the disclosure of

related party transactions.  Prior to November 2006, Reg. 402(a)(5) allowed the exclusion

of certain related party transactions from the executive compensation disclosures if those

items were discussed within the related party disclosures:

> *Transactions With Third Parties Reported under Item 404.*  This
> item <u>includes transactions between the registrant and a third party</u>
> <u>where the primary purpose of the transaction is to furnish</u>
> <u>compensation to a named executive officer.</u>  No information
> need[s] to [be] given in response to any paragraph of this item,
> other than paragraph (j), as to any such third – party transaction if
> the transaction has been reported in response to Item 404 of
> Regulation S-K (§229.404). (Emphasis added)

Therefore, if the transaction was properly disclosed according to Reg. 404, Info

had the option to include or not include disclosures of transactions with third parties if the

primary purpose of that transaction was to furnish compensation to a named officer.

However, if the relationship with the third party was not primarily for the purpose of

---

[9] Prior to the revisions to SEC Regulation S-K in 2006, this requirement was set forth in Reg.
402(b)(2)(iii)(C)(1); see also SEC Release No. 33-6962, *Executive Compensation Disclosure*, (October 16,
1992).
[10] Prior to the revisions to SEC Regulation S-K in 2006, this requirement was set forth in the Instructions to
Item 402(b)(2)(iii)(C).
[11] SEC Release No. 33–8732A, *Executive Compensation and Related Person Disclosure*, (Aug. 29, 2006)
[71 FR 53158]. These revisions were adopted on November 7, 2006 for Forms 8-K for triggering events
that occur on or after November 7, 2006 and in Forms 10-K for fiscal years ending on or after December
15, 2006.  See also Info 001442 – 43.

issuing compensation to that individual, there would be no option available and disclosure would have been required in accordance with Reg. 402.

However, the amended Reg. 402 no longer permits this exclusion from the executive compensation disclosures:

> **7. Interplay of Items 402 and 404**
> We are amending Item 402 so that it <u>requires disclosure of all transactions between the company and a third party where the primary purpose of the transaction is to furnish compensation to a named executive officer</u> as proposed. Also as proposed, amended Item 402 will no longer exclude from its disclosure requirements information about compensatory transaction that had been disclosed under the related person transaction disclosure requirements of Item 404.[12]  (Emphasis added; footnote omitted)

In addition, both before and after the amendments, the regulation required perquisites and other personal benefits to be valued based on the aggregate incremental cost to the company.

<u>Info's Amendments to its Executive Compensation Disclosures</u>

During the investigation by Info's Special Litigation Committee, as well as during the subsequent SEC investigation, Info identified numerous categories of perquisites and other personal benefits that Mr. Gupta received during his tenure as CEO of the Company. These included the following:

- Personal use of private aircraft.

- Maintenance and personal use of a yacht.

- Reimbursement for personal credit card charges.

- Multiple country club memberships.

- Personal use of multiple automobiles.

---

[12] Release No. 33–8732A, *Executive Compensation and Related Person Disclosure*, p. 120.

- Expenses related to Mr. Gupta's personal residences.

- The premium on three different life insurance policies.

- Use of Company office space for administration of personal affairs.

- Salaries for employees of Mr. Gupta.

Info's Special Litigation Committee directed a detailed review of the Company's payments in each expense category to determine the value of the personal benefits received by Mr. Gupta. It was the results of these analyses that were ultimately reported in Info's 2007 Form 10K/A filed with the SEC on March 16, 2009, which amended the Company's disclosure on executive compensation. The Company further amended its executive compensation disclosures on November 3, 2009 as Amendment No. 2 to its 2008 Form 10-K, and then again on December 1, 2009 in Amendment No. 3 to its 2008 Form 10-K.

Methodology for Reviewing Mr. Gupta's Perquisite Compensation

I reviewed the Company's methodology and the assumptions they made in accumulating the value of perquisites and personal benefits provided to Mr. Gupta from 2003 through 2006. Where I found the Company's methodology appropriate, I did sample testing of their work – a standard procedure for auditors – and relied upon their conclusions. Where I found their assumptions to be incorrect, I adjusted their analysis accordingly. Based on the applicable SEC regulations and my experience with regard to executive compensation disclosure as a member of the NASDAQ Listing Qualifications Panel, as an academic fellow in the Office of the Chief Accountant at the SEC, and in a consulting role with public companies, there are certain questions that aid in determining

whether a reimbursement made to Mr. Gupta directly, or an expense paid on his behalf, was a perquisite. These questions include:

1. Was this expense directly and integrally related to the performance of Mr. Gupta duties as an executive officer? If it was, then the item would not be considered a perquisite.

2. Did the item confer a direct or indirect personal benefit to Mr. Gupta? If not, then the item would not be considered a perquisite.

3. Was the item available to all employees on a non-discriminatory basis? If it was, then the item would not be considered a perquisite.

In its 2006 amendments to Reg. 402, the SEC also provides additional guidance on what constitutes a perquisite, including a non-exhaustive list of examples of items requiring disclosure as perquisites or other personal benefits,[13] many of which were also identified in Info's 2003 "Proxy and 10-K Questionnaire":[14]

- Club memberships not used exclusively for business entertainment purposes.
- Personal financial or tax advice.
- Personal travel using vehicles owned or leased by the company.
- Personal travel otherwise financed by the company.
- Personal use of other property owned or leased by the company
- Housing and other living expenses (including payments for the executive or director to stay at his or her personal residence).

---

[13] SEC Release No. 33-8732A, p. 77.
[14] *See* Investigative Ex. 511.

As noted above, I understand these 2006 amendments to reflect a codification of the existing practices. Accordingly, I considered this guidance for the disclosures made both before and after 2006.

I evaluated whether the methodology used by the Company as a result of its internal and SEC investigations was reasonable. As part of that evaluation, I primarily considered the source documents used by the Company and determined the reasonableness of any assumptions made, as described herein. In certain instances I determined it appropriate to make adjustments to the Company's conclusions, and I have provided an explanation of those adjustments herein, as well as an outline of my calculations and the sources in Appendix A.

Private Aircraft Travel

During his tenure as CEO, Mr. Gupta made regular use of private aircrafts to travel, both for Info business as well as for personal excursions. Clearly, to the extent that Mr. Gupta used the private aircraft to make personal trips, the expenses were not integrally related to his work and therefore represented a personal benefit. Moreover, access to private aircraft is not a benefit available to all Info employees, and the identification of private aircraft usage as a perquisite to the CEO is a widely accepted practice. Indeed, an April 2005 article in *USA Today* discussed the extensive perquisites enjoyed by CEOs of public companies, particularly the personal use of company aircraft. The article discusses the disclosures that have been made in the SEC filings of JP Morgan Chase, Tyson Foods, and Duke Energy, among others, noting that each company disclosed that its CEO has the benefit of the personal use of the company's private

aircraft.[15] Info's own "Proxy and 10-K Questionnaire" specifically identified "personal travel expenses" as a perquisite.[16] This is also in line with the SEC's 2006 amendments to Reg. 402, which specifically identify "personal travel using vehicles owned or leased by the company" as a perquisite requiring disclosure.[17]

Based on the guidance discussed above, my experience, and disclosures made by other companies for related compensation, I determined that Mr. Gupta's personal travel on private aircrafts constituted perquisite compensation.

As an initial matter, there can be no dispute that use of these private jets was limited to certain individuals within Info. Indeed, Mr. Das testified:

> Q: … Who could use the jets?
>
> A: To the best of my knowledge, there were only a handful of senior executives at the company that were entitled to reserve a jet for business purposes. I do not remember exactly who all they were. It was under ten people at the very senior level. That did not mean that if one of these individuals were making a trip that other junior members of the team could not join them for that meeting.
>
> \*   \*   \*
>
> Q: Were there any policies and procedures in place concerning the use of aircraft during your tenure as CFO? I mean use of corporate aircraft.
>
> A: I do not remember any policy or procedure that I was made aware of by my staff. … I think my general understanding was that, as you have alluded, that Mr. Gupta had pretty direct authority in terms of determining who of his senior staff, even if they were authorized – he would make that determination in terms of who was using it and if it was for a legitimate business purpose or not. I am not saying that he necessarily denied it. He wanted to make sure the corporate jet was not misused or abused by anyone at the company.[18]

---

[15] Strauss, Gary. "The corporate jet: Necessity or ultimate executive toy?" *USA Today*. April 27, 2005. http://www.usatoday.com/money/companies/management/2005-04-26-corp-jets-cover_x.htm.
[16] See Ex.511 at InfoUSA 001442 – 43.
[17] SEC Release No. 33-8732A, p.77
[18] See Das June 9, 2009 testimony, p.96-98.

The travel identified here as perquisites was personal in nature.  For example, Mr. Gupta and Laurel Gottesman used the private aircraft for a flight from Omaha to Las Vegas the weekend of August 15, 2003, during which excursion they were married.  Mr. Gupta indicated on the invoice submitted to Info that the $51,250 trip was related to business development, and he testified that was the purpose of his cousin accompanying them on the trip.[19]

In another instance, Mr. Gupta, his son Alex, and Brad Roselle used the private aircraft to fly from Omaha to Aspen for a weekend in February 2003.  Mr. Gupta testified that Mr. Roselle was his former ski instructor that he had hired at Info.  Given that there were no business meetings on Mr. Gupta's calendar for that weekend, this appears to be a strictly personal excursion.  However, Mr. Gupta authorized Info to pay $8,460 for this trip, indicating that it was related to business development.[20]  Mr. Dean did not challenge either of these payments or require them to be disclosed as compensation to Mr. Gupta.

<u>Payment for Use of Annapurna Private Aircraft</u>

From 2003 through 2005, Mr. Gupta utilized three aircraft in which Annapurna Corporation (Annapurna), an entity wholly owned by Mr. Gupta, owned a fractional interest and one aircraft in which Everest Investment Management, LLC (EIM), a company 40% owned by Mr. Gupta, owned a fractional interest.[21]  Each of the four different aircraft were managed and operated by NetJets.

---

[19] See Ex. 581 at IG_ER006680 – 85.  It is noteworthy that Mr. Dean approved the payment of this invoice related to Mr. Gupta's wedding travel.  See also Gupta September 15, 2009 testimony, p.364-366.
[20] See Ex. 582 at IG_ER006062 – 64.  Mr. Dean also approved payment of this invoice related to Mr. Gupta's weekend excursion in Aspen.  See also Gupta September 15, 2009 testimony, p.366-369.
[21] See Ex. 402, p.64

3-11

For each aircraft ownership interest purchased from NetJets, Annapurna and EIM would pay an initial one-time purchase amount for their ownership interest, which was 12.5% for each aircraft. The charges thereafter would consist of monthly maintenance charges; hourly flight charges; variable fuel charges; taxes, fees and war risk insurance; and ground transportation, catering charges, and overnight crew costs, if any.[22] Annapurna would receive invoices or flight documentation from NetJets after Mr. Gupta utilized its services, and those invoices would be forwarded to Info for payment.[23]

At some point, Mr. Gupta made the decision to charge Info an additional charge above the costs billed by NetJets.[24] This additional charge purportedly covered the cost of depreciation, Annapurna's initial cost to buy the 12.5% interest in the planes, and a mark-up.[25] There appears to have been no written agreement between Info and Annapurna regarding these billing rates.[26] Annapurna would then request Info to pay the incremental flight costs directly to NetJets, and then pay the additional charges to Annapurna.[27]

Annapurna's fractional ownership interests in two of the aircraft and EIM's fractional ownership interest in another aircraft were eventually sold to Info. Thereafter, NetJets billed Info directly for the monthly management fees associated with its

---

[22] Each NetJets contract allotted Annapurna a certain number of flight hours each year. When the allotment for the year had been exceeded, NetJets charged an hourly flight usage rate, as well as a fuel surcharge, taxes and fees associated with the flight. See Mr. Gupta's testimony, September 15, 2009, pp. 331-332. See also investigative testimony of Paul Nietzel (accountant with Info from December 2002-December 2004), March 30, 2009, pp. 142-143, 152-153.

[23] All payments made by Info for use of the aircrafts, including the aircraft owned by EIM, were directed to either Annapurna or NetJets. There were no payments made to EIM.

[24] Dean testimony, June 18, 2009, pp. 445-448; see also Ex. 564; Gupta testimony, September 15, 2009, pp.332-333.

[25] See Nietzel testimony, March 30, 2009, pp. 142-143, and 165-166; investigative testimony of Steven Frye (KPMG audit partner for Info's annual 2003 audit), August 26, 2009, pp.143-144; Dean testimony, June 18, 2009, p. 445; investigative testimony of Alexi Wellman (KPMG audit partner), September 9, 2009, pp.76-77; and Exs. 56, 195 and 314.

[26] See Nietzel testimony, March 30, 2009, p.160

[27] See Exs. 56 and 314; see also PA-0000048 – 50, at 49.

ownership interests, as well as the incremental flight costs discussed above. However, Mr. Gupta continued to use the private aircrafts for his personal travel needs.

### Info's Methodology for Determining Perquisite Amounts for Air Travel

. In order to identify the population of transactions related to the use of private aircrafts, Info generated an accounts payable report for all noncommercial flight vendors, including payments made to Annapurna and to NetJets, as discussed supra, as well as other smaller flight vendors. Info then obtained and reviewed the supporting documentation for each transaction by comparing the details therein, including notations as to the business purpose of the travel, where available, to Mr. Gupta's calendar and travel itineraries.[28] The process followed by the Company in its classification of Mr. Gupta's expenses is memorialized as follows:

> … the Company allocated each expense as either a perquisite to Vinod Gupta, a nonperquisite to Vinod Gupta, or unknown, based upon (1) its review of relevant entries in Vinod Gupta's Microsoft Outlook calendar and travel itineraries; (2) personal knowledge of the Company, its facilities, personnel, and business relationships; and (3) its review of available source documentation—including invoices from flight and credit card vendors, flight authorization forms, receipts, summary schedules allocating credit card charges for payment, handwritten notations, and any other documentation included as support of selected expenses. …

> Certain expenses, predominantly incurred on behalf of individuals other than Vinod Gupta, were allocated as unknown where a review of the expense and associated documentation did not provide an adequate basis on which to determine whether the expense involved entertainment of representatives of actual or prospective customers or vendors of the Company or of personal friends of Vinod Gupta.[29]

---

[28] See IG_ER013350
[29] See IG_ER013350

Based on Mr. Gupta's own testimony, the Company's reliance upon his calendar

is reasonable:[30]

> Q: Was the Outlook calendar kind of the best mechanism by
> which to document your meetings and where you needed to be
> during the 2002-2003 time period?

> A: You know, this was one of the way; it may not have
> everything, or a meeting would be canceled but may still be on
> here. I just don't want you to think that this is absolute gospel
> here.

> Q: Sure, but this is the mechanism by which you and others
> understood what your appointments would be during the year.
> Is that right?

> A: Yeah. This was what I call the basis for my appointments and
> everything.

> Q: Okay. And is the Outlook calendar the basis for your
> appointments during 2004 to -5, -6, and 2007 as well as 2008?
> Is that fair, for that entire time period?

> A: Yeah.

The initial detailed review of each transaction was performed by Michael

Dwornicki, former director of Info's internal audit department from July 2005 into

2007.[31] He determined whether each expense would be best classified as a business

expense or as a perquisite. In performing this task, he was advised to adhere to the

following general guidelines:

- To determine whether the use of Company aircraft was
  integrally and directly related to the performance of Mr.
  Gupta's duties, the Company should determine, with respect to
  each flight on the Company aircraft by Mr. Gupta or one of his

---

[30] See Gupta September 15, 2009 testimony, p.360-361

[31] Prior to joining Info, Mr. Dwornicki had 18 years experience as an internal auditor, including more than
10 years with Berkshire Hathaway, during which time he reviewed internal control processes as well as
expense reimbursements to executive officers. Given his experience and his working knowledge of the
Company, he is an appropriate person to conduct Info's detailed transaction review. See Dwornicki
testimony, pp.12-18. I obtained an understanding of the procedures Mr. Dwornicki followed and the
assumptions he made based on the memorandums he prepared, and then subsequently confirmed with him.
My staff, who assisted me in the preparation of this report, subsequently confirmed with him my
understanding of Info's overall approach.

guests, whether the "primary purpose" of such flight was business or personal in nature. Making this determination would require an examination of all surrounding circumstances. For example, it may involve an examination of whether a flight was made to a destination primarily for vacation or other non-business purposes, and whether any ostensible business purpose was an ancillary consideration rather than the primary reason for the trip.

- If the Company determines that the "primary purpose" of a flight was non-business in nature, the Company should deem the entire cost of such flight to be a perquisite to Mr. Gupta.[32]

During his review, Mr. Dwornicki considered each leg of a flight separately to determine whether the purpose of that leg was primarily for business or personal in nature. In this way, he allocated the costs associated with individual invoices.

Mr. Dwornicki also encountered several flights which were sufficiently documented to be business related, but on which Mr. Gupta was accompanied by family members or other personal guests. In these instances, Mr. Dwornicki determined that the incremental costs to Info for these individuals to travel with Mr. Gupta were de minimis. As such, the Company did not calculate these incremental costs when evaluating an expense as business or personal. Also, if Gupta or his family member was not present on the flight, then it was not considered a perquisite to him. However, if a family member was flying it was assumed to be a perquisite unless there was supporting documentation to evidence the business purpose. In addition, certain disbursements did not have the necessary supporting documentation to allow Mr. Dwornicki to make a judgment about the business or personal nature of the expenses. For these expenditures, the related

---

[32] The memo outlining these criteria was prepared by Hogan & Hartson LLP, Info's external general counsel. See IG002124 –28 at 26.

3-15

perquisite for each disbursement was calculated based on the ratio of perquisite to non-perquisite for that plane's use each year.

Mr. Dwornicki's analysis was subsequently adjusted to reduce the perquisites attributed to Mr. Gupta by approximately $124,600. These adjustments reflect additional documentation provided by counsel for Mr. Gupta to support the business purpose of certain flights. This analysis was reviewed by Tom Oberdorf, Info's CFO during 2009, and was used as the basis for the amended disclosures related to Mr. Gupta's executive compensation.

### Analysis of Info's Methodology – Private Aircraft Travel

Except as identified below, I believe the analysis conducted by Info was appropriate and is consistent with my understanding – as explained above – of the flights that constitute perquisite compensation to Mr. Gupta.

In addition to reviewing the methodology, I reviewed a haphazard sample[33] of the aircraft usage transactions evaluated by Mr. Dwornicki in order to gain comfort as to the reliability of Info's procedures. This is a standard technique relied upon by accountants, and based on this sampling, Mr. Dwornicki faithfully applied the methodology described above. As such, the Company's overall methodologies and assumptions appear reasonable, with one arguable point: Mr. Dwornicki's allocation of certain transactions as "unknown."

All transactions identified as having an "unknown" purpose were not classified as perquisites. Several of the charges classified as "unknown" appear to be flights on which Mr. Gupta was not a passenger. It is reasonable that Info providing its customers or

---

[33] Haphazard sampling is a methodology widely accepted by the auditing profession. It involves selecting items without bias, and is intended to approximate a random sample selection. *Montgomery's Auditing, Eleventh edition.* Chapter 10.

potential clients with the private aircraft would qualify those expenses as business entertainment expenses. It is unclear whether the passengers were business associates or personal friends or family of Mr. Gupta; therefore it is arguable as to whether Mr. Gupta himself received any personal benefit from these arrangements. As such, I have made no adjustments related to the transactions that the Company identified as "unknown," and those charges remain excluded from the calculation of perquisites.

In addition, I noted a few minor inconsistencies in Mr. Dwornicki's application of the guidelines set forth above. As such, the following adjustments were made, the effects of which are summarized in Table 3.1 below:[34]

- Management fees paid for aircraft ownership were always considered a business expense by the Company. At the very least, for the years in which Annapurna held the ownership interest in the aircrafts, this fixed cost of owning the planes should have been allocated between business and personal use of the aircrafts. For the years in which Info owned the aircrafts, I assumed that the Company would absorb the full management fees associated with its ownership interest.[35]

- KPMG reviewed a small sample of invoices for private aircraft travel as part of its audit procedures surrounding the validity of capitalized acquisition costs. Although KPMG's review did not consider whether personal use of the aircraft was the primary purpose for the travel, simply to be conservative, I have adjusted the Company's analysis to assume that each of the acquisition-related flights reviewed by KPMG was, in fact, primarily for business purposes.

---

[34] See also Appendix I to this report.
[35] This approach minimized the amount of expenditures that were identified as perquisites to Mr. Gupta.

- KPMG reviewed a small sample of invoices as part of its audit procedures surrounding related party transactions, which included certain invoices related to private aircraft travel. Although KPMG's review did not consider whether personal use of the aircraft was the primary purpose for the travel, simply to be conservative, I have adjusted the Company's analysis to assume that each of the flights reviewed by KPMG was, in fact, primarily for business purposes.

- The other inconsistencies consist of items noted during my review of a haphazard sample of private aircraft disbursements made by Info. Since it was not practicable to re-perform the company's detailed investigation, for each year I have extrapolated these inconsistencies found in my haphazard sample over the total population of disbursements.[36]

The effect of each of these adjustments is summarized in Table 3.1 below, as well as within Appendix I to this report.

**Table 3.1**

|  | Management Fees paid to NetJets | Amounts Capitalized as acquisition costs | KPMG related party testing | Other inconsistencies extrapolated | Total |
|---|---|---|---|---|---|
| 2003 | $ 169,200 | $        - | $        - | $    26,900 | $   196,100 |
| 2004 | 120,600 | (42,400) | (112,200) | (128,300) | (162,300) |
| 2005 | 10,900 | - | - | (46,900) | (36,000) |
| 2006 | - | - | - | (118,200) | (118,200) |
| **Total** |  |  |  |  | **($ 120,400)** |

---

[36] Note that this methodology of extrapolating errors is consistent with sampling techniques employed by auditors in accordance with the AICPA's generally accepted auditing standards codification §350, *Audit Sampling*, which was adopted April 16, 2003 as part of the interim standards of the PCAOB.

<u>Mr. Gupta's Perquisites from Private Aircraft Travel</u>

Based on my review of Info's investigation of private aircraft travel, the Company should have included at least $870,000; $538,200; $767,500; and $342,800 of perquisites to Mr. Gupta related to private aircraft travel expenditures. These amounts should have been reported within the executive compensation disclosures in its 2003, 2004, 2005, and 2006 annual proxy statements and Forms 10-K, respectively.[37] These conclusions are illustrated in Table 3.2 below.

**Table 3.2**

|       | Per Info investigation[38] | Adjustments | Minimum Required Disclosure[39] |
|-------|---------------------------|-------------|---------------------------------|
| 2003  | $ 673,900                 | $   196,100 | $ 870,000                       |
| 2004  | 700,500                   | (162,300)   | 538,200                         |
| 2005  | 803,500                   | (36,000)    | 767,500                         |
| 2006  | 461,000                   | (118,200)   | 342,800                         |

<u>Private Yacht Travel</u>

Annapurna also directly leased a large yacht, the American Princess, which Mr. Gupta made use of for both personal and business purposes. To the extent that Mr. Gupta made personal use of the yacht, it clearly was not integrally related to his work and conferred on him a personal benefit. The personal benefit is particularly clear during the period when Mr. Gupta owned the yacht through Annapurna, granting him the cache of owning a yacht. Indeed, Mr. Dean testified that all requests for use of the yacht were

---

[37] See the section on materiality for discussion related to the materiality of the overall perquisites disclosure.
[38] See the flight cost analyses prepared by the Company at IG_ER015806, IG_ER016118, IG_ER016288, and IG_ER016314.
[39] See Appendix A to this section, Private Aircraft Travel

required to go through Mr. Gupta's office.[40]  Moreover, it is clear that use of the yachts

was not a benefit available to all Info employees.

In fact, Info's own "Proxy and 10-K Questionnaire" also specifically identified

"personal travel expenses" as a perquisite,[41] a characterization that is in line with the

SEC's 2006 amendments to Reg. 402, which specifically identify "personal travel using

vehicles owned or leased by the company" as a perquisite requiring disclosure.[42]  Thus,

based on all available guidance, it is undeniable that use of the yacht offered a personal

benefit to Mr. Gupta beyond that which was available to other employees of Info, and

therefore should have been recognized as a perquisite to Mr. Gupta.

Annapurna charged Info a monthly fee, presumably for the lease and maintenance

costs associated with ownership of the yacht.  This fee did not change from month to

month based on Info's business usage of the yacht, and yet there was no contractual

agreement in place between Annapurna and Info regarding its use or the reimbursement

arrangement.

In fact, the Annapurna invoices did not always clearly identify that the fees were

related to the yacht.  Throughout 2003, Annapurna invoiced Info $30,000 per month for

"Travel Services for Business Development."  These invoices were processed through

Info's accounts payable system and ultimately received payment approval from Mr.

Dean, regardless of the fact that there was absolutely no detail of the nature or the

business purpose of the expense.[43]

---

[40] See Dean testimony, June 17, 2009 testimony, p.252
[41] See Ex.511 at InfoUSA 001442 – 43.
[42] SEC Release No.33-8732A, p.77
[43] See Ex.412

In 2004, the monthly fee amounts were less consistent, beginning as $30,000 per month through April 2004, then settling to $22,000 per month in June 2004 through Info's purchase of the yacht in April 2005.[44] The invoices also began to note that the services related to the "use of boat" or "use of *American Princess*." To my understanding, there was still no contract or agreement in place between Annapurna and Info to substantiate these monthly charges.

Further identifying the use of the yacht as a personal benefit to Mr. Gupta, these monthly payments were to cover Mr. Gupta's mortgage on the ship.  Mr. Dean was clearly aware that these monthly fees represented the mortgage on the yacht:[45]

Q:  What did you understand the monthly recurring payment was for?

A:  My understanding was, you know, as we started this process was that this was really for the -- almost, let's say the reimbursement of the mortgage or the note associated with the yacht.

\* \* \*

Q:  ... did you understand that the company was essentially paying for the entire cost of the yacht that Mr. Gupta owned through Annapurna?

A:  Yes.

In addition, beginning in late 2003, Annapurna also sent regular invoices to Info for the employment costs of the crew, including health insurance and per diem expenses, as well as for telephone and television expenses on the yacht, petty cash, credit card expenses incurred by the yacht captain, and even gifts for the crew members.[46]

---

[44] See "052308 data request cov.xls" and "Count II Number 7.xls." See also example of invoices paid by Info at Ex.7.
[45] See Dean testimony, June 17, 2009, p.282.
[46] See KPMG-0018871 – 81 at 71 – 73 and JB0029.

3-21

According to Mr. Dean, these recurring charges were understood to be expense reimbursements for Mr. Gupta's use of the yacht:[47]

> Q: ... Did you understand that these expenses associated with the yacht were continuously billed to the company whether or not the company had a function or it had used the yacht?
>
> A: Yes.
>
> Q: So you understood that it didn't matter whether the boat was being used or the yacht was being used, these expenses were always billed to the company?
>
> A: ... So the expenses, the ongoing expenses, related to the yacht, which, as the saying goes, a boat is a hole in the water that you pour money into. It takes docking fees, it takes a crew, it takes maintenance, it takes all those things to have it available for use by the company regardless of whether the company uses it or not.

Annapurna's lease of the yacht was taken over by Info in April 2005.[48]  This change in ownership was effected after numerous concerns were raised to the Board of Directors and the Audit Committee regarding significant related party transactions that were occurring between Info and Mr. Gupta's wholly owned entities.[49]  To the extent that the yacht was used solely for business purposes after Info acquired it, these expenses would arguably be appropriate.  However, the evidence indicates that Mr. Gupta made personal use of the yacht (in addition to the social benefit he incurred from "owning" a yacht) at least during 2006.[50]

<u>Methodology for Analyzing Private Yacht Expenditures</u>

Expenses for the yacht were primarily paid by Info to Annapurna or directly to other vendors through the accounts payable system, but there were also yacht-related

---

[47] See Dean testimony, June 17, 2009, pp.258-259
[48] See Exhibit 73 at RKMCI006518.
[49] See further discussion of these related party transactions and the sale of the American Princess in the section on related party transactions.
[50] See IG_ER017020.

expenses that were reimbursed to Mr. Gupta through his personal credit cards. These charges were primarily related to dockage and electricity fees apparently incurred while the boat was in use; therefore, the nature of these fees is similar to those costs that were paid through the accounts payable system.

For purposes of preparing Amendment No. 3 to the 2008 Form 10-K, the Company performed a review of all transactions processed through accounts payable from 2006 through 2008 that were segregated into the "water vessel account" or which were described as related to use of the American Princess. This detail, along with the charges to the credit card, formed the total population of yacht-related expenditures.[51] The Company determined, based on Mr. Gupta's calendar and Company practices, how many days during the year the yacht was used for business purposes. The Company then allocated expenditures related to the yacht to Mr. Gupta in proportion to the days the yacht was not used for business purposes. This amount was disclosed as a perquisite to Mr. Gupta in 2006.

In order to determine the value of yacht-related perquisites received by Mr. Gupta in 2003 through 2005, I followed a similar methodology for establishing the population of related expenditures. I used the accounts payable detail for Annapurna, as well as a detail of check payments identified by the Company as related to the private yacht, and combined these expenses with those charged during the relevant period to Mr. Gupta's credit card. Linda Lupi, the captain of the yacht throughout the relevant period, represented that the yacht was used for business purposes approximately 20 days per year. From 2006 through 2008, according to the Company, the yacht was used for

---

[51] Note that included in the total population of expenditures are the value of the mortgage payments on the yacht, which was owned by Info during 2006. The yacht-related credit card expenses were included with the total population, and therefore were apportioned in the same fashion.

business purposes for only 15 days of that three-year period. Thus, to be conservative, I used the estimate of 20 days of business usage each year from 2003 to 2005 to allocate yacht expenditures to Mr. Gupta.

<u>Mr. Gupta's Personal Benefits from Private Yacht Expenditures</u>

Based on my analyses, I estimate that the perquisites Mr. Gupta received related to Info's payment of yacht-related expenses are valued at approximately $549,900; $559,500; $449,000; and $633,400 in each of 2003, 2004, 2005, and 2006, respectively.[52] As detailed further in the section on materiality, these amounts alone were material to Info's executive compensation disclosure in each year. Thus, management's failure to report these amounts in its annual proxies and reports violated SEC regulations and rendered the financial statements false and misleading in each year.

<u>Credit Card Expense Reimbursements</u>

For each of his monthly credit card bills, Mr. Gupta would review the charges and designate each as a business or a personal charge. Occasionally his personal card would be used to charge amounts for other employees, and all of those charges would be designated as business expenses. After his review, Mr. Gupta authorized the bill for payment, typically with his signature "ok VG." Annapurna's request for payment by Info for the business portion of the credit card charges was supported by a summary schedule of the charges on the statement, but typically would not include a copy of the credit card statement and rarely would include receipt documentation of the expenses. The expenses were not detailed on an expense report, as was required by all other employees of Info.[53]

---

[52] See a detail of my calculations within Appendix I to this section.
[53] See Dean testimony, June 17, 2009, pp. 239-240

While these requests for payment flowed through Info's established accounts payable approval process,[54] none of the individuals signing off took responsibility for obtaining documentation to support the business purpose of Mr. Gupta's credit card charges. Even the CFOs who approved the invoices and then oftentimes signed the check payments assumed that Mr. Gupta's representation that the charges were business-related was sufficient.[55] For example, in September 2004 Mr. Gupta submitted for reimbursement several accommodation and meal charges related to a trip to Italy. After reviewing his calendar and itineraries, Mr. Gupta testified that he and his wife were accompanied by three other couples and that the primary purpose of the trip was to have a one-week vacation. This is contrary to his initial representation that the charge related to business development. In fact, Mr. Das reviewed and authorized the payment to be made on behalf of Mr. Gupta.[56]

As I believe is obvious, to the extent that Mr. Gupta submitted personal expenses, those expenses were not integrally related to Mr. Gupta's work and represented a personal benefit to him. Moreover, such a benefit, of course, was not available to all Info employees. Based on the guidance discussed above and on my experience, the reimbursement of such expenses constituted perquisite compensation required to be disclosed.

<u>Info's Methodology for Analyzing Credit Card Expenditures</u>

To identify the population of payments made on Mr. Gupta's credit cards, Info generated an accounts payable report, and then obtained the credit card statements related

---

[54] The process for cutting check disbursements related to Mr. Gupta's expenses was changed in August 2005 to shift responsibilities to an Annapurna employee, thereby significantly compromising the design effectiveness of internal controls. See further discussion with the Internal Controls section herein.
[55] See Dean testimony, June 17, 2009, p. 389 and Das testimony, June 10, 2009. pp. 210-214
[56] See Gupta testimony, September 16, 2009, pp. 493-498 and Exs. 602, 605, and 320.

to those payments.  Given the volume of transactions, the Company determined it

appropriate to limit its review as follows:

> [T]he Company selected for analysis all credit card charges of
> $400 or greater incurred by Vinod Gupta and for which the
> Company paid between January 1, 2003 and December 31, 2007.
> … Credit card expenses that appeared from the statement
> description to relate to country club use were segregated for
> inclusion in a separate analysis of all country club-related
> expenditures made by the Company between 2003 and 2007.
> Credit card expenses that appeared from the statement description
> to relate to the American Princess were also segregated … [57]

There were certain of Mr. Gupta's credit cards to which other company

employees may have directed expenditures.  Mr. Dwornicki was again tasked with

reviewing these expenditures.  His analysis encompassed only the charges that were

made by Mr. Gupta, and only those which Mr. Gupta had not already designated as

personal expenditures.  In addition, the charges on certain credit card statements that

could not be located were excluded from the analysis.  A review of these charges would

only serve to *increase* the personal benefits received by Mr. Gupta; therefore the

Company's analysis in this regard would be considered conservative.

In determining the nature of each charge to Mr. Gupta's credit cards as either

business or personal, Mr. Dwornicki considered all of the flight and other travel

information that was available to him, as well as his knowledge of the operations of the

Company, before ultimately making a judgment.

<u>Evaluation of Info's Methodologies – Credit Card Expenses</u>

I reviewed a haphazard sample of the credit card transactions evaluated by Mr.

Dwornicki in order to gain comfort as to the reliability of Info's procedures.  Based on

---

[57] See IG_ER013350

my review, the Company's overall methodologies and assumptions appear reasonable, with one exception: Mr. Dwornicki's allocation of certain transactions as "unknown." The Company described the "unknown" transactions as follows:

> Certain expenses, predominantly incurred on behalf of individuals other than Vinod Gupta, were allocated as unknown where a review of the expense and associated documentation did not provide an adequate basis on which to determine whether the expense involved entertainment of representatives of actual or prospective customers or vendors of the Company or of personal friends of Vinod Gupta.[58]

Ultimately, all transactions identified as having an "unknown" purpose were not classified as perquisites and other personal benefits for reporting in Info's amended executive compensation disclosures. I reviewed each of the transactions that Mr. Dwornicki had classified as "unknown." If the transactions involved an employee or board member of Info, even without a documented business purpose I assumed that it was a non-perquisite to Mr. Gupta. However, transactions that involved other individuals and for which no business purpose was evident are those that I considered to be personal in nature and constituted a personal benefit to Mr. Gupta.

<u>Personal Benefits from the Reimbursement of Credit Card Expenses</u>

Other than the "unknown" transactions discussed above, I noted no other inconsistencies in the random sample I selected for review. My analysis of the "unknown" credit card transactions from 2003 through 2006 resulted in an increase of $89,700 over the total amount of personal benefits the Company previously calculated. Thus, my analysis suggests that Mr. Gupta's reimbursements for personal expenses through his credit card totaled $312,100; $327,500; $292,900; and $255,100 in each of the years 2003, 2004, 2005, and 2006, respectively. As detailed further in the section on

---

[58] See IG_ER013350

materiality, these amounts alone were material to Info's executive compensation

disclosure in each year.  Thus, management's failure to report these amounts in its annual

proxies and reports violated SEC regulations and rendered the financial statements false

and misleading in each year.

<u>Country Club Memberships and Related Expense Reimbursements</u>

Mr. Gupta purchased memberships with 31 different country clubs during the

period of 2003 through 2006.[59]  Many of these memberships were half paid by Mr. Gupta

and half paid by Info.  The clubs often invoiced the Company directly for expenses

incurred while visiting, and Mr. Gupta often submitted country club-related charges on

his credit card for reimbursement as well.

It is clear that Mr. Gupta received a personal benefit from his club memberships.

Moreover, the reimbursement of such club expenses was not available to all Info

employees.  In fact, Info's own "Proxy and 10-K Questionnaire" specifically identified

the "reimbursement of club dues" as a perquisite,[60] a characterization that is in line with

the SEC's 2006 amendments to Reg. 402, which specifically identify "club memberships

not used exclusively for business entertainment purposes" as a perquisite requiring

disclosure.[61]

Based on the guidance discussed above, my experience, and disclosures made by

other companies for related compensation, it is reasonable that a company would

reimburse an executive for a limited number of club memberships; however, 31 country

club memberships are excessive.  Moreover, expenses incurred at these clubs should be

---

[59] See IG_ER014258
[60] See Ex.511 at InfoUSA 001442 – 43.
[61] SEC Release No.33-8732A, p.77

subject to the same analysis as any other business expense to determine if they constitute perquisite compensation.

### *Info's Methodology for Analyzing Country Club-related Expenditures*

Mr. Dwornicki reviewed the credit card charges related to country clubs using the same guidelines as for all other credit card expenditures for which Mr. Gupta was reimbursed, including excluding all transactions below the minimum threshold of $400.[62]

The Company also identified any disbursements made directly to country clubs by generating a vendor distribution report for each of the 31 clubs. To reduce the volume of transactions reviewed, Mr. Dwornicki employed a minimum transaction threshold of $1,000 related to the accounts payable disbursements.[63] The Company determined that it was reasonable for Mr. Gupta to hold three country club memberships for the purpose of entertaining clients. As such, all membership dues and fixed fees paid to the two clubs with the highest usage in the Omaha vicinity and to a third club with the highest overall usage were absorbed by Info as business-related expenses.[64] This assumption is reasonable given, among other reasons, the greater availability of the Omaha country clubs for use by other employees.

To determine the business or personal nature of each transaction, Mr. Dwornicki reviewed all supporting documentation available for each check disbursement. He also considered all of the relevant travel information available and his knowledge of Company operations before ultimately making a judgment. Certain payments for which no supporting documentation was available have been allocated as follows:[65]

---

[62] See IG_ER013350
[63] See IG_ER014258
[64] See IG_ER014260
[65] See IG_ER 014258

3-29

- Payments for membership dues or fixed fees were deemed a perquisite to Mr. Gupta, other than the three exceptions discussed previously.
- Other transactions with the country clubs were allocated between business and personal use based on the ratio of usage at that particular club.

<u>Evaluation of Info's Methodologies – Country Club-related Expenses</u>

Except as detailed below, I believe the Company's methodology is a reasonable one and comports with the disclosure requirements.

For all country club expenditures, there were certain items that Mr. Dwornicki classified as "unknown," similar to his review of other categories. I reviewed each of the "unknown" country club transactions. If the transactions involved an employee or board member of *Info*, even without a documented business purpose, I assumed that it was a non-perquisite to Mr. Gupta. However, transactions that involved other individuals and for which no business purpose was evident are those that I considered to be personal in nature and constituted a personal benefit to Mr. Gupta. My review resulted in only minor differences from the Company's original analysis.

I also reviewed a haphazard sample of the other country club transactions evaluated by Mr. Dwornicki in order to gain comfort as to the reliability of Info's procedures. I noted no material inconsistencies in my sample of country club-related expenditures. Based on my review, the Company's overall methodologies and assumptions appear reasonable.

<u>Personal Benefits from the Reimbursement of Country Club-related Expenditures</u>

My analysis, consistent with that performed by Info, suggests that the personal benefits that Mr. Gupta received related to country club expenditures totaled $100,000;

$251,900; $114,200; and $88,100 in each of the years 2003, 2004, 2005, and 2006, respectively. As detailed further in the section on materiality, these amounts alone were material to Info's executive compensation disclosure in each year. Thus, management's failure to report these amounts in its annual proxies and reports violated SEC regulations and rendered the financial statements false and misleading in each year.

### Personal Vehicle Usage and Expense Reimbursements

During the period from 2003 through 2006, Mr. Gupta had primary use of at least 14 different cars that Info purchased, leased, or made the lease payments for.[66] Many of these were parked at Mr. Gupta's various residences and were strictly for his personal use, and at least four of those were leased through Aspen Leasing, a company wholly owned by Mr. Gupta. However, there were three cars parked at Mr. Gupta's various residences that were available for employee use during business travel.

To the extent that Mr. Gupta had personal use of the cars, it was not integrally related to his work and represented a personal benefit, particularly given the luxury nature of the cars available to Mr. Gupta. In fact, Info's own "Proxy and 10-K Questionnaire" specifically identified "a company car furnished to [an executive] that is used for personal purposes (including commuting)" as a perquisite,[67] a characterization that is in line with the SEC's 2006 amendments to Reg. 402. The SEC regulation specifically identifies the "personal use of other property owned or leased by the company" and "personal travel using vehicles owned or leased by the company" as a perquisites.[68]

---

[66] See Ex. 187.
[67] See Ex.511 at InfoUSA 001442 – 43.
[68] SEC Release No.33-8732A, p.77

Based on the guidance discussed above, my experience, and disclosures made by other companies for related compensation, I have determined that reimbursement for personal use of the cars constitutes perquisite compensation required to be disclosed.

<u>Methodology for Analyzing Personal Automobile Expenditures</u>

A review of the various accounts payable details produced in this case provides a total of all automobile payments made by the Company during the period. Based on the Special Litigation Committee's investigation of the various vehicles, I determined that ten of the vehicles identified were used exclusively by Mr. Gupta or his family members.[69] In addition, Mr. Gupta identified another vehicle parked in Washington, D.C. that was used by his son both prior to and during his son's employment at Info:[70]

> Q: And do you know, Mr. Gupta, whether your son Ben actually used that car, and if you do, could you explain what it is you know or recall about his use of the car?
>
> A: Well, Ben used -- I don't know which car; either Lexus or -- probably Lexus. He -- you know, he used it while he was working and also before he was working for infoUSA. And he was working for the congressman, so he -- that's when he drove the car.
>
> Q: Congressman Rahm Emanuel?
>
> A: Yeah.
>
> Q: And he drove around Mr. Emanuel in the Lexus?
>
> A: Yeah, I believe so.
>
> Q: It was a white 2004 RX-330 Lexus. Right?
>
> A: That I don't know which year, but I think it was a Lexus.

---

[69] See Ex. 187. One additional vehicle located in California was identified by the Special Litigation Committee as solely utilized by Mr. Gupta. Based on Mr. Gupta's testimony, this vehicle, which was purchased in 2006, was used primarily by the individual running the license division in the San Mateo office and was not parked at his home in Hillsborough, California (Gupta testimony, September 15, 2009, p. 293). As such, in the interest of conservatism, I have excluded this vehicle from my analysis of the personal automobile benefits received by Mr. Gupta. *See also* Appendix I to this report.

[70] See Gupta testimony, September 15, 2009, pp. 306-307

According to the Special Litigation Committee's investigation, the three additional vehicles available for Mr. Gupta's personal use were determined to have less than 10% business use. This assessment is based on the number of days that Info employees visited Mr. Gupta's personal residences for business purposes.[71]

Consistent with the Company's own methodology as first disclosed in the Amendment to its 2007 Form 10-K,[72] the value of the personal benefits that Mr. Gupta received from the use of automobiles was determined as follows:

- For those vehicles under lease agreements, I calculated the total lease payments made from 2003 through 2006.

- For those vehicles purchased by Info, I calculated the depreciation on the vehicles based on the straight-line method and a 5-year asset life. This is consistent with the Company's asset depreciation policy during the time period.[73]

- The total repairs, maintenance, and insurance expenses[74] paid during the period were allocated based on the overall ratio of business use to Mr. Gupta's personal use of the automobiles reviewed. This allocation was necessary due to the lack of detail maintained by the Company.

<u>Personal Benefits from Automobiles Paid for on Mr. Gupta's Behalf</u>

Based on my analyses, Mr. Gupta received a personal benefit from his use of company-paid automobiles of approximately $58,400; $93,500; $101,200; and $190,800 in each of 2003, 2004, 2005, and 2006, respectively. As detailed further in the section on

---

[71] See "Gupta Private Residence Lodging Chart" at Ex. 210, which incorporates information from the property logs at each residence, as well as anecdotal evidence collected from employees.
[72] Amendment No. 1 to Info's 2007 Form 10-K was filed with the SEC on March 16, 2009.
[73] See Ex. 67.
[74] The Company appears to have considered only insurance premiums as an incremental cost, which is consistent with its amended executive compensation disclosures. However, I believe it is appropriate to include all expenses related to the ownership or lease of the vehicles. See amounts at Appendix I.

materiality, these amounts alone were material to Info's executive compensation disclosure in each year. Thus, management's failure to report these amounts in its annual proxies and reports violated SEC regulations and rendered the financial statements false and misleading in each year.

### Personal Residences and Related Expenses

Prior to and during 2003 through 2006, Annapurna made numerous requests from Info for reimbursement of costs for Mr. Gupta's personal residences. As acting CFOs, Messrs. Das and Dean each approved or were aware of these payments.[75] In fact, it was not until the internal audit department began raising questions about related parties in 2004 and Dr. Vasant Raval, chairman of Info's audit committee, shared the results of his own investigation into related party transactions with the board of directors in February 2005 that reimbursements to Mr. Gupta for his personal residences were limited.

Housing expenses are not properly reimbursable. Info's own "Proxy and 10-K Questionnaire" specifically identified the reimbursement of "housing and other living expenses" as a perquisite,[76] a characterization that is in line with the SEC's 2006 amendments to Reg. 402, which specifically highlights "payments for the executive or director to stay at his or her personal residence" as a perquisite requiring disclosure.[77]

### Methodology for Analyzing Reimbursements related to Personal Residences

Mr. Gupta owned several properties around the country which he occasionally made available to clients and employees for use while on business travel. The primary properties for which Mr. Gupta received reimbursement were a house in Hillsborough,

---

[75] See Das testimony, June 9, 2009, pp.144-145, 180; Dean testimony, June 16, 2009, pp. 180, 186. See also Exs. 7, 157, and 396.
[76] See Ex.511 at InfoUSA 001442 – 43.
[77] SEC Release No.33-8732A, p.77

California, an apartment in Washington, D.C., and a condominium in Maui, Hawaii owned by his son.

Mr. Gupta testified that the Hillsborough house was purchased for the purpose of using the residence in lieu of a hotel in the San Francisco area.[78] For that business use, Info paid Annapurna $5,000 of rent per month throughout 2003 and 2004. I have seen no documents to support how this monthly rental fee was derived. In addition, Annapurna occasionally invoiced the company for "shared services" related to the residence, which amounted to monthly installments of $5,000 in 2003 and 2004.[79] The shared services appear to have consisted of cable, utilities, and internet hookups.[80] There was no business purpose noted or supporting documentation made available to explain the nature of the shared services.

Mr. Gupta also secured the use of a residence in Washington, D.C. in 2004 by employees traveling to that location,[81] for which the Company paid $5,800 rent per month.[82] Mr. Gupta also passed through to the Company various costs related to the regular maintenance of the residence, including the cost of a house manager, utilities, and cleaning services.[83]

In addition, Info reimbursed Mr. Gupta's son either $5,000 or $4,000 per month in for the business use of his condominium in Maui. During 2004 and 2005, the reimbursement was $4,000 per month. As part of that arrangement, Info made a

---

[78] See Gupta testimony, September 14, 2009, pp. 77-78
[79] See Ex. 543 KPMG 0018871 – 73
[80] See Dean testimony, June 16, 2009, pp. 182, and 207-209
[81] See Nietzel testimony, March 31, 2009, p.341. Nietzel testified that this lease agreement was with Info, not with Mr. Gupta. He does admit that Mr. Gupta's personal effects were in the condo and it was used by some employees. The owner is an unaffiliated third party.
[82] See 00469. Interestingly, during this timeframe, Mr. Gupta's son had an internship with a congressman for three to six months. See Gupta testimony, September 15, 2009, pp. 306-307.
[83] See 00468 – 71