recurring monthly payment for the association dues on the condominium as well.[84] The

rental payment totaled $57,000 for 2003 and $48,000 for 2004 and 2005.[85] The

association dues, according to Info's monthly recurring payment schedule states that Info

was paying $860 per month, which is approximately $10,000 per year.[86] Info's 2007

Form 10-K states the association dues were $11,000 for 2006.[87] Therefore, the

association dues payments totaled approximately $10,000 a year for 2003 through 2005,

and $11,000 for 2006.

    SEC Regulation S-K, Item 402 requires that perquisites "be valued on the basis of

the aggregate incremental cost to the registrant and its subsidiaries."[88] As such, in order

to estimate a fair value of the business use of the residences, the Company estimated the

cost of a hotel room for the number of nights that the residences were utilized for a

business purpose. Using the hotel rates and the lodging data collected at the direction of

the Special Litigation Committee,[89] I recalculated the cost of lodging that Info should

have recorded as a business expense to be $79,000.

### Personal Benefits from Reimbursement related to Mr. Gupta's Personal Residences

    During 2003 through 2006, Mr. Gupta received a total of approximately $647,600

in reimbursements in rental fees and maintenance expenses related to the upkeep of his

personal residences. Of those reimbursements, I estimate that only approximately

$79,000 of those payments represent legitimate business use of the properties. Based on

my analyses, Mr. Gupta received a personal benefit for expenses related to the usage of

---

[84] See Exs. 11 and 396
[85] See "052308 data request cov.xls" for the accounts payable detail of Gupta, Jess.
[86] See Ex. 11
[87] See "052308 data request cov.xls" for the accounts payable detail AOAO the Ridge.
[88] SEC Regulation S-K, Instructions to Item 402(b)(2)(iii)(C)
[89] See Ex. 210 IUSA-SLC-13660 – 66

his personal residences of $183,100; $331,500; $50,300; and $3,600 in each of 2003, 2004, 2005, and 2006, respectively. From 2003 through 2006, the Company paid at least $568,500 of expenses related to Mr. Gupta's personal residences above and beyond the fair market value of the business use of those properties. Thus, in accordance with Reg. 402, Info should have reported approximately $568,500 in personal benefits to Mr. Gupta in their annual public filings for the reimbursement of expenses related to his personal residences.

<u>Life Insurance</u>

From 2003 through 2006, there were three different life insurance policies on Mr. Gupta, each owned by the Gupta Family 1999 Irrevocable Trust (the "Gupta Trust") and designating the Gupta Trust as the beneficiary. During that period, Info paid a total of $172,800 in premiums on these life insurance policies.

The first life insurance policy on Mr. Gupta was purchased in 1999 and had an annual premium of $36,696. Mr. Gupta instructed that Info pay the premium on this policy beginning in June 2000, apparently in lieu of purchasing a key man life insurance policy.[90] The Company continued to pay the annual premiums on this policy in each year through 2004.[91] Mr. Dean was aware that Info was paying these premiums at least by May 2002, when he received a memo from Mr. Vakili which clearly states that the annual premium of the policy "has been paid by infoUSA each year."[92] Mr. Das also signed his approval for payments of the monthly premiums on the life insurance policy.[93]

---

[90] See Ex. 206
[91] See Exs. 203, 6, and 80.
[92] See VG 0002771
[93] See INFOUSA 00421

In 2002, the Company purchased an additional life insurance policy on Mr. Gupta. The new policy, which also named the Gupta Trust as the beneficiary, was issued August 16, 2002.[94] The Company paid the $39,000 initial premium that same month[95] as well as the subsequent annual premiums in 2003 and 2004.[96] Mr. Dean became aware of this policy at least by March 2003, when he was forwarded an invoice directly from Mr. Gupta with the instructions to pay the insurance premium on his life insurance policy.[97] Likewise, Mr. Das approved payment of the premium on this policy knowing that the Gupta Trust owned the policy.[98]

Mr. Gupta purchased a third life insurance policy on himself in December 2003 that was also owned by the Gupta Trust. The initial premium appears to have been paid by Mr. Gupta; however, he instructed Info to make the second payment of the $21,400 premium on this policy in January 2005.[99]

By definition, key man insurance is for the benefit of the company, with the purpose being to protect the company in the event of the untimely death or disability of a covered executive. Since the life insurance policy was purchased by and for the benefit of the Gupta Trust, it would not be considered an ordinary business expense to the Company. Rather, Info's payment of the annual premium represents a form of compensation and should have been disclosed as a perquisite of Mr. Gupta.

---

[94] See Ex. 204
[95] See Ex. 205
[96] See Ex. 15 at JB 0027 is a detail of prepaid assets demonstrating that Info recorded a prepaid asset of $39,000 in July 2003 described as "Gupta Family 1999 Irrevocable Trust," representing the Company's payment and subsequent expense of the life insurance policy premium. See also, Ex. 79.
[97] See SEC testimony Exh.6. The invoice was processed by Info's accounts payable department and the check disbursement made on April 8, 2003.
[98] See Ex. 79 at INFOUSA 00003
[99] See Ex. 81

Each of the invoices for the life insurance premiums were processed through the accounts payable system, obtaining the required approval from each level of review, including the CFO, prior to cutting the checks. Even so, the fact that these policies benefited the Gupta Trust rather than the Company was repeatedly ignored by Info executive management. In fact, the only individual who appears to have acknowledged the potential effects on Mr. Gupta's compensation was Mr. Nietzel, who was employed by Annapurna at the time.[100]

Thus, in accordance with Reg. 402, Info should have reported $75,700, $75,700, and $21,400 in 2003, 2004 and 2005, respectively in personal benefits to Mr. Gupta related to the payment of life insurance premiums on his behalf.

<u>Office Space Utilized by Related Entities</u>

During 2003 and 2004, Annapurna and EIM occupied office space in a building owned by Info.[101] This building was adjacent to the Info's main building in Omaha. A report issued by email, dated February 8, 2005, by Dr. Vasant Raval, a member of the audit committee, noted that the "Everest Building" was being occupied by several entities other than Info. He recommended the following:

1. Related parties should pay InfoUSA for value received. This should be under a formal contract, such as rental agreement.

2. Any other related party tenants of other properties of InfoUSA should be identified. Such entities should enter into similar agreements with InfoUSA.

…<u>The question of independence of a director may surface if the director or his organization is an occupant of InfoUSA premises and particularly, if no rental/ lease agreement exists between InfoUSA, and the director or his organization.</u>[102] (Emphasis added)

---

[100] See Ex. 202 at VG 0002956
[101] See KPMG 0080097 – 100 and Ex. 40.
[102] See Ex. 40 at INFOUSA 011417

In January 2005, Annapurna and EIM entered into a lease agreement with Info for the office space that specified a monthly lease payment of $1,600.[103] Thus, in accordance with Reg. 402, Info should have reported $19,200 in 2003 and 2004 in personal benefits to Mr. Gupta related to the use of Info's office space.

<u>Payment for Personal Employees</u>

As demonstrated herein, Mr. Gupta often mixed his responsibilities as CEO with his personal affairs, and this practice extended to the co-mingling of personnel responsibilities between Annapurna and Info. Evidence indicates that Info paid a salary or wages to certain individuals that provided personal services to Mr. Gupta from 2003 through 2006. Info first reported this personal benefit to Mr. Gupta as executive compensation in the Amendment to its 2007 Form 10-K. Info disclosed therein that in 2006 it made payments totaling $124,600 for "salaries and expenses related to the rendering of property management and other services to assist Mr. Gupta, including ... payments by the Company pursuant to a services contract with a company affiliated with a relative of Mr. Gupta."[104]

Evidence indicates that Shelly (Godek) Van Gilder, Paul Nietzel, and Brad Roselle were each employed directly by Info for a period of time between 2003 and 2006, and yet each held responsibilities for certain of Mr. Gupta's personal affairs. Info also paid the salary of Julie Burke, his house manager in Washington, D.C., as part of Mr. Gupta's reimbursement for residential expenditures. Under Reg. 402, the work

---

[103] See VG 0000888 and KPMG 0080097 – 100
[104] Info's Form 10-K/A as filed with the SEC on March 16, 2009, p.25.

performed by each of these individuals on behalf of Mr. Gupta during their employment
with Info is considered a personal benefit received by Mr. Gupta.

### Shelly Van Gilder, Accountant

Shelly Van Gilder was employed by Annapurna from 2001 through August
2005,[105] where she handled all of the accounts receivable and accounts payable for Mr.
Gupta's various entities, including the review of invoices and cutting checks.  When she
became an employee of Info in August 2005, Ms. Van Gilder gained only one piece of
responsibility – cutting Info checks.  This was also the one responsibility that was
eliminated when she was moved back to Everest in February 2008.[106]  During 2005 and
2006, Info paid salary and wages to Ms. Van Gilder of $11,900 and 31,800,
respectively.[107]  These payments were subsequently reported as perquisites to Mr. Gupta
in Info's first amendment to its 2007 Form 10-K, as filed with the SEC on March 16,
2009.

### Julie Burke, House Manager

Info also paid expenses for the house manager of Gupta's personal residence in
Washington, D.C.  Mr. Gupta testified that Ms. Burke was the housekeeper for his
properties in Washington, D.C., first at the condominium and later at the house that Mr.
Gupta purchased.[108]  Initially she was paid a monthly fee, plus expense reimbursements,
through accounts payable, and then in late 2004 Ms. Burke was added to Info's
payroll.[109]  Her services, which included laundry, shopping, and cleaning, among other
things, provided personal benefit to Mr. Gupta in amounts totaling $19,400; $26,800; and

---

[105] See Ex.140, p. 10.
[106] See Van Gilder testimony, pp.45-48.
[107] See IG018951 - 52
[108] See Gupta September 15, 2009 testimony, p.264
[109] See IG018957 – 61 and IG018965

3-41

$24,500 during 2004, 2005 and 2006, respectively. These payments were subsequently reported as perquisites to Mr. Gupta in Info's first amendment to its 2007 Form 10-K, as filed with the SEC on March 16, 2009.

### Corporate Avengers

In 2006, Info contracted the services of Corporate Avengers. It was initially represented that the services provided were related to investor relations and the product development of SalesGenie.[110] However, it eventually surfaced that the individual under contract was Laurel Gupta's son (Mr. Gupta's stepson), and of the Company subsequently revealed that the services he provided were personal in nature.[111] During 2006, Info paid Corporate Avengers a monthly fee for his services, which totaled $22,000 for the year.[112] This contractual agreement was specifically disclosed in Info's first amendment to its 2007 Form 10-K, as filed with the SEC on March 16, 2009.

### Paul Nietzel, Accountant

Mr. Nietzel was first hired as one of Mr. Gupta's personal accountants and worked directly for Annapurna. In about December 2002 he transferred into the property management division at Info, a position he held until approximately December 2004. According to his testimony, Mr. Nietzel did maintain certain responsibilities for processing Mr. Gupta's private aircraft travel invoices, credit card expenses, and other reimbursement requests while he was employed by Info; therefore, his job responsibilities were never really fully segregated between the two entities.[113] During 2003, 2004, and 2005 Info paid to Mr. Nietzel salary and wages of $74,400; $90,800; and $38,300,

---

[110] See Ex.254 at RKMCI007631
[111] See Dean June 16, 2009 testimony, pp.133-134 and Heckart April 7, 2009 testimony, p.297
[112] See disbursement detail in "052908 ap request.xls"
[113] See Nietzel March 30, 2009 testimony, pp.30-34.

3-42

respectively.[114]  Mr. Nietzel was also paid a total of approximately $14,100 through the accounts payable system subsequent to his employment with Info.[115]  To the extent that Mr. Nietzel performed work for Mr. Gupta that did not benefit the Company directly, these expenses would be considered to be personal benefits for Mr. Gupta and would require disclosure as compensation under Reg. 402.

### Brad Roselle, Director of Trade Shows

Brad Roselle was initially Mr. Gupta's ski instructor at a resort in Colorado.[116] Ultimately Gupta offered him a job in sales at Info.  Roselle received salary and wages as well as a monthly car allowance from Info.[117]  During the period at issue, Info made payments to Roselle for salary, wages, and his monthly car allowance totaling $86,800; $77,900; $80,700; and $84,000 in each of 2003, 2004, 2005, and 2006, respectively.  To the extent that Mr. Roselle performed work for Mr. Gupta that did not benefit the Company directly, these expenses would be considered to be personal benefits for Mr. Gupta and would require disclosure as compensation under Reg. 402.

### Personal Benefit to Mr. Gupta from Info's Payment for his Personal Employees

Although there is evidence to suggest that each of these individuals performed personal services for Mr. Gupta during their period of employment with Info, I did not include these amounts in my summary of undisclosed perquisites in my opinion on materiality because I was unable to definitively verify the percentage of time that each of these individuals allocated to Mr. Gupta's personal matters.

---

[114] See IG018953 – 55.
[115] See "061008 ap request.xls."
[116] Gupta September 15, 2009 testimony, p. 368
[117] Heckart April 6, 2009 testimony, p. 122

<u>Deficiencies in Internal Controls over Financial Reporting</u>

Messrs. Das and Dean, during their tenures as principal accounting officers at Info, were responsible for ensuring that executive compensation was accurately disclosed in accordance with Reg. 402. This responsibility is outlined by the SEC within SOX Sections 302 and 906, each of which require the CFO to certify that the financial statements have been prepared in accordance with SEC regulations, and that they fairly present the financial information of the company. In addition, SOX Section 404 requires that the CFO certify that the company has designed the appropriate internal controls over financial reporting and that those controls are operating effectively. Based on the results of my analyses, Messrs. Das and Dean failed to adequately perform their responsibilities with regard to internal controls over disclosures, and the omission of required disclosures on executive compensation from Info's 2003, 2004, 2005, and 2006 financial statements rendered those statements materially false and misleading.

<u>Messrs. Das and Dean 's Failure to Ensure Proper Executive Compensation Disclosures</u>

In his October 3, 2006 speech discussing the 2006 revisions to executive compensation disclosure, John W. White, Director in the SEC Division of Corporation Finance, also emphasized the role of a CFO in ensuring the proper internal controls over disclosures:[118]

> I also assume you are familiar with the related requirement that public companies maintain disclosure controls and procedures which apply to all information filed or submitted to the SEC. Among other things, I assume you're very familiar with these controls because they should be feeding into and contributing to your ability to make the certifications that are required of each of you, as a CFO, under Section 302 of the Sarbanes-Oxley Act. ...

---

[118] White, John W.; *Executive Compensation Disclosure and the Important Role of CFOs*; SEC Staff Speech to CFO Executive Board; NY,NY; October 3, 2006.

And remember there are two separate and distinct reasons, both related to your certifications, that you should especially care about disclosure controls and procedures.

- As I said earlier, your company's disclosure controls and procedures provide much of the support you need in making your required certifications (and don't forget your 906 certifications for that matter, on which you have personal criminal liability); but also

- Your Section 302 certification specifically speaks to your responsibility for disclosure controls and procedures and to you, as CFO and a certifying officer, having evaluated those and disclosed your conclusions about them in your company's public filing — you cannot hide your head in the sand on this one.

Mr. White went on to say that the executive compensation disclosures, and specifically the Compensation Discussion & Analysis that was required under the revised SEC regulations beginning in 2006, is covered by the CFO's certification of the annual report in accordance with Section 302 of the Sarbanes-Oxley Act of 2002.

It is clear that Info's internal controls surrounding financial reporting disclosures were inadequate, especially considering the significant perquisites and other personal benefits received by Mr. Gupta that were not reported as executive compensation in Info's annual reports.  In fact, the Company disclosed these significant material weaknesses in the Amendment to its 2007 Form 10-K, filed with the SEC on March 16, 2009.

However, at some point from 2003 through 2006, all of the items identified herein as perquisites and other personal benefits to Mr. Gupta were processed through Info's accounts payable system.  The breakdown of Info's internal controls over the accounts payable process contributed in large part to the material misstatements of executive compensation in Info's financial statements.

<u>Info's Internal Controls over Accounts Payable</u>

According to Ms. Burger's testimony,[119] all invoices received by Info would be processed through several levels of review and approval, depending on the amount of the invoice and the level of approval required in accordance with the Company's policies. Expense reports submitted by employees for reimbursement of travel and entertainment expenses were processed through a separate department for validation of the items claimed.[120]  Mr. Gupta's expenses would be submitted differently – the invoices and/or check requests were submitted from Annapurna with Mr. Gupta's approval for payment. The amounts were then coded to the proper expense account, countersigned, and paid by Info.  All checks greater than $10,000 required two signatures from authorized check signers, which included the CFO, among others.[121]

Ms. Burger indicated that it was her belief that the check signatories would be reviewing the checks and supporting documentation "to ensure the expense was an appropriate business expense."[122]  She also testified that the dual signature requirement did not preclude Mr. Gupta from providing the second signature on checks for expenses incurred by him or on checks issued to his related entities.  This situation presents a conflict of interest for Mr. Gupta and negates the internal control purpose for requiring dual signatures on check disbursements.[123]  Thus, while Info's internal controls may have appeared to be properly designed, they were not operating effectively due to the CFO's

---

[119] Ms. Burger became Info's first Director of Internal Audit in 2003 and was tasked with setting up the internal control infrastructure and documenting all processes followed by the Company.
[120] See Burger January 13, 2009 testimony, p. 40.
[121] See Burger January 13, 2009 testimony, pp. 52-57 and Dean June 16, 2009 testimony, pp.137-140.
[122] See Burger January 13, 2009 testimony, p. 59.
[123] See Burger January 13, 2009 testimony, pp. 76-77.

oversight, or lack thereof, which essentially amounted to a management override of the internal control procedures.

Mr. Gupta's expenses should have been processed through the same channels as all other employees, with the CFO providing the final review and approval. In fact, a majority of the invoices I have examined related to payment of the perquisites and personal benefits to Mr. Gupta have, in fact, been approved by the acting CFO – either Mr. Das or Mr. Dean.[124] However, throughout the relevant period Messrs. Das and Dean, by their own admissions, took Mr. Gupta's representations regarding his expense reimbursements at face value.

Mr. Das testified that Mr. Gupta's signature on an invoice requesting reimbursement indicated that Mr. Gupta "was certifying that this particular expense was for a legitimate business purpose that he undertook on behalf of the company," simply for the fact that he was CEO, Chairman of the Board, and a Section 16 officer.[125] Mr. Das repeatedly emphasized his reliance on the other accounting staff that had reviewed and coded the invoices to assess the validity of expenses submitted by Mr. Gupta. Even Alan Heckart, Info's Corporate Comptroller, who took over the review of Mr. Gupta's expenses from Mr. Das in May 2005 after Mr. Das, was concerned about the lack of detail that Mr. Gupta provided as support for his reimbursement requests:

> Q: ... When you first see Mr. Gupta's expenses, what was your first reaction?
>
> A: My first reaction was there was a lot of travel, and there just wasn't enough detail for me to be comfortable. After I was told that I need to give this approval, I wanted to be comfortable with what I was approving, so I wanted to see much more detail than a spreadsheet. Because from my standpoint, the spreadsheet, you

---

[124] See specific sections herein for additional detail related to the individual perquisites and personal benefits.
[125] See Das June 9, 2009 testimony, p. 91.

could put any dollar amount, but if the source document doesn't agree to that I would never have known.

So particularly for the credit cards, I wanted to see that detail, from a reasonable standpoint at least, matched what the summary was, or at least to know, "What are you defining as business development?  What are you defining as 'other'?  What are you defining as" – that's what I wanted to see.[126]

Based on the lack of supporting detail, Mr. Heckart believed that Mr. Das had not

been adequately fulfilling his responsibilities for reviewing Mr. Gupta's expenses:

Q: Did Mr. Das explain how he was able to get comfortable with the credit card charges for Mr. Gupta and sign off without the credit card statement?

A: He didn't.  But, you know, one thing when I worked with Mr. Das, he was very clear that he didn't want to deal with the details.  You know, that's just beneath him. ...[127]

\* \* \*

A: ... after I had looked at, you know, the invoices for several months now, and I'm trying to get my – kind of my big picture together of where I see opportunities.  And this is an area I jumped on very quickly, that it was – it seemed to me that everybody was just approving, but nobody was really looking at the detail.  And I wanted to get more detail so when we filed it away, we had good support to hold this information up.

Q: So your understanding of the process that was in place, after you've had some experience looking at these invoice from Mr. Gupta for expenses, was that the accounting department was not looking at sufficient detail in order to be effective in terms of reviewing and approving these invoices.

A: Yeah.  The accounting department wasn't responsible for approving them.  It was more I was referring to Mr. Das as far as his approval on them. ...

Q: So your understanding, after taking over the role of reviewing Mr. Gupta's expenses, was that Mr. Das had not been appropriately exercising a sufficient review because there is no detail for them [sic] to review.

---

[126] See Heckart April 6, 2009 testimony, p. 65
[127] See Heckart April 6, 2009 testimony, p. 67

> A: And that was my opinion. That was my opinion, that I felt like I don't know how they could put their approval on this without seeing the detail behind it. ...[128]

In fact, as an example, Mr. Das provided the authorization for payment of the credit card expenses previously discussed, which clearly related to a vacation in Italy. The supporting documentation only indicated "business development" as the reason for the trip, with no further description or supporting documentation for the business purpose of the expenditure.[129] Yet there is no evidence to suggest that Mr. Dean ever raised a question as to the validity of the expense incurred.

Mr. Dean also noted that, when he was responsible for the review of Mr. Gupta's expenses, he relied on Mr. Gupta's approval of his own expenses and did not consider it necessary to review the charges since he was CEO of the Company:

> A: ... And the process was basically his approval to pay that expense, his either explicit or implicit assertion that this is a business expense, business related and then there was an allocation of – it was properly coded by somebody how it got into the general ledger. ...[130]

> \* \* \*

> Q: ... Did you do anything to assess what Mr. Gupta's criteria was to determine whether an expense was business or personal when you were CFO or any time around the time you were CFO?

> A: Did I do anything to understand Mr. Gupta's criteria?

> Q: Correct.

> A: No, but I applied my own sense of reasonableness and a sort of general understanding, given I wasn't with him, as you pointed out earlier, 24 hours a day. I was often around him enough to know that when he filled out an expense or whether there was something there I knew -- if he made an assertion that it was business expense, I knew what he spent it on, what it was for. And then I

---

[128] See Heckart April 6, 2009 testimony, p.70-71
[129] See Ex. 320
[130] See Dean June 16, 2009 testimony, pp.137-138.

> could sign off based on the reasonableness of it. It all seemed
> perfectly reasonable to me.
>
> Q: So exactly what did your review of Mr. Gupta's expenses mean?
>
> A: It means that first of all, I was able to see that he had approved
> them for payment, that they were coded properly and that they
> seemed to be reasonable, relying on his assertion that they were
> business expenses.[131]

In fact, Mr. Dean provided the authorization for payment of the flight invoices previously

discussed, which clearly related to Mr. Gupta's wedding in Las Vegas and a weekend ski

excursion with his son and ski instructor. Each invoice was indicated to be "business

development" with no further description or supporting documentation for the business

purpose of the expenditure, and yet it does not appear that Mr. Dean ever raised a

question as to the validity of the expense incurred.[132]

Clearly, Messrs. Das and Dean did not fulfill their responsibilities as it related to

establishing sound internal control procedures for reviewing and approving the CEO's

expenditures throughout 2003, 2004, and 2005. Then, in August 2005, Mr. Dean was

involved in a discussion with Mr. Gupta to redesign the accounts payable processes, a

change that further segregated the processing of Mr. Gupta's executive expenditures.[133]

In reality, the Mr. Dean helped develop a way for Mr. Gupta to circumvent internal

controls over the accounts payable process.

In August 2005, in response to his apparent frustration with the accounts payable

process, Mr. Gupta determined that the processing of the corporate expenditures that he

was approving would be performed within the executive area. The change was

purportedly due to Mr. Gupta's concerns about certain confidential activities becoming

---

[131] See Dean June 16, 2009 testimony, pp.148-149
[132] See Exs. 581 and 582
[133] See Burger January 13, 2009 testimony, pp.95-103

3-50

known by the accounting department. As a result, Ms. Van Gilder was re-assigned from Annapurna and became a direct employee of Info. She was given the responsibility for coding the invoices received; then, with Mr. Gupta's approval, Ms. Van Gilder would cut the check from Info and then send the check and supporting documentation to Mr. Dean for his review.[134] In this way, expenses incurred by Mr. Gupta completely circumvented the accounts payable process and relied solely on the review of Mr. Dean to ensure the propriety and accuracy of the disbursements. This was the process in place from August 2005 through early 2008, when it was eliminated by remediations implemented as a result of the Special Litigation Committee's findings.

The management override of internal controls extended from the accounts payable process into the controls of financial statement disclosures. Mike Schultz, Info's comptroller and chief accounting officer, testified that he approached Mr. Dean and Mr. Das in December 2004 regarding the inclusion of certain personal benefits in Mr. Gupta's annual compensation. Mr. Dean's response was "we don't do that here," indicating that Info does not include personal benefits on Mr. Gupta's W-2.[135]

With the filing of Amendment No. 1 to Info's 2007 Form 10-K on March 16, 2009, the Company acknowledged the following material weaknesses in its internal controls over financial reporting:

- The Board of Directors and Management did not maintain an effective control environment as a result of ineffective oversight of internal control over financial reporting.
- The Company did not maintain adequate policies and procedures to ensure that disbursements of the Company were made in accordance with authorizations of management and the directors of

---

[134] See Burger January 13, 2009 testimony, pp.95-109; Dean June 16, 2009 testimony, pp.76, 136-137; Dean June 17, 2009 testimony, pp. 386-89; Heckart April 6, 2009 testimony, pp.62-63.
[135] Schultz testimony, May 6, 2009, pp. 37-40

the Company. Contributing to this material weakness was inadequate segregation of duties and ineffective policies and procedures to ensure that the processing of payments requires appropriate supporting documentation and authorization. The nature of transactions subject to this material weakness included expense reimbursements, corporate expenditures, personal utilization of Company assets by the Chief Executive Officer, issuance of stock options, and payments to related parties.

- The Company did not maintain effective procedures to monitor its disbursement-related controls and whether such controls remain adequately designed, specifically procedures to ensure that the Board of Directors is provided sufficient information to enable it to appropriately monitor the activities of senior management, including the Chief Executive Officer.

<u>Responsibilities of Messrs. Das and Dean</u>

In their position as CFO, Messrs. Das and Dean should have known of their responsibilities for oversight of the accounts payable process and should have recognized the importance of their review of Mr. Gupta's expenses. Given their direct involvement with the process, I can only conclude that Messrs. Das and Dean were both well aware of the internal control deficiencies that existed, both in the operation of the accounts payable process and in the design (or non-existence) of internal controls over financial reporting and disclosures.

Even so, Mr. Das certified the fair presentation and reliability of Info's 2003 and 2004 Forms 10-K in accordance with SOX Sections 302 and 906. With respect to Info's 2004 Form 10-K, Mr. Das also certified to the effectiveness of the design and operation of the Company's internal controls over financial reporting in accordance with SOX Section 404. While this certification was not required prior to Info's fiscal year 2004, the SEC specifies under SOX Section 302 the requirements of the signing officers with respect to internal controls:

4. the signing officers--

    A. are responsible for establishing and maintaining internal controls;

    B. have designed such internal controls to ensure that material information relating to the issuer and its consolidated subsidiaries is made known to such officers by others within those entities, particularly during the period in which the periodic reports are being prepared;

    C. have evaluated the effectiveness of the issuer's internal controls as of a date within 90 days prior to the report; and

    D. have presented in the report their conclusions about the effectiveness of their internal controls based on their evaluation as of that date;

Mr. Das clearly failed to meet his obligations for ensuring the proper disclosures of executive compensation and for ensuring the effectiveness of Info's internal controls over financial reporting in 2003 and 2004.

Similarly, Mr. Dean certified the fair presentation and reliability of Info's 2005 and 2006 Forms 10-K in accordance with SOX Sections 302, 906, and 404. Mr. Dean has a longstanding history with the Company as CFO (prior to and during 2003), as well as continuing involvement with and ongoing knowledge of Info's accounting practices from late 2004 through 2006. Based on this history, and considering the results of my investigation of perquisites and personal benefits received by Mr. Gupta during this period, it is undeniable that Mr. Dean failed to fulfill his responsibilities for ensuring the proper disclosures of executive compensation and for ensuring the effectiveness of Info's internal controls over financial reporting in 2005 and 2006.

Summary

As demonstrated herein, Messrs. Das and Dean were aware that Info was paying for or reimbursing Mr. Gupta for all of the various perquisites and personal benefits he

received from 2003 through 2006. In fact, they were each personally responsible for approving invoices for payment or for signing the check payments themselves; and therefore, they were well aware of Mr. Gupta's intent to circumvent the accounts payable process and override the internal controls placed in operation.

In addition, Messrs. Das and Dean failed to ensure that the perquisites and personal benefits afforded to Mr. Gupta were reported as part of his compensation. Each failed to implement the necessary policies and procedures to ensure that Info was appropriately disclosing executive compensation in accordance with SEC regulations. Yet Messrs. Das and Dean both signed the SOX Section 404 certifications, representing to the public that the company's internal controls were properly designed and operating effectively, as well as the SOX Sections 302 and 906 indicating that the financial statements and disclosures were fairly represented.

# APPENDIX I

**Perquisites -- Private Aircraft Travel**

| | | 2003 | | 2004 | | 2005 | | 2006 |
|---|---|---|---|---|---|---|---|---|
| Company Analysis, by Mr. Dwornicki [1] | $ | 673,900 | $ | 700,500 | $ | 803,500 | $ | 461,000 |
| NetJets Management Fees allocable to Mr. Gupta's personal flights [1] | | 169,200 | | 120,600 | | 10,900 | | - |
| Amounts KPMG determined to be Capitalizable Acquisition Costs [2] | | - | | (42,400) | | - | | - |
| Amounts reviewed by KPMG in testing Related Party Transactions [3] | | - | | (112,200) | | - | | - |
| Other inconsistencies extrapolated [4] | | 26,900 | | (128,300) | | (46,900) | | (118,200) |
| **Perquisites Received by Mr. Gupta** | $ | 870,000 | $ | 538,200 | $ | 767,500 | $ | 342,800 |

(1) See the flight cost analyses prepared by Mr. Dwornicki at IG_ER015806, IG_ER016118, IG_ER016288, and IG_ER016314.

(2) See Exs. 563 and 564.

(3) See Exs. 541, 561, and 572. Note that Ex. 572 does not identify individual invoices tested by KPMG. As such, from the Company's analysis I obtained all Annapurna invoices for the first quarter 2005. Any amounts classified by Mr. Dwornicki as perquisites to Mr. Gupta have reversed as non-perquisites and are included in the adjustment.

(4) Based on my review of a haphazard sample of transactions in the Company's analysis, I determined that certain transactions totaling $3,300; ($48,300); ($6,700); and ($6,600) in 2003, 2004, 2005, and 2006, respectively, were classified inconsistent to the Company's overall methodologies and assumptions. I extrapolated these inconsistencies to estimate the potential effects across the entire population of aircraft usage during each year.

3-56

# Perquisites -- Private Yacht Travel

| | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|
| Accounts Payable details [1] [2] | $ 522,600 | $ 530,500 | $ 443,500 | $ 649,400 |
| Reimbursed expenses charged to Mr. Gupta's credit cards [3] | 59,200 | 61,400 | 31,500 | N/A |
| Estimate for the number of days the yacht was utilized for business purposes [4] | 20 days | 20 days | 20 days | 9 days |
| Perquisites Received by Mr. Gupta | $ 549,900 | $ 559,500 | $ 449,000 | $ 633,400 |

(1) For years 2003 through 2005, see "052308 data request cov.xls" and "Count II Number 7.xls."

(2) For 2006, see the 2006-2008 yacht expense analysis prepared by Mr. Dwornicki at IG_ER017020. This amount includes $372,782 of payments made for the lease of the yacht, as well as the yacht-related credit card expenses reimbursed to Mr. Gupta.

(3) See the credit card expenses related to the yacht as accumulated by Mr. Dwornicki at IG_ER010434. For 2006, yacht-related credit card expenses reimbursed to Mr. Gupta are included in the accounts payable detail used by the Company.

(4) I have assumed 20 days of business use in each year from 2003 through 2005 based on Captain Lupi's estimate communicated to the Special Litigation Committee.

3-57

Personal Benefits -- Credit Card Charges

| | 2003 | | 2004 | | 2005 | | 2006 | |
|---|---|---|---|---|---|---|---|---|
| Company Analysis, by Mr. Dwornicki [1] | $ | 276,200 | $ | 301,200 | $ | 282,100 | $ | 238,400 |
| Reclassification of transactions listed in the Company's analysis as "unknown" [1] | | 35,900 | | 26,300 | | 10,800 | | 16,700 |
| Personal Benefits Received by Mr. Gupta | $ | 312,100 | $ | 327,500 | $ | 292,900 | $ | 255,100 |

(1)  See the credit card expenses analysis prepared by Mr. Dwornicki at IG_ER014554.

3-58

## Perquisites -- Personal Vehicles

| | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|
| **Leased Vehicles** | | | | |
| Four vehicles leased through Aspen Leasing [1] | $ 10,400 | $ 28,800 | $ - | $ - |
| Three Jaguar automobiles leased directly through Info [1][2] | 3,700 | 18,400 | 20,100 | 20,000 |
| 2002 Red Lexus SC430 in Omaha [1] | 15,200 | 3,800 | - | - |
| 2001 White Lexus LS430 in Hillsborough [1] | 14,500 | - | - | - |
| 2004 White Lexus RX330 in Washington, D.C. [3] | - | 8,800 | 9,400 | 9,400 |
| 2005 Silver Mercedes CLK in Hillsborough [4] | - | - | 14,100 | 14,200 |
| **Purchased Vehicles** | | | | |
| Two automobiles purchased from Aspen Leasing, through Classic Auto Sales [5] | - | - | 16,400 | 34,800 |
| 2004 Lexus RX330 [7] | 4,600 | 9,200 | 9,200 | 9,200 |
| 2004 Lexus RX350 in Hillsborough [6] | 3,400 | 8,900 | 8,800 | 2,600 |
| 2003 Jeep Wrangler in Aspen [6] | 3,300 | 5,600 | 5,500 | 5,400 |
| 2005 Jeep Wrangler in Miami [7] | - | 500 | 5,500 | 5,500 |
| 2005 Smart Car [8] | - | - | - | 3,100 |
| Insurance, Repairs, & Maintenance Expenses [9] | 3,300 | 9,500 | 12,200 | 5,600 |
| **Perquisites Received by Mr. Gupta** | $ 58,400 | $ 93,500 | $ 101,200 | $ 109,800 |

3-59

## Perquisites – Personal Vehicles

(1) See Ex. 340 for total lease payments made by Info, which represents the value of the perquisite received by Mr. Gupta. See also the Special Litigation Committee's analysis in Ex. 187.

(2) Leasing costs were allocated as 100% personal use by Mr. Gupta. According to Mr. Gupta, the red Jaguar was given to the director of Donnelly Marketing. Mr. Nietzel confirmed that the vehicle was sold at the lease termination. See Gupta September 15, 2009 testimony, p.303 and Nietzel March 30, 2009 testimony, p.67.

(3) See Exs. 340 and 65 total lease payments made by Info. Leasing costs were allocated as 100% personal use by Mr. Gupta. Mr. Gupta testified that his son, Ben Gupta, used the car both before and during his employment with Info. See Gupta September 15, 2009 testimony, pp.306-308.

(4) Leasing costs were allocated as 100% personal use by Mr. Gupta. According to Mr. Gupta, he considered the Mercedes CLK in Hillsborough to be his personal car; this assessment is consistent with the analysis prepared by the Special Litigation Committee at Ex. 187. See Gupta September 15, 2009 testimony, pp.302-303.

(5) See Ex. 66 for the timing of and the purchase price of vehicles. The value of the perquisite received by Mr. Gupta was calculated based on the depreciation expense on the vehicle in accordance with Company asset depreciation policies. See depreciation policies in Ex. 15 at JB0017. The Special Litigation Committee determined that Mr. Gupta had full use of the vehicle for personal purposes. See Ex. 187.

(6) See Ex. 187 for the purchase date, purchase price, and disposal date of the vehicle. The value of the perquisite received by Mr. Gupta was calculated based on the depreciation expense on the vehicle in accordance with Company asset depreciation policies. See depreciation policies in Ex. 15 at JB0017.
Based on the Special Litigation Committee's analysis in Ex. 187, this vehicle was used partially for business purposes. Thus, the value of the perquisite is reduced by the number of days that the vehicle may have been used for a business purpose, which is determined as the number of days each year that Info employees or contacts stayed at Mr. Gupta's residence in the city where the vehicle was parked. See [USA-SLC-13660 - 65 for the Company's assessment of the number of business days usage of Mr. Gupta's personal residences.

(7) See Ex. 187 for the timing of the purchase and disposal of the vehicle, as well as the purchase price. The Special Litigation Committee determined that Mr. Gupta had full use of the vehicle for personal purposes.
The value of the perquisites received by Mr. Gupta was calculated based on the depreciation expense on the vehicle in accordance with Company asset depreciation policies. See depreciation policies in Ex. 15 at JB0017.

(8) See Ex. 187 for the purchase date, purchase price, and disposal date of the vehicle. Mr. Gupta testified that his son, Ben, drove a Smart Car in Washington, D.C. Thus, I have assumed that the vehicle was used solely for personal purposes.
The value of the perquisite enjoyed by Mr. Gupta was calculated as the depreciation expense on the vehicle in accordance with Company asset depreciation policies. See depreciation policies in Ex. 15 at JB0017.

(9) See "Count II Number 6.xls." All vehicle insurance, maintenance, & repair expenses are included, except those which were clearly related to vehicles not personally used by Mr. Gupta or his family members. The expenses are then allocated as 66% personal based on the overall ratio of personal use vehicles as compared with vehicles owned, leased, or paid for by Info from 2003 through 2006.

3-60

# Personal Benefits -- Private Residences

| | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|
| Reimbursements for Hillsborough, CA residence [1] | $ 120,000 | $ 115,000 | $ - | $ - |
| Reimbursements for Washington, D.C. apartment [2] | - | 148,800 | 69,600 | - |
| Reimbursements for Maui, HI condominium [3] | 67,000 | 58,300 | 58,600 | 59,300 |
| Less: Replacement cost (estimated hotel charges) [4] | (12,600) | (2,400) | (8,700) | (55,400) |
| Personal Benefits Received by Mr. Gupta | $ 174,400 | $ 319,700 | $ 119,500 | $ 3,900 |

(1)  See Annapurna AP detail at "Count II Number 7.xls."

(2)  See "Washington dc condo rent.xls," which is a vendor report for John Handbidge, the landlord of the apartment rented.  Rental payments are $5,800 per month not adjusted for repair and maintenance costs.  See also 00468 - 71, excluding $10,500 paid to Julie Burke that is included in my calculation of personal benefits Mr. Gupta received as a result of Info paying his personal employees.

(3)  See "052308 data request cov.xls" for vendors Gupta, Jess and AOAO the Ridge, which represents the condminium association dues also paid by Info.

(4)  See IUSA-SLC-13660 - 66.

3-61

4.      **GAAP Violations Regarding Related Party Transactions**

During fiscal years 2003, 2004 and 2005, Info's related party disclosures, as required by

GAAP and those required by Reg. 404, were materially false and misleading. Info did not disclose

certain transactions involving two entities wholly-owned by Mr. Gupta, which would have made

them related party transactions requiring disclosure: (1) Annapurna Corporation (Annapurna), which

was Mr. Gupta's investment company for his personal investments;[1] and (2) Aspen Leasing

Services, LLC (Aspen Leasing), an entity which bought and leased assets such as automobiles, boats

and exercise equipment.[2] This section will discuss the GAAP associated with disclosure of these

related party transactions. The materiality of each of these GAAP violations will be discussed in

section 5, Materiality of the Misstatements, of this report.

In order to determine whether transactions involving Mr. Gupta and Info constituted related

party transactions that would have required disclosure in Info's financial statements for fiscal years

2003 through 2005, and applicable proxy statements, I reviewed documentation and testimony and

applied GAAP and SEC requirements.

Related Parties and Required Disclosures

A related party is defined by GAAP in SFAS No.57, *Related Party Disclosures*, as

follows:

- Affiliates of the enterprise.

- Trusts for the benefit of employees, such as pension and profit-sharing trusts that are managed by or under the trusteeship of management.

- Principal owners of the enterprise. Owners of record or known beneficial owners of more than 10 percent of the voting interests of the enterprise.

- Management of the enterprise. Management includes persons who are responsible for achieving the objectives of the enterprise and who have the authority to establish policies and make decisions by which those objectives

---

[1] Gupta testimony, September 14, 2009, p. 45
[2] Nietzel testimony, March 30, 2009, pp. 57-58

4-1

are to be pursued. Management normally includes members of the board of directors, the chief executive officer, chief operating officer, vice presidents in charge of principal business functions (such as sales, administration, or finance), and other persons who perform similar policymaking functions. Persons without formal titles also may be members of management.

- Members of the immediate families of principal owners of the enterprise and its management. Immediate family includes family members whom a principal owner or a member of management might control or influence or by whom they might be controlled or influenced because of the family relationship.

Mr. Gupta, as part of management, CEO, and as a principal owner of more than 10 percent of the voting interests of Info constituted a related party during the time period covered in this report.

SFAS No. 57 also states:

1. ... Transactions between related parties commonly occur in the normal course of business. Some examples of common types of transactions with related parties are: sales, purchases, and transfers of realty and personal property; services received or furnished, for example, accounting, management, engineering, and legal services; use of property and equipment by lease or otherwise; borrowings and lendings; guarantees; maintenance of bank balances as compensating balances for the benefit of another; intercompany billings based on allocations of common costs; and filings of consolidated tax returns. Transactions between related parties are considered to be related party transactions even though they may not be given accounting recognition. For example, an enterprise may receive services from a related party without charge and not record receipt of the services.

Required Public Filing Disclosures

As previously mentioned in Section 2 of this report, public companies, such as Info, are required to file annual and quarterly reports with the SEC. These filings are utilized by third parties, such as investors, creditors and regulators. Accurate and full disclosure of financial information, as well as non-financial information, is essential to the end user in order to make informed decisions.

The required SEC annual filing or report, Form 10-K, instructs that financial statements included in the Form comply with GAAP. Therefore, Info was required to comply with the SFAS No.57, *Related Party Disclosure.* As such, SFAS No. 57 required the following to be disclosed:[3]

> 2. Financial statements shall include disclosures of material related party transactions, other than compensation arrangements, expense allowances, and other similar items in the ordinary course of business. However, disclosure of transactions that are eliminated in the preparation of consolidated or combined financial statements is not required in those statements. The disclosures shall include:
>> a. The nature of the relationship(s) involved
>> b. A description of the transactions, including transactions to which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements
>> c. The dollar amounts of transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period
>> d. Amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement  (footnotes omitted)

Info was also required, according to the instruction for Form 10-K, Item. 13, to comply with the disclosure requirements of Reg. 404,[4]

Reg. 404 states[5]:

> (a) *Transactions with management and others.* Describe briefly any transaction, or series of similar transactions, since the beginning of the registrant's last fiscal year, or any currently proposed transaction, or series of similar transactions, to which the registrant or any of its subsidiaries was or is to be a party, in which the amount involved exceeds $60,000 and in which any of the following persons had, or will have, a direct or indirect material interest, naming such person and indicating the person's relationship to the registrant, the nature of such person's interest in the transaction(s), the amount of such transaction(s) and, where practicable, the amount of such person's interest in the transaction(s):
>> (1) Any director or executive officer of the registrant;

---

[3] Financial statements disclosures are found in the notes to the financial statements.
[4] *SEC Handbook, Rules and Forms for Financial Statements and Related Disclosures,* As of December 2000, Commerce Clearing House, Inc., Chicago, IL. Page 33,211.
[5] This Reg. 404 was applicable to Info's fiscal years ended December 31, 2003 through 2005. Reg. 404 was amended on November 7, 2006.

(2) Any nominee for election as a director;
(3) Any security holder who is known to the registrant to own of record
beneficially more than five percent of any class of the registrant's voting
securities; and
(4) Any member of the immediate family of any of the foregoing persons.
(Footnotes omitted)

Reg. 404 also states:

*Instructions to Item 404.*
1. No information need be given in response to any paragraph of Item 404 as to
any compensation or other transaction reported in response to any other paragraph
of Item 404 or to Item 402 of Regulation S-K [§229.402] or as to any
compensation or transaction with respect to which information may be omitted
pursuant to Item 402.

Therefore, Info had the <u>option</u> to include, or not to include, disclosures of certain

relationships and related transactions that yielded compensation, such as perquisites, if they had

been disclosed in accordance with Reg. 402. However, if those related party transactions were

more involved in nature than what was required to be was disclosed according to Reg. 402, there

would be no option and disclosure would have also been required in accordance with Reg. 404.

<u>Info's Related Party Transaction Disclosure</u>

<u>NetJets</u>

As mentioned in section 3 of this report, Annapurna and Everest Investment Management,

LLC (EIM), a company 40% owned by Mr. Gupta,[6] had each purchased a 12.5 % ownership

interest in aircrafts from NetJets Sales, Inc. (NetJets). The following is a list of the aircrafts that

Annapurna had ownership interest in during the aforementioned time frame:

- Hawker 800XP (N805QS )- sold or disposed in July 2003[7]

- Citation X (N932QS) - sold on July 7, 2004[8]

---

[6] Ex. 402, p.64
[7] Info paid NetJets and Annapurna for use of this aircraft through June of 2003. An assumption is made here that
Annapurna either sold or disposed of this aircraft after June of 2003, since there were no payments made to either
Annapurna or NetJets relating to this aircraft, thereafter, and there were no invoices after that time period.
[8] EVER/ASP00129-30.

4-4