- Gulfstream IV (N441QS) - sold in February 2005[9]

In addition, EIM had an ownership interest in:

- Citation Excel (N694QS) - sold on November 7, 2003[10]

Annapurna would receive invoices or flight manifests from NetJets after Mr. Gupta utilized

its services, and they would be forwarded to Info for payment. At some point, Mr. Gupta made the

decision to charge Info an additional charge on flight usage of the aircrafts.[11]  This additional charge

purportedly consisted of depreciation, Annapurna's initial cost to buy the 12.5% interest for the

planes, and a mark up.[12]  Mr. Gupta's staff, from Annapurna, would then request those additional

charges be paid directly to Annapurna by Info, and the NetJets direct costs be paid directly to

NetJets by Info.[13]  Mr. Gupta testified as follows:

> Q   What prompted that division of payments where
>      infoUSA would make a portion of its payments to NetJets
>      directly?
> A   That I don't know, but it really didn't make any
>      difference whether Info cuts two checks or they cut one
>      check.  No.
> Q   Do you have any memory of why that occurred, whose
>      idea it was, how it happened, anything about that?
> A   I don't even know when that started; I mean, I
>      just -- you'd have to refresh my memory there.
> Q   And you don't remember why it started.
> A   No.  I just don't recall.
> Q   Was there any discussion that you remember about
>      that, by paying NetJets directly, there would be a reduction
>      in the related-party transactions payments?
> A   I think we had some conversations on that, that if
>      Info pays directly to NetJets for the hourly charge, then we
>      show less payment to Annapurna.
> Q   You show less in the SEC filings?  Is that what you
>      mean?

---

[9] Ex. 34, p.104; see also Ex. 545.
[10] Ex. 546.
[11] Dean testimony, June 18, 2009, pp. 445-448; see also Ex. 564 and Gupta testimony, September 15, 2009, pp.332-333.
[12] Nietzel testimony, March 30, 2009, pp. 142-143, and 165-166; Frye testimony, August 26, 2009, pp. 143-144; Dean testimony, June 18, 2009 p. 445; Wellman testimony, September 9, 2009, pp.76-77; see also Exs. 56, 195, and 314.
[13] See Exs. 56 and 314; see also PA-0000048-50, at 49.

A   infoUSA shows less payment to Annapurna.

Q   Yeah, and you show less payment to Annapurna in the
SEC filings regarding related-party transactions.  Right?

A   Yeah, that I think that's --

Q   Is that where you show less --

A   Yeah, that's where we were working.

*     *     *

Q   You testified earlier that you believe there were
some communications about that, by infoUSA paying NetJets
directly, that there would be a reduction in the amount of
related-party transactions that infoUSA  had to show.
Correct?

A   Just my guess; I mean, I was not sure about that;
that was just my guess.[14]

The payments made to NetJets, on behalf of Annapurna for direct charges, and the payments

made to Annapurna for the additional charge were both related party payments.  The guise of

separate payments did not eliminate this fact, since the payments to NetJets were on behalf of

Annapurna.  In its public filings, Info only included payments to Annapurna as related party

transaction.[15]  Info omitted payments made directly to NetJets for the aircrafts owned by Annapurna

and EIM in its Forms 10-K disclosures for 2003, 2004 and 2005.  This was incorrect and clearly a

violation of GAAP, as these payments were material related party expenses that should have been

disclosed. The aircraft expenses that Info should have disclosed relating to Annapurna and EIM

were $1,346,000, $836,000, and $179,000 for fiscal years 2003, 2004 and 2005, respectively.[16]

Additionally, Info should have disclosed the relationship between Annapurna and EIM.

---

[14] Gupta testimony, September 15, 20009, pp. 340-341

[15] For 2003, see KMPG-0018871-3 and Ex. 286; for 2004, see Exs. 40, 129, 283 and 549; and for 2005, see Exs. 31, 36, and 86.

[16] IG021892-99. *Note*: the labeling of the years 2003 and 2005are incorrect on IG021899; they should be reversed. The amounts for 2003 and 2005 were traced to IG_ER015806, IG_ER016118,and IG_ER016288 for accuracy. The total amounts consisted of payments that Info made to NetJets during the time periods that Annapurna owned the aircrafts.

4-6

Info's Purchase of Aircrafts

2003

On November 7, 2003 EIM sold its 12.5% ownership interest in the Citation Excel (N694QS) aircraft back to NetJets.[17] On the same day, Info purchased a 12.5% interest in the same aircraft from NetJets for $1,098,750.[18] Mr. Gupta signed both the document terminating EIM's ownership in the aircraft and the purchase agreement for Info. These two transactions were clearly linked. The transactions were completed on the same day, the same aircraft that was sold by Mr. Gupta's wholly-owned entity was purchased by Info,[19] and Mr. Gupta was the same person signing the transaction as seller and purchaser of the aircraft.

Although, on its form, the transaction appears as a sale between Annapurna and NetJets, and a purchase between Info and NetJets, the substance of the transaction was that Annapurna sold the aircraft to Info. It was a related party transaction that was required to be disclosed. Info did not disclose this transaction in its related party footnote on Form 10-K for fiscal year ended December 31, 2003, nor did it disclose it in the proxy statement.[20] This was a clear violation of GAAP.

FASB Emerging Issues Task Force (EITF) 00-21, *Revenue Arrangements with Multiple Deliverables*, states the following:

> . . . [S]eparate contracts with the same entity or related parties that are entered into at or near the same time are presumed to have been negotiated as a package and should, therefore, be evaluated as a single arrangement in considering whether there are one or more units of accounting. That presumption may be overcome if there is sufficient evidence to the contrary. (para. 2)

---

[17] Ex. 546
[18] InfoUSA  008781-92
[19] The aircraft sold and purchased had the same FAA registration number.
[20] Exs. 286 and 402

4-7

Additionally, GAAP requires recording the substance of transactions and not merely following their form.   Statement of Financial Accounting Concepts (SFAC)[21] No. 2, *Qualitative Characteristics of Accounting Information,* states as follows:

> Substance over form is an idea that also has its proponents, but it is not included because it would be redundant. The quality of reliability and, in particular, of representational faithfulness leaves no room for accounting representations that subordinate substance to form. Substance over form is, in any case, a rather vague idea that defies precise definition. (para.160)

Financial statements should reflect the substance of transaction and events. This important concept of representing a transaction for its actual economic substance and reality, instead of its technical form, is discussed throughout auditing guidelines. For instance, AU Section 334, *Related Parties,* states:

> [T]he auditor should be aware that the substance of a particular transaction could be significantly different from its form and that financial statements should recognize the substance of particular transactions rather than merely their legal form. (para. 02)[22]

Additionally, AU Section 411, *The Meaning of Present Fairly in Conformity With Generally Accepted Accounting Principles,* states:

> Generally accepted accounting principles recognize the importance of reporting transactions and events in accordance with their substance.  The auditor should consider whether the substance of transactions or events differs materially from their form. (para.06)

> [T]here sometimes are no established accounting principles for reporting a specific transaction or event. In those instances, it might be possible to report the event or transaction on the basis of its substance by selecting an accounting principle that appears appropriate when applied in a manner similar to the application of an established principle to an analogous transaction or event.  (para.09)

---

[21] "In the absence of the sources of established accounting principles described above, it is appropriate to consider other accounting literature. The most influential literature in this category is Statements of Financial Accounting Concepts (SFAC) of the FASB." (AU Section 411.11)

[22] See AU 334 footnote 2: for "[s]ome pronouncements specify criteria for determining, presenting, and accounting for the substance of certain transactions and events."

4-8

It is axiomatic that theses simultaneous transactions, which closed on the same day on November 7, 2003, should have been deemed as a related party transaction between Annapurna and Info. SFAS No. 57 states that "sales, purchases, and transfers of realty and personal property" between the entity and the related party require disclosure. Info omitted the transaction from its Form 10-K for year ended December 31, 2003 and in the proxy statement referenced therein.

### 2004

On July 7, 2004, the same type of transaction that was described above occurred again. Annapurna sold its 12.5% ownership interest in the Citation X (N932QS) aircraft to NetJets.[23] On the same day, Info purchased a 12.5% interest in the same aircraft from NetJets for $1,650,000.[24] Mr. Gupta signed both the document terminating Annapurna's ownership in the aircraft and the purchase agreement for Info.

Info did not disclose this related party transaction with Annapurna on its Form 10-Q for the quarter ended September 30, 2004.[25] SFAS No. 57 states that "sales, purchases, and transfers of realty and personal property" between the entity and the related party require disclosure. This omission was a violation GAAP as the related party transaction required disclosure.

### Yacht and Home Expenses Not Separately Disclosed

Info's disclosure in its 2003, 2004, and 2005 10-Ks, and proxy statements referenced therein, incorrectly described the related party transaction amounts disclosed as being for aircraft services paid to Annapurna. Info did not separately disclose the fact that there were payments included in those disclosures for yacht and home expenses that Annapurna owned.

---

[23] EVER/ASP00129-30
[24] InfoUSA 007710-007779
[25] It should be noted that Info did not disclose any related party transactions in its Form 10-Qs during the 2004 fiscal year.

Info's disclosures were as follows:

Form 10-K 2003

> Annapurna Corporation bills the Company when the Company's employees and officers use the aircraft. The Company paid a total of $2.2 million, $2.2 million and $2.1 million in 2003, 2002 and 2001, respectively, to Annapurna Corporation for usage of the aircraft and other travel expenses. (p. 64)

Form 10-K 2004

> The Company paid a total of $1.5 million, $2.2 million and $2.2 million in 2004, 2003 and 2002, respectively, to Annapurna Corporation for usage of the aircraft and related services. (p. 67)

Form 10-K 2005

> The Company paid a total of $297 thousand, $1.5 million and $2.2 million in 2005, 2004 and 2003, respectively, to Annapurna Corporation for usage of the aircraft and related services. (p. 67)

During Info's fiscal years 2003, 2004, and 2005, it was making recurring payments to Annapurna for a yacht Annapurna owned, the American Princess. The payments consisted of a set monthly amount based upon the value of the yacht, on a monthly rental basis, and employment costs of the crew.[26] The payments were made to Annapurna, each month, even if the yacht was not utilized by Info.[27] The yacht expenses for Info fiscal years 2003, 2004, and 2005, were approximately $370,000, $473,000, and $32,000 respectively.[28]

Additionally, Info made recurring monthly payments of $5,000 to Annapurna for expenses related to a home owned by Annapurna.[29] The payments consisted of a rental charge,

---

[26] See Gupta testimony, September 14, 2009, pp. 129-138, and 152-153; Burger testimony, January 13, 2009, p.186 Note: The monthly recurring payment amount was $30,000 in 2003 through half of 2004, and then $22,000 thereafter until the yacht was purchased by Info in the second quarter of 2005. It appears that the employment costs were then invoiced separately (i.e., not included in the recurring payment). See KMPG-0018871-3, and Exs. 73, 86 and 549.

[27] Dean testimony June 17, 2009, p.254-258, and 282; see also, Exs. 7, 396, and 542

[28] For 2003, the monthly payments for "TRAVEL SERVICES" of $30,000 were added with the "AMERICAN PRINCESS EMPLOYMENT REIMBURSEMENT" of $10,430.96 to yield, $370,000 (see KMPG-0018871-3). For 2004, see Exs. 40 and 73, at RKCIO06518. For 2005 see Ex. 86.

[29] According to Mr. Gupta, the Hillsborough's home was originally purchased by a family partnership [see Ex. 216, as it states the owner as Gupta & Sons Properties] to house employees of InfoUSA.com, which at the time, around 2001 was a company owned 60% by Info and 40% by Trident Capital. InfoUSA.com would pay Mr. Gupta a monthly fee of $5,000 (see Ex. 453). InfoUSA.com became a wholly owned by Info around 2003. See Gutpa

and other charges called "shared services."[30] The shared services appear to have consisted of cable, utilities, and internet hookups.[31] There appears to have been no written agreements between Annapurna and Info for these shared services.[32] Also, during 2003 and 2004, documentation and invoices illustrated Info's monthly recurring rental payments of $5,000 to Annapurna for the Hillsborough, CA home.[33] The total amount paid to Annapurna for these home expenses in fiscal years 2003 and 2004 was $120,000 and $120,000, respectively.[34] SFAS No. states that "use of property and equipment by lease or otherwise" between the entity and the related party is a transaction requiring disclosure.

The above yacht and home payment transactions were not separately disclosed in the Info's Forms 10-K for fiscal years 2003 through 2005 but rather were misleadingly described in the disclosure of aircraft usage payments, as "other travel services" or "related services." Neither description truly depicts true nature of the expenses. In addition, the proxy statements for the annual meeting of stockholders for 2004 and 2005 omitted the words "related services" altogether when describing the expense. The proxy statement for the annual meeting for 2003 included the words "other travel services" to describe yacht and home expenses. Yacht expenses for hosting parties and entertainment purposes are not travel expenses and neither are payments for home expenses. The disclosures were false and misleading.

It was not until the Form 10-K for fiscal 2007 was filed that the reader of the financial statements was made aware of yacht expenses:

---

testimony, September 14, 2009, pp. 79-87. According to Ex. 216, at some point the owner became Annapurna (see Ex. 216 at VG 001379). All payments were made out to Annapurna.
[30] See KMPG-0018871-3; and Exs. 14, 40, 157, 396, and 549.
[31] Dean testimony, June 16, 2009, pp. 182, and 207-209
[32] Heckart testimony, April 6, 2009, pp. 142
[33] See Ex. 11 for monthly recurring payment schedule. The monthly recurring payments of $5,000 for rent and $5,000 shared services multiplied by 12 months yields $120,000.
[34] See KMPG 0018871-3; and Exs. 40 and 549.

A total of $297 thousand was paid in 2005 to Annapurna Corporation, which
included $265 thousand for usage of the aircraft, and $32 thousand for usage of
the boat, of which $22 thousand was reimbursed to the Company from Annapurna
Corporation. (p. 104)

Info Purchase of Annapurna's Sky Box

In the second quarter of 2003,[35] the Company purchased the rights to a skybox at Lincoln

Memorial Stadium for $617,000 from Annapurna. This transaction was disclosed as a related

party transaction in Info's 10-Q for the quarter ended June 30, 2003.  However, this amount was

incorrectly also included in the amount disclosed in the 2003 10-K related party disclosure for

aircraft usage and other travel expenses.[36]

### Summary of Disclosed Expenses

The following table illustrates the breakdown of the amounts included in Info's related

party disclosures in its 10-Ks for expenses incurred for usage of the aircraft and "other travel

services" (2003) and "related services" (2004 and 2005).

**Table 4.1**

| Description | 2003 | 2004 | 2005 |
|---|---|---|---|
| Aircraft Payments to Annapurna | $1,125,000 | $929,000 | $265,000 |
| Sky Box Purchase from Annapurna | $617,000 | | |
| Yacht Payments to Annapurna | $370,000 | $473,000 | $32,000 |
| Home Payments to Annapurna | $120,000 | $120,000 | $ - |
| Other | | $2,000 | |
| | | | |
| **Total Amount Disclosed in Filings** | **$2,232,000** | **$1,524,000** | **$297,000** |
| | | | |
| **Omitted NetJet Expenses** | **$1,346,000** | **$836,000** | **$179,000** |

As illustrated, the description for aircraft services was misleading for not disclosing the

yacht and home expenses, and incomplete, as it omitted the NetJets expenses altogether.  Info's

---

[35] See Ex. 549 and KPMG-0018872
[36] KPMG-0018873

disclosure violated GAAP. The misleading information eliminated the representational

faithfulness of Info's financial statements.

SFAS No. 57, states:

### USEFULNESS OF RELATED PARTY DISCLOSURES

12. FASB Concepts Statement No. 2, Qualitative Characteristics of Accounting Information, examines the characteristics of accounting information that make it useful. That Statement concludes that for accounting information to be useful, it should be relevant (meaning that it has predictive or feedback value) and reliable (meaning that it has representational faithfulness, verifiability, and neutrality). That Statement further concludes that information about an enterprise increases in usefulness if it can be compared with similar information about other enterprises and with similar information about the same enterprise for some other period or point in time.

13. Accounting information is relevant if it is "capable of making a difference in a decision by helping users to form predictions about the outcomes of past, present, and future events or to confirm or correct expectations."[4] Relationships between parties may enable one of the parties to exercise a degree of influence over the other such that the influenced party may be favored or caused to subordinate its independent interests. Related party transactions may be controlled entirely by one of the parties so that those transactions may be affected significantly by considerations other than those in arm's-length transactions with unrelated parties. Some related party transactions may be the result of the related party relationship and without the relationship may not have occurred or may have occurred on different terms. For example, the terms under which a subsidiary leases equipment to another subsidiary of a common parent may be imposed by the common parent and might vary significantly from one lease to another because of circumstances entirely unrelated to market prices for similar leases.
[4] Concepts Statement 2, paragraph 47

\*       \*       \*

17. The Board also believes that relevant information is omitted if disclosures about significant related party transactions required by this Statement are not made. "Completeness of information also affects its relevance. Relevance of information is adversely affected if a relevant piece of information is omitted, even if the omission does not falsify what is shown."[7]
[7] See Concepts Statement 2, paragraph 80

SFAC No. 2, paragraph 80, states:

***Reliability***
58. That information should be reliable as well as relevant is a notion that is

4-13

central to accounting. It is, therefore, important to be clear about the nature of the claim that is being made for an accounting number that is described as reliable.

59. The reliability of a measure rests on the faithfulness with which it represents what it purports to represent, coupled with an assurance for the user, which comes through verification, that it has that representational quality. Of course, degrees of reliability must be recognized. It is hardly ever a question of black or white, but rather of more reliability or less.

\*      \*      \*

*Completeness*

79. Freedom from bias, both in the measurer and the measurement method, implies that nothing material is left out of the information that may be necessary to insure that it validly represents the underlying events and conditions. Reliability implies **completeness** of information, at least within the bounds of what is material and feasible, considering the cost.

80. Completeness of information also affects its relevance. Relevance of information is adversely affected if a relevant piece of information is omitted, even if the omission does not falsify what is shown.

Annapurna's Rent-Free Office Space

During 2003 and 2004, Annapurna and EIM occupied office space in a building owned by Info.[37] This building was adjacent to the Info's main building in Omaha.

A related party report issued by email, dated February 8, 2005, by Dr. Vasant Raval noted that the "Everest Building" was being occupied by several entities other than Info. He recommended the following:

1. Related parties should pay InfoUSA for value received. This should be under a formal contract, such as rental agreement.
2. Any other related party tenants of other properties of InfoUSA should be identified. Such entities should enter into similar agreements with InfoUSA.

...The question of independence of a director may surface if the director or his organization is an occupant of InfoUSA premises and particularly, if no rental/ lease agreement exists between InfoUSA, and the director or his organization.[38]

The quote above is accurate. A reader of the financial statements should know company transactions involving its directors. It is a company's duty to truthfully and, with full

---

[37] KPMG 0080097-100.; see also Ex. 40.
[38] Ex. 40

4-14

transparency, disclose its related party transactions. This material information should have been disclosed to the reader of the financial statements. In January 2005, Annapurna and EIM entered into a lease agreement with Info for the office space. According to the lease, the monthly payment was $1,600.[39] Therefore, it is reasonable to approximate that the yearly rent that these entities would have had to pay in 2003 and 2004 would have been approximately $19,000 per year.

It was not until the Form-K for fiscal year 2007 was filed, that disclosure was presented for the rent, as follows:

> During 2007, 2006, and 2005, Everest Inc. (f/k/a Vinod Gupta & Company, f/k/a Annapurna Corporation) and Everest Investment Management LLC rented office space in a building owned by the Company....The payments totaled $21 thousand, $30 thousand and $27 thousand during 2007, 2006 and 2005, respectively.
> (p. 103)

SFAS No. 57 states, "A description of the transactions, including transactions to which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements." Therefore, Info violated GAAP by not disclosing the free use of office space to Annapurna and EIM.

Payments to Aspen Leasing

Payments for Lease of Automobiles

During fiscal years 2003 and 2004, Info made recurring payments to Aspen Leasing for the use of automobiles that Aspen Leasing owned.[40] Info had internally identified these payments for fiscal years 2003 and 2004 as $41,000 and $58,000, respectively, as being related

---

[39] VG 0000888, and KPMG 0080097-100
[40] Schultz testimony, May 6, 2009, pp. 99-101; and Schafer testimony, January 21, 2009, p. 138. See also Ex. 192. Payments appear to have started in 2002 according to the accounts payable report-see Ex. 65.

party transactions.[41]  However, the payments were not disclosed as related party transactions to

the public. SFAS No. 57 states that "use of property and equipment by lease or otherwise"

between the entity and the related party is a transaction requiring disclosure.

The amounts that were omitted from related party disclosure in Info's Forms 10-K for

fiscal years 2003 and 2004; therefore, rendering the filing not in accordance with GAAP.

Automobiles Purchased from Aspen Leasing

In February 2005, Info purchased four automobiles that it had previously leased from

Aspen Leasing. However, Info did not, in form, purchase the automobiles directly from Aspen

Leasing; rather it purchased them from Classic Auto Sales LLC (Classic) subsequent to Aspen

Leasing selling the automobiles to Classic. The amount of these purchases totaled $182,000.[42]

The transaction was structured this way with the sole purpose of attempting to circumvent related

party disclosure.[43]  Mr. Gupta testified that the reasoning to have Info buy directly from Classic,

as opposed from buying from Aspen Leasing directly was to avoid related party disclosure:

> Q   Whose idea was that to run the transaction through
>     Classic Auto Sales?
> A   That I don't know.  Could be Stormy or Fred or
>     somebody.
> Q   You don't know; you're just -- was it you who
>     authorized the transaction to run through Classic Auto Sales?
> A   I just don't recall, no.
> MR. McLUCAS:  Do you recall why the sale from Aspen
>     was made to Classic and then Classic to the company?  Do you
>     have any understanding of what the point was?
> THE WITNESS:  I don't know.  It could be that if
>     Aspen sells it to Classic and Classic sells it to Info, then
>     it could not be a related-party transaction, but if Aspen
>     sold it to Info, that would be a related-party transaction.
> BY MS. FRANCISCUS:
> Q   And therefore the transaction would have to be
>     disclosed in the SEC filings, because it was over the $60,000
>     threshold.  Is that right?

---

[41] See KMPG-0018880, and Exs. 40 and 549.
[42] See Exs. 55, 66, 67, 572, and 579; and InfoUSA 009540-48.
[43] Nietzel testimony, March 30, 2009, pp. 118-119; see also, IUSA-SLC-13522; and Exs. 66 and 321.

> A    Yeah, I think somebody suggested that we should do
>        that. I don't know whether it was Stormy or Fred. To me it
>        didn't make a difference one way or the other.
>        And from what I recall, eventually it was
>        disclosed, that from what I recall, KPMG said that it didn't
>        make any difference; they still have to disclose it. That's
>        just my recollection.
> Q    Who suggested that structuring the transaction in
>        such a way to run the cars through Classic Auto Sales would
> A    I just don't recall. I don't know; it could be Raj
>        Das or Stormy or Fred or somebody; you know, I just don't
>        recall.[44]

Mr. Tom Schafer, an internal auditor at Info, stated, "And so rather than transferring
ownership directly from Annapurna or Aspen Leasing Services directly to infoUSA, there was a
middle man involved so that it had the appearance of being an arm's-length transaction."[45]

Mr. Fred Vakili, the chief administrative officer (CAO), testified about the purchase from
Classic:

> Q    So did Mr. Gupta make the suggestion to have
>        InfoUSA purchase the cars that had previously been leased
>        from Aspen Leasing?
> A    I think so. I think so. I think at that time
>        there was this big effort of getting rid of all related-party
>        transactions, and I don't know the exact timing, what point
>        the cars were --.[46]
>
> Q    Was it your idea, or somebody else's idea to start
>        this transaction?
> A    It wasn't a matter of really -- Vin just said,
>        because we were trying to have this list that Dr. Raval had
>        put together, and were trying to go through and eliminate all
>        of these things, and accounting people were involved in doing
>        that, and I was involved in, you know, from my side of the
>        business.
> A    ...And Vin said, you know, "Who's that guy in" --
>        Classic Auto, Terry Kuehl, who runs Classic Auto, is a guy
>        that we've all bought cars from in Omaha. He's just a
>        regular guy. He's not a particular dealership, but he sells
>        and -- you know, he says, "Why don't we just call him and

---

[44] Gupta testimony, September 15, 2009, pp. 313-314
[45] Shafer testimony, January, 21, 2009, p. 141
[46] Vakili testimony, May 19, 2009, p. 232

have him just take all these things out of Aspen Leasing,"
and somebody called Terry, and Terry just took them all from
Aspen Leasing, and sold them to InfoUSA.
Q   So it was Mr. Gupta's idea?
A   Yeah.  I mean, I'm sure that it was.[47]

As discussed earlier regarding the purchase of the aircrafts, the substance of a transaction
is required to be reflected in the financial statements. These transactions were linked transactions;
one transaction was done in contemplation of the other. The sale of the autos from Aspen Leasing
to Classic, and then the re-sale of the same autos, from Classic to Info, elevated form over
substance.  As stated above, SFAS No. 57 states that "sales, purchases, and transfers of realty and
personal property" between the entity and the related party require disclosure. Therefore, the
omission the auto purchases violated GAAP because it rendered the related party disclosure note
to the financial statement as incomplete, and thus unreliable. Info's Form 10-K for 2005 was in
violation of GAAP. Additionally, Info's annual proxy statement was not in accordance with Reg.
404 as these purchases should have been disclosed.

Rent Paid To Jess Gupta

During Info's fiscal years 2003, 2004, and 2005 Info paid a monthly payment to Jess
Gupta, Mr. Gupta's son, for use of his condominium in Maui. These payments consisted of a
payment of either $5000 or $4,000 a month during 2003, and $4,000 per month for 2004 and
2005, totaling payments of $57,000 for 2003 and $48,000 for 2004 and 2005.[48] Info made
recurring monthly payments for the association dues on the condominium as well.[49] Info's was
making monthly recurring payments ranging from of either $820, $860 or $932 during fiscal

---

[47] Vakili testimony, May 19, 2009, pp. 232-233
[48] Exs. 40, 73, 86, 396 , and 549
[49] Exs. 11 and 396

years 2003, 2004 and 2005, which approximated $10,000 per year.[50] These payments to Gupta's

son constituted related party transactions that should have been disclosed in the public filings.[51]

<u>Messrs. Das and Dean's Failure to Ensure Proper Related Party Disclosures According to GAAP</u>

<u>and SEC Regulations</u>

Messrs. Das and Dean, during their tenures as CFOs at Info, had an obligation to ensure that

related party transactions were accurately disclosed in accordance with GAAP, and Reg. 404.

Mr. Das certified to Info's Forms 10-K as required by SOX Sections 302, 906 and 404, for

Info's fiscal years 2003 and 2004.[52] Mr. Dean certified to Info's Forms 10-K required by SOX

Sections 302, 906 and 404, for Info's fiscal years 2005.  In addition, Das signed Info's Forms 10-K

for 2003 and 2004, and its Form 10-Q for the third quarter 2004.   Dean signed Info's Forms 10-K

for 2005.

As described in Section 2 of this report, Management's Responsibility for Financial

Reporting, in order to comply with the aforementioned SOX sections, Mr. Das and Mr. Dean were

required to ensure proper disclosure of the public filings; evaluate and report on the effectiveness

of the company's internal control over financial reporting as of fiscal year end, including a

statement as to whether or not the company's internal control over financial reporting was

effective (i.e., that there were no material weaknesses);[53] and ensure that the financial statements

comply with applicable securities laws and fairly present the financial condition and results of

operations of the company.

Messrs. Das and Dean's responsibility in complying with the SOX requirements was to

ensure that Info's internal controls were in place to effectively track, record and disclose the

---

[50] See Ex. 11, and "052308 data request cov.xls" for vendors Gupta, Jess and AOAO the Ridge,  which represents the condominium association dues also paid by Info.

[51] Info subsequently included these payments it public filings for fiscal year 2007.

[52] SOX Section 404 did not required compliance until fiscal year end December 31, 2004, and after.

[53] A material weakness is a control deficiency, or combination of control deficiencies, that result in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected. (Info's Form 10-K for year ended December 31, 2004, p. 40)

related party transactions in the public filings. As discussed in this section of the report, evidence indicates that the controls were weak. As a result, the reporting of those transactions was false, misleading and incomplete.

Mr. Das

Mr. Das stated that he was "never was an expert on the nuances and technical part of the accounting," and that he was not a CPA and had relied on Info's audit committee and disclosure committee to make sure that Info was "perfect" in their public filings. It was not the audit committee or the disclosure committee's responsibility to ensure accuracy in Info's public filings; it was Mr. Das's responsibility. Also of note, the disclosure committee did not come into effect until 2005.[54]

In regards to public filings and disclosures, he stated that he had not come across many CPAs who were "knowledgeable because these rules are changing so rapidly." He never drafted the financial statements or the Management's Discussion and Analysis of Financial Condition or Results of Operations on the Form 10-K.[55] Mr. Das testified repeatedly that he relied on others to ensure the accuracy of the financial statements and public filings.

> Q   So you really took no role in the Form 10-K other
>      than to review it?
> A   That is correct.
> Q   And you never took ownership of that document?  You
>      just reviewed it?
> A   To the best of my knowledge, I never took ownership
>      of the document.[56]

A major reason that SOX Sections 302 and 906 were enacted in the first place was for someone, specifically the principal officers of a company, to take ownership.  Under SOX, the CEO and the CFO could no longer say that they relied on others to ensure that the public filings

---

[54] Das Testimony, June 10, 2009, p. 371
[55] Das testimony, June 9, 2009, pp. 40-41
[56] Das testimony, June 9, 2009, pp. 47-48

4-20

were "perfect," as Mr. Das stated that he had done. Audit committees are not the ones

responsible for financial statements conforming with GAAP, it is management's responsibility,

specifically the person in management who is certifying to such in the filings.

If one is to comply with a regulation or law, one needs to become knowledgeable about

such a law. Mr. Das had the responsibility to understand SOX requirements. He stated, "My

understanding was that SOX mandated that a Section 16 officer of the company and the board

members could not have related party transactions with the company."[57] In regards to related

party transactions, he reiterated that, "SOX forced us to get rid of that so it did not become -- we

had a lot of strategic things to think about."[58] However, SOX never mandated that a public

company could not to participate in related party transactions. He also stated:

> A   My understanding going into the CFO job was that
> before Sarbanes-Oxley compliance it was okay for public
> companies to have related party transactions as long as they
> did adequate disclosures around the materiality -- around
> material related party transactions. I still do not know
> what the exact SOX requirement is. My understanding going
> into SOX compliance is public companies could not have
> related party transactions.[59]

Mr. Das also failed to meet his obligations as CFO when it came to ensuring that the

related party transactions were in accordance with GAAP and Reg. 404. In order to ensure

compliance, Mr. Das had to make sure that financial reporting and disclosure controls were

effective to capture and report such transactions. That was not the case.

As Mr. Das testified on June 10, 2009:

> Q   Also as part of this collective effort, was there a
> review of the related party transaction policies and
> procedures in place at InfoUSA?
> A   I don't remember any such review or formal policy
> around it.
> Q   Do you recall ever reviewing a related party
> transaction policy at the company?

---

[57] Das testimony, June 9, 2009, p. 63
[58] Das testimony, June 9, 2009, p. 77
[59] Das testimony, June 9, 2009, p. 80

    A   I don't remember.
    Q   Do you know if one existed?
    A   I don't -- I can't think of one.
    Q   Do you know whether there was -- do you know
        whether or not related party transactions that had taken
        place during your tenure as CFO were at all in compliance
        with controls or procedures at the company?
    A   I don't know how to answer that question.
    Q   Let's try it this way.  Are you aware of what the
        procedures or policies or controls were with respect to
        related party transactions?
    A   I don't know what the policy and procedure controls
        would be around related party transactions. [60]

Mr. Das further testified:

    Q   So just so I'm clear, you're [sic] involvement that you
        recall on related party transactions was simply disclosure.
        You don't recall being involved or aware of any procedures
        policies or controls in place with respect to entering into
        related part transactions during your tenure?
    A   I don't remember myself being part of that. [61]

These statements seem peculiar since he attended the audit committee meetings on

January 24, 2005 and July 21, 2005 where related party transaction policies were distributed. [62]

Prior to those meetings, Ms. Burger notified the audit committee, in a meeting on July 13, 2004

which Mr. Das attended, that there was no formal policy in place to notify Accounting & Finance

of related party transactions. She recommended that a formal policy and procedure be

established, and distributed to all employees and directors, which defined and explaining related

party relationships and alert accounting and finance of those relationships. [63]

    Ms. Burger also sent an email, on December 15, 2004, to Mr. Das and Mr. Schultz stating

that the audit committee approved a related party policy, amended December 6, 2004, to be

effective immediately, and that pre-approval must be obtained prior to the related party

---

[60] Das testimony, June 10, 2009, p. 245
[61] Das testimony, June 10, 2009, 246
[62] See Exs. 73 and 116.
[63] Burger testimony, January 13, 2009, pp. 226-228; see Exs. 18 and 19.

transaction being entered into.[64] The policy stated that the CFO, the chief administrative officer

(CAO), and the CEO must approve all non-material related party transactions (i.e., less than

$60,000), and all material related party transactions (i.e., greater than $60,000) required approval

by the audit committee. This policy was never enforced.[65] Dr. Raval stated that there was no

approval for any aircraft that Info purchased or the seven year capital lease of the yacht

previously owned by Gupta, either by him or the audit committee.[66] It was Mr. Das's duty as

CFO and a certifier of the public filings to enforce this policy

Additionally, Mr. Das was also listed as an attendee in the audit committee meeting on

July 21, 2005, when another revised policy was distributed.[67] Mr. Das's testimony clearly

describes his breach of duties; as a SOX certifier, he was responsible to be "part of that." It was

Mr. Das's responsibility to ensure, even before the related party policy of December 2004

became effective, that the Company's internal controls were in place to capture related party

transactions for proper approval and disclosure.

SOX Section 302(b) specifically states that the certifying officer

> [Design] such internal controls to ensure
> that material information relating to the issuer and its
> consolidated subsidiaries is made known to such officers
> by others within those entities, particularly during the
> period in which the periodic reports are being prepared....

Mr. Das should have inquired about any related party policies that were in existence when

he became a CFO in September 2003. There was a written policy dated April 2002.[68] There

appears to be no testimony to support that this policy was ever in effect, yet in the November 22,

---

[64] Ex. 27. *Note:* It was not until the internal audit department was formed in late 2003, to assist Info in becoming
SOX compliant, that the internal controls around related party transaction began to be addressed. As a result, an
amended policy was developed and became effective in December 2004; however, Board approvals were still not
sought for the aircraft and capital lease of the yacht.
[65] Burger testimony, January 13, 2009, pp. 256-258, and 261 – 262; see Exs. 13 and 27.
[66] Raval testimony, August 20, 2009, pp. 440 and 463
[67] Ex. 73
[68] Ex. 13, at COBO_0000167-168

2004 minutes to the audit committee, it was stated that the <u>existing</u> related party policy needed to be updated. Also, in the December 14, 2004 audit committee meeting, when the December 6th policy came into effect, it stated that the <u>previous</u> policy was superseded. [69] Ms. Burger testified that there was a policy in existence when she first became director of internal audit, but was not sure if it was in effect.[70] It appears that the April 2002 policy was something that other employees at Info were aware of, but that it was neither effective nor followed.  In any case, Mr. Das should have inquired about the existence of such a policy and ensured that it was explicit, and all encompassing, and adhered to.

Ms. Burger stated that she never saw Dr. Raval's signature as a pre-approval for material related party transactions by the time she left internal audit in April/May 2005.[71] Additionally, her successor as director of internal audit, Mr. Dwornicki, noted the same pre-approval deficiency during his SOX test work from January 1, 2005 through September 2005, which he documented and emailed to Mr. Das on September 27, 2005. He noted that only 46 out of 74 invoices had all three required approvals (i.e., CFO, CAO and CEO) for non-material related party transactions.  Mr. Dwornicki's document also stated that the current related party policy did not make it clear that the materiality threshold was not just for an individual item over $60,000, but also for a series of items whose cumulative amounts for the related party exceeded $60,000.[72]

Mr. Schafer, Info's internal auditor, testified regarding the director and officer (D&O) questionnaire, which appeared to be the main control to identify related parties.

> Q  What was the method of identifying related parties
> during your tenure?  Director and officer questionnaires?
> Anything -- something like that or --
> A  Well, yes, the director and officer questionnaires.
> And other than that, it was really -- I think the company

---

[69] Exs. 22 and 23; see also Ex. 358.
[70] Burger testimony, January 13, 2009, pp. 166-167
[71] Burger testimony, January 13, 2009, p. 261
[72] Dwornicki testimony, April 8, 2009, p. 44

> relied on the accuracy of those questionnaires and on the
> honesty of individuals to declare related parties. I don't
> think there was a -- in my opinion, there was not the effort
> made by any party outside of internal audit to full
> investigate and to want to understand the nature and the
> extent of related-party payments.[73]

Mr. Das testified that he did not have an understanding of what exactly was done with the

answers to the D&O questionnaires:

> Q  And did you understand that at the time that you
> were CFO, that the D&O questionnaires and the answers
> provided by officers and directors would help create the
> information that ultimately went into the proxy statements
> filed with the SEC?
> A  I had a general understanding of it. I didn't
> really know how it was correlated or how they used that
> information.[74]

In regards to the extent of Mr. Das's responsibility over related party transaction

disclosure, he said he would ask, "'Are we being completely 100 percent accurate in disclosing

everything that we need to disclose for SEC requirements?' That's the extent of my recollection

when I was involved in dealing with the related party issue."[75]

In addition, when asked during his testimony if he was concerned about internal controls

over related party transactions, he responded:

> At the time I started no one raised concerns around
> it. Later on when we were complying with Sarbanes-Oxley for
> our first year that became a topic, which KPMG and our audit
> committee were very interested. Of course, I was very
> interested in eliminating related party transactions so we
> <u>did not have to deal with it.</u>[76]

Mr. Das stated in the testimony that he was concerned about the level of related party

transactions and that he wanted to "get rid of them," "remove them," "eliminate them," because

---

[73] Schafer testimony, January 13, 2009, pp. 40-41
[74] Das testimony, June 10, 2009, p. 351
[75] Das testimony, June 10, 2009, p. 256
[76] Das testimony, June 9, 2009, p. 76

they did not viewed positively by investors[77] As Mr. Das stated, if the assets become Info's assets then there would not be anything to disclose.[78]

Mr. Das testified that the only action he took to ensure that the representations made to KPMG regarding related party transactions for their year end audit of fiscal 2003 were accurate, was to rely on Info's controller, Mr. Hoffman and his team. Mr. Das did not remember seeing any work papers they prepared.[79] He simply relied on them. His reliance of Mr. Hoffman continued when a member of the audit committee emailed Mr. Das on March 8, 2005,[80] directly, looking to him for answers to questions about the related party disclosure for the fiscal 2004 Form10-K:

> Q   Mr. Borda says, "I'm reviewing the draft of the 10-
>      K and I noted that under the related party transactions, only
>      Annapurna was listed.  Don't we have to report others as
>      well, including Robins, Kaplan, Miller & Ciresi, Aspen
>      Leasing and Financial Communications, the various consulting
>      entities, et cetera.  The list the audit committee was
>      provided was quite long."  Do you recall receiving Mr.
>      Borda's e-mail on this topic?
> A   Yes, I do recall receiving this e-mail in response
>      to my sending out to disclosure committee members to review
>      the public filings.
> Q   <u>Did you respond to Mr. Borda?</u>
> A   <u>I did not, because again, this would have been
>      outside my technical expertise area.</u>  So I -- this is a --
>      I'm happy you have a copy of this e-mail.  This again confirm
>      what I've been telling you since yesterday.  I would pass
>      this on to someone like my corporate controller who with his
>      staff would be better able to assist around the technical
>      requirements around this kind of disclosure.
> Q   Did you get a response from Mr. Hoffman?
> A   I don't remember getting a response from him to
>      this particular e-mail, but Mr. Hoffman was very hardworking
>      and conscientious person.  So it would be hard for me to
>      believe that he did not send somebody.  I just don't remember

---

[77] Das testimony, June 9, 2009, pp. 63, 77-79 ; and June 10, 2009, pp. 240 and 287
[78] Das testimony, June 9, 2009, pp. 163-165
[79] Das testimony, June 10, 2009, p. 374
[80] Ex. 128

whether he sent me a response or what it was.[81]

It was Mr. Das's responsibility as CFO to follow up with this issue and ensure that disclosures in the 2004 10-K were in accordance with GAAP; however, the disclosures were false, misleading, and incomplete.

Additionally, in order for Mr. Das to know how to comply with Reg. 404, Mr. Das should have known what Reg. 404 entailed. However, Mr. Das did not:

> Q  Did you ever make an effort to review Item 404 under Regulation S-K dealing with related party transactions? Those are the SEC rules for disclosure of related party transactions.
> A  If I did, I do not remember. It was a long time ago.
> Q  Do you believe you took the effort to review Item 404 of Regulation S-K?
> A  I do not remember.[82]

He stated that he was not sure if he reviewed the proxy statements before or after they were filed.

> A  My role was in this very similar to my role in 2003 proxy statement which I've testified to you about. If you would like, I can tell you again.
> Q  Essentially you said that you don't recall whether or not you reviewed the 2003 proxy statement before or after it was filed. Is that true for 2004?
> A  That's correct for the proxy statement, yes.[83]

In light of his responsibility as of CFO, Mr. Das should have at least reviewed the sections of the proxy statements that had been referenced in the 10-K before they were filed. The information required to be disclosed in the Form 10-K, for Reg. 404, was referenced to the proxy statements. Therefore, it was Mr. Das's responsibility to ensure that the information was

---

[81] Das testimony, June 10, 2009, pp. 389-390
[82] Das testimony, June 9, 2009, p. 82
[83] Das testimony, June 10, 2009, p. 379

accurate. Additionally, Mr. Das's name was listed in both proxy statements as a person whom

other shareholders could elect to vote on their behalf. [84]

With respect to SOX Section 404, the following was included in Info's Form 10-K:

> Management, including the Chief Executive Officer and Chief Financial Officer,
> has conducted an evaluation of the effectiveness of the Company's internal control
> over financial reporting as of December 31, 2004.... Based on its assessment,
> management concluded that the Company did not maintain effective internal
> control over financial reporting as of December 31, 2004 because of the following
> material weaknesses:

> > The Company lacks the necessary depth of personnel with sufficient
> > technical accounting expertise. Accordingly, in certain circumstances, an
> > effective secondary review of technical accounting matters cannot be
> > performed. As a result, improper accounting for certain complex
> > transactions could occur, resulting in the Company reporting incorrect
> > amounts in its financial statements. (p. 38)

The public filings were not in accord with GAAP or Reg. 404, as explained previously in

this section of my report, yet Mr. Das signed and certified to this in Info's Forms 10-K for fiscal

years 2003 and 2004, and, by reference, to the proxy statements therein. Mr. Das did not ensure

that disclosure controls and financial reporting controls for related party transactions were

effective.

Mr. Das knew Aspen Leasing and Annapurna were owned by Gupta and that Info was

making payments to Annapurna, NetJets, and to Aspen Leasing for aircraft usage, yacht

expenses, car usage and Hillsborough home expenses.[85] He was also aware that a middleman

(i.e., Classic) was used to purchase automobiles that he had originally approved for purchase

from Aspen Leasing, but then there was a decision made to purchase the automobiles through

Classic instead, which according to testimony was done for the sole purpose of not reflecting a

---

[84] See Exs. 283 and 286.
[85] Das testimony, June 9, 2009, pp. 143-144, 157-160, 162-163, 175-178; see Exs.7, 73, 116, 157, 314, 321 and 396;
see also Das testimony, June 10. 2009, pp. 237-238, 271-273, and 366-369.

related party transaction.[86] The aforementioned related party transactions were expenses that required disclosure in the public filings.  Mr. Das's failure to meet his obligations as CFO to ensure that these transactions were properly disclosed led to materially false and misleading disclosures as described herein.

Mr. Dean

Mr. Dean was aware that related party disclosures had been given more attention by Info, from the time he had left Info in 2003, to the time he returned in August of 2004 until the time he became CFO in approximately February 2006. He stated that related party transactions were a topic of discussion at every audit committee meeting that he attended when he returned to the CFO position. [87] Mr. Dean was also aware that there were significant internal control weaknesses regarding related party transactions during the time that he certified to SOX Sections 302, 906, and 404 for Info's 2005 fiscal year end.

On December 30, 2005, he sent an email to members of the audit committee, among others, stating that he had met with Mr. Dwornicki to discuss SOX deficiencies, including related party transactions deficiencies.  Mr. Dean stated in his email that:

> We will also be sending out directors and officers questionnaires in a couple of weeks, and a process will be put in place to ensure that the questionnaires are reviewed and any potential related party transactions are added to our list.  I will handle the implementation of the review process. [88]

Mr. Dwornicki stated that he did not "have any understanding of the method that the review was conducted or anything about how the director and officer questionnaires were looked at to develop the list of related parties."[89]  The D&O questionnaire was one of the major

---

[86] See Exs. 321 and  579, and InfoUSA 009540-48.
[87] Dean testimony, June 16, 2009, p.83
[88] Ex. 269
[89] Dwornicki testimony, April 8, 2009, pp. 99- 100

internal controls utilized to capture related parties and it was weak because it was not filled out completely by the individuals who were requested to fill it out.

Mr. Dwornicki reported a significant deficiency summary, "Deficiency, 12/31/05, Sarbanes-Oxley 2006 significant deficiency summary," which stated that, "Not all offices had responded properly to the directors and officers proxy questionnaire section on related parties. As a result, accounts payable personnel did not have an up-to-date list of all related party businesses."[90]

Mr. Dean was aware of the deficiencies in surrounding related parties, yet there is no evidence that he followed up on the D&O questionnaire process, mentioned above. He was aware that Info was making lease payments to Annapurna for the yacht prior to the Company purchasing the yacht, through a seven year capital lease, and that those payments were included as other "related services" for describing aircraft usage;[91] he knew that Info was making payments directly to NetJets on Annapurna's behalf, and that it was only the payments made to Annapurna (i.e., not NetJets) that were the ones reflected in the related party disclosure;[92]

Info's Form 10-K states the following:

> Management is responsible for establishing and maintaining "adequate internal control over financial reporting" for the Company as such term is defined in Exchange Act Rule 13a-15(f). The Company's internal control system was designed to provide reasonable assurance to the Company's management and board of directors regarding the reliability of financial reporting and the preparation and fair presentation of published financial statements.
> Management, including the Chief Executive Officer and Chief Financial Officer, has conducted an evaluation of the effectiveness of the Company's internal control over financial reporting as of December 31, 2005, ....

\*     \*     \*

---

[90] Dwornicki testimony, April 8, 2009, p 105; Ex. 270
[91] Dean testimony, June 17, 2009, pp. 255-256, 291 and 307-308; and June 18, 2009, pp. 593-596
[92] Dean testimony, June 18, 2009, pp. 445-446, and 597-598

**(b)    Evaluation of Disclosure Controls and Procedures**

...The Company's Chief Executive Officer and Chief Financial Officer concluded that, as of December 31, 2005, the Company's disclosure controls and procedures were effective....[93]

This was not the case. Related party disclosures controls and procedures were not effective. The public filings were not in accord with GAAP or Reg. 404, as explained previously in this section of my report, yet Mr. Dean certified to this in Info's 10-K for fiscal year 2005, and the proxy statement referenced therein. Mr. Dean did not ensure disclosure controls and financial reporting controls for related party transactions were effective. In addition, he signed and certified the 2005 Form 10-K without ensuring that the disclosures were adequate. As a result of Dean's failures to meet his obligations in his accounting roles at Info, the related party disclosures in Info's Forms 10-K for 2005 were materially false and misleading.

---

[93]Info Form 10-K for year ended December 31, 2005, pp. 39-40

**5.**    **Materiality of the Improper Disclosures**

As described earlier, various investigations led Info to identify several categories of perquisites and other personal benefits that Mr. Gupta received during his tenure as CEO of the Company. Info's Special Litigation Committee directed a detailed review of the Company's payments in each expense category to determine the value of the personal benefits received by Mr. Gupta.  A subsequent investigation by the SEC resulted in additional changes to the disclosure of perquisites.

The analyses resulting from the investigations caused Info to file a 2007 Form 10K/A with the SEC on March 16, 2009, which amended the Company's disclosure on executive compensation.  The Company further amended its executive compensation disclosures on November 5, 2009 as Amendment No. 2 to its 2008 Form 10-K, and then later on December 1, 2009 in Amendment No. 3 to Info's 2008 Form 10-K.

Relevant Accounting Literature re: the Materiality of the Misstatements

The accounting literature is clear that when assessing materiality of a misstatement, one must consider qualitative characteristics, especially relevance and reliability, in addition to quantitative characteristics.[1]

SFAC No. 2, *Qualitative Characteristics of Accounting Information,* defines materiality as:

> The magnitude of an omission or misstatement of accounting information that, in the light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would have been changed or influenced by the omission or misstatement.[2]

---

[1] Relevance is defined in SFAS No. 2 as "The capacity of information to make a difference in a decision by helping users to form predictions about the outcomes of past, present, and future events or to conform or correct prior expectations."  Reliability is defined as "The quality of information that assures that information is reasonably free from error and bias and faithfully represents what it purports to represent."

[2] See the glossary of terms in SFAC No. 2.

Although materiality judgments "are primarily quantitative in nature," SFAC No. 2 notes that whether an item is "large enough for users of the information to be influenced by it...will usually be affected by the nature of the item; items too small to be thought material if they result from routine transactions may be considered material if they arise in abnormal circumstances."[3]  In other words, "magnitude by itself, without regard to the nature of the item and the circumstances in which the judgment has to be made, will not generally be a sufficient basis for a materiality judgment."[4]

In discussing the considerations that enter into experienced human judgment, the Financial Accounting Standards Board states:

> ...However, that position is not intended to imply either that the Board may not in the future review that conclusion or that quantitative guidance on materiality of specific items may not appropriately be written into the Board's standards from time to time.  That has been done already (for example, in the Statement on financial reporting by segments of a business enterprise), and the Board recognizes that quantitative materiality guidance is sometimes needed....[5]

SEC Staff Accounting Bulletin No. 99, *Materiality,* (SAB 99), further stressed the need to consider both qualitative as well as quantitative factors in assessing the materiality of a misstatement as set forth in SFAC No. 2.[6]  In reaching its conclusions, the Staff relied upon the guidance set forth in SFAC No. 2 as well as in court decisions and noted, further, that the "formulation [of the concept of materiality] in the accounting literature is in substance identical to the formulation used by the courts in interpreting the federal securities laws."

---

[3] SFAC No. 2, paragraph 123.
[4] SFAC No. 2, paragraph 125.
[5] SFAC No. 2, paragraph 131.
[6] Issued in December 1999, SAB 99 summarizes the SEC Staff's views as a result of its reviews of previous filings.

In responding to a question as to whether amounts and items are material to the financial statements if they "fall below a percentage threshold set by management or the auditor," the Staff noted that "quantifying, in percentage terms, the magnitude of a misstatement is only the beginning of an analysis of materiality; it cannot appropriately be used as a substitute for a full analysis of all relevant considerations. Materiality concerns the significance of an item to users of a registrant's financial statements. A matter is 'material' if there is a substantial likelihood that a reasonable person would consider it important."

The Staff further noted that:

> ...an assessment of materiality requires that one views the facts in the context of the 'surrounding circumstances,' as the accounting literature puts it, or the 'total mix' of information, in the words of the Supreme Court. In the context of a misstatement of a financial statement item, while the 'total mix' includes the size in numerical or percentage terms of the misstatement, it also includes the factual context in which the user of financial statements would view the financial statement item. The shorthand in the accounting and auditing literature for this analysis is that financial management and the auditor must consider both 'quantitative' and 'qualitative' factors in assessing an item's materiality._Court decisions, Commission rules and enforcement actions, and accounting and auditing literature have all considered 'qualitative' factors in various contexts.

In that regard, SAB 99 contains a comprehensive, but not an "exhaustive list of the circumstances that may affect materiality of a quantitatively small misstatement." Those circumstances include references to regulatory requirements and management compensation:

- whether the misstatement affects the registrant's compliance with regulatory requirements; and
- whether the misstatement has the effect of increasing management's compensation – for example, by satisfying requirements for the award of bonuses or other forms of