## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | CASE NO. 8:10CV102 |
| Plaintiff, | ) ) | |
| v. | ) ) | MEMORANDUM AND ORDER |
| RAJNISH K. DAS and STORMY L. DEAN, | ) ) ) ) | |
| Defendants. | ) | |

This matter is before the Court on the Defendants' Motion for Summary Judgment (Filing No. 84), the Plaintiff's Motion in Limine (Filing No. 102), and the Defendants' Motion in Limine (Filing No. 105). The motions are supported by Briefs (Filing Nos. 85, 93, 94, 103, 106, 113, 119, 126, 127, 128, 130, 135, 138)[1] and Indexes of Evidence (Filing Nos. 86, 87, 95, 96, 97, 104, 107, 114, 115, 120, 121, 129, 131, 132, 136, 137). For the reasons discussed below, the Motion for Summary Judgment will be denied, and the Motions in Limine both will be granted in part.

### FACTUAL AND PROCEDURAL HISTORY

This case was brought by the United States Securities and Exchange Commission ("SEC") against the Defendants, alleging fraud and other misconduct by two former chief financial officers ("CFOs") of infoUSA Inc. (now InfoGroup Inc.) ("Info"). Defendant Rajnish K. Das ("Das") is a New York resident and was Info's CFO from September 2003 until January 2006. Defendant Stormy L. Dean ("Dean") is a Nebraska resident and served as Info's CFO from January 2000 to September 2003, and from January 2006 until December

---

[1] The SEC's Notice of Supplemental Authority (Filing No. 126) and the Defendants' Objection to it (Filing No. 127), are considered as materials supplementing the briefs.

2008.  The SEC generally claims that, during their respective tenures, the Defendants prepared and reviewed Info's Forms 10-K and proxy statements, which contained material understatements and failed to disclose all the compensation of Vinod Gupta ("Gupta"), Info's former chief executive officer ("CEO") and former chairman of its board of directors. The SEC also claims the Defendants failed to disclose related-party transactions involving entities owned or controlled by Gupta.

## I.  Defendants' Statement of Facts

Defendants' brief in support of their motion for summary judgment contains a statement of material facts that complies with NECivR 56.1(a).  (Filing No. 85 at 3-9.)  The SEC addressed that statement at the end of its brief (Filing No. 94 at 60-70), and the following facts are uncontested:

Info is a Delaware corporation with its principal place of business in Omaha, Nebraska.  It is engaged in the business of providing database and marketing information. At the times relevant to this case, Info's stock traded publicly on the NASDAQ National Market System, and was registered with the SEC under Section 12 of the Securities Exchange Act of 1934 ("Exchange Act").  Info was required to, and did, file annual reports with the SEC on Forms 10-K; quarterly reports on Forms 10-Q; and proxy materials on Forms 14.

Gupta, who immigrated to the United States from India, founded Info "from scratch," and it grew to where it had sales of $383,158,000; $434,876,000; and $688,773,000 in 2005, 2006, and 2007, respectively.  In 2007, it employed over 4,800 people, and had facilities throughout the United States, London, Hong Kong, New Delhi, Singapore, and Sydney.  At all times during Das's and Dean's respective tenures as CFO, Info engaged

2

outside disclosure counsel to advise it in connection with the preparation of all its SEC filings.  From mid-1998 through the end of 2006, Info's outside disclosure counsel was Eric Madson ("Madson"), a partner in the law firm of Robins, Kaplan, Miller & Cerisi L.L.P. Beginning in 2007, Info retained Hogan & Hartson of Washington, D.C., as its disclosure counsel.  From 1998 through at least 2009, Info's outside auditor was KPMG LLP.

At all times relevant, Gupta was Info's chief executive officer, and chairman of its board of directors.   Dean joined Info in 1995 as its tax director.  He was trained as an accountant, but never practiced public accounting.  By 2000, he had risen to become Info's CFO.  He took a leave of absence in 2002, and rejoined Info as CFO in 2003.  He left Info in September 2003 after a dispute with Gupta, but rejoined the Company in 2004.  In January 2006 he again became Info's CFO and served in that position until December 2008.  During the time Dean was Info's CFO, he spoke with Gupta daily, and was aware of his activities and whereabouts.

Das was hired to be Info's CFO in September 2003, when he was 32 years old.  He and his family had been residing in New York City, where he worked as an investment banker.  Das had a background in finance, but not accounting.  Das resigned as Info's CFO in January 2006 and had no further responsibility for accounting or financial reporting thereafter.  Das left Info's employ in July 2006.

Info's annual and quarterly reports on Forms 10-K and 10-Q, respectively, were drafted by a staff accountant, who usually worked from the previous year's filing.  Drafts were updated with current information from various groups within Info, and circulated among Info's senior officers, its outside auditor, KPMG, and its outside counsel. Subsequent drafts were reviewed, modified as appropriate, and approved by Info's officers,

3

outside auditors, and outside counsel.  The final drafts were presented to the Audit Committee of Info's Board of Directors, and finally to Info's full Board of Directors for approval before filing.

As part of the process of the preparation of Info's proxy materials, senior officers of Info, including Gupta, were required to complete a questionnaire which, among other things, required the disclosure of all perquisites.  This questionnaire was used to ascertain the existence of perquisites and related-party transactions.

## II.  The SEC's Statement of Facts, and the Defendants' Objections

The SEC's brief in opposition to the motion for summary judgment (Filing No. 94) contains 66 separately numbered paragraphs with factual assertions, supported by citations to the evidentiary record.  (*Id*. at 2-22.)  Defendants object to the factual assertions in paragraphs 22-43, 46-59, and 62-63 (see Filing Nos. 112, 113, consolidated with Reply Brief, Filing No. 119, per Order, Filing No. 123.)  In general, Defendants contend that there is insufficient admissible evidence to support the SEC's assertion that any representations made by the Defendants were *false*, that any alleged misrepresentations were *material*, or that the Defendants acted with the requisite *scienter* to support the SEC's claims.  Defendants contend that any evidence presented by the SEC in support of its claims in these respects is inadmissible because it is hearsay, irrelevant, the product of settlement negotiations, the product of expert testimony based on unreliable methodology, evidence of subsequent remedial measures, and/or unduly prejudicial.

4

### A.  Uncontested Facts

The Defendants have not contested the following facts, presented in the SEC's brief:

During the time that Das served as Info's CFO, he was responsible for reviewing, approving, and directing Info to pay Gupta's expense reimbursement requests.  As CFO, Das played a role in the preparation of Info's Forms 10-K, Forms 10-Q, and proxy statements, which he signed and certified.  Das also certified Info's year-end financial statements for fiscal years 2003 and 2004, and certain quarterly financial statements for 2003, 2004, and 2005, pursuant to the Sarbanes-Oxley Act of 2002[2] ("Sarbanes-Oxley"). He signed certain management representation letters directed to Info's external auditors for 2003, 2004, and 2005, on which the auditors relied, and he completed certain questionnaires that listed the kinds of perquisites that must be reported by corporate officers and directors.

During the time that Dean served as Info's CFO, he was responsible for reviewing, approving, and directing Info to pay Gupta's expense reimbursement requests, and he played a role in preparing Info's annual and quarterly reports.  He signed and certified Info's Forms 10-K for 2005 through 2007, pursuant to Sarbanes-Oxley.  He also certified certain Forms 10-Q for Info's fiscal years 2003, 2005, and 2006; signed certain management representation letters to Info's auditors upon which they relied in 2004, 2005,

---

[2] Also known as the Public Company Accounting Reform and Investor Protection Act, the civil statutes enacted through Sarbanes-Oxley are codified at 15 U.S.C. § 7201 *et seq.*, and §§ 78o-6 and 78d-3.

5

and 2006; and completed certain questionnaires that listed the kinds of perquisites that must be reported by corporate officers and directors.

Info's internal controls and policies required that expense reimbursement requests submitted by Gupta demonstrate a business purpose, and the purpose of the CFO's review of the expense reimbursement requests was, in part, to ensure that the expenses submitted were appropriate for reimbursement.

Info's Forms 10-K that Das and Dean signed and certified for 2003 through 2006 incorporated by reference proxy statements that purported to disclose executive compensation, including perquisites, or "other compensation," as well as any related-party transactions.  The Form 10-K that Das signed and certified in March of 2004 for Info's fiscal year 2003 referenced Gupta's "other compensation" as $6,000 for a matching contribution to his 401(k) plan.  The Form 10-K that Das signed and certified in March of 2005 for Info's fiscal year 2004 referenced Gupta's "other compensation" as $6,500 for a matching contribution to his 401(k) plan.  The Form 10-K that Dean signed and certified in March of 2006 for Info's fiscal year 2005 referenced Gupta's "other compensation" as $7,000 for a matching contribution to his 401(k) plan.  The Form 10-K that Dean signed and certified in March 2007 for Info's fiscal year 2006 referenced Gupta's "other compensation" as $112,600 for an executive compensation consulting fee, a home office, and an auto allowance, and a matching contribution to his 401(k) plan.

Das approved payment of premiums on Gupta's life insurance policies in 2002, 2003, and 2004, knowing that the policies were owned by Gupta's family trust and not by Info; and Dean was aware of the payments.  From 2003 through 2005, Info entered into related-party transactions with corporations owned by Gupta, including payments for use

6

of aircraft, residences, vehicles, and a yacht, as well as the purchase of interests held by one such corporation in certain private jets.  Info's Forms 10-K and related proxy statements for those years disclosed related-party transactions for "useage of the aircraft and other travel expenses" and "useage of the aircraft and related services."

### B.  Issues of Fact

The SEC refers the Court to evidence of a broad variety of expense reimbursements approved by Das or Dean that the SEC contends were for Gupta's personal expenses and were not disclosed as perquisites or "other compensation" on proxy statements, incorporated by reference in Info's Forms 10-K and 10-Q.  These include personal use of private jets, vacation expenses for Gupta and his wife, personal credit card expenses, country club memberships and golf fees, cars owned or leased for personal use (sometimes through a corporation owned by Gupta), expenses of maintaining personal residences (including rental expenses for homes that were the property of a corporation owned by Gupta), expenses for use and maintenance of a yacht (that was the property of a corporation owned by Gupta), and premiums for life insurance policies owned by Gupta family members or a family trust.  The SEC refers the Court to evidence suggesting that Das and Dean knew that the expense reimbursements were for Gupta's personal expenses and should have been imputed to Gupta as taxable income and disclosed on proxy statements, incorporated by reference in Info's Forms 10-K and 10-Q.  The SEC also describes two derivative actions brought by shareholders in 2006, alleging misuse of Info's assets, the SEC's investigation, and an internal investigation initiated by Info's board of directors that led to a settlement agreement and the ultimate amendment of Info's Forms 10-K.

7

Das and Dean contest this evidence and the inferences drawn from it by the SEC. They suggest that much of the evidence is presented out of context and is subject to challenge as hearsay, irrelevant, unduly prejudicial, evidence of subsequent remedial measures, evidence derived from settlement negotiations, and expert testimony not supported by reliable methodology.

## STANDARD OF REVIEW

Summary judgment is only proper when the Court, viewing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in the nonmoving party's favor, determines the evidence "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Semple v. Fed. Express Corp.*, 566 F.3d 788, 791 (8th Cir. 2009) (quoting Fed. R. Civ. P. 56(c)). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, . . . Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The moving party need not negate the nonmoving party's claims by showing "the absence of a genuine issue of material fact." *Id.* Instead, "the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

In response to the movant's showing, the nonmoving party's burden is to produce specific facts demonstrating "'a genuine issue of material fact' such that their claim should proceed to trial." *Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 422 (8th Cir. 2009), *cert.*

8

*denied,* 130 S. Ct. 1074 (2010) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  The nonmoving party is required to demonstrate a "genuine issue of material fact" that is outcome determinative—"a dispute that might 'affect the outcome of the suit under the governing law.'" *Bloom v. Metro Heart Group of St. Louis, Inc.*, 440 F.3d 1025, 1029 (8th Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Thus, a "genuine issue" is more than "'some metaphysical doubt as to the material facts,'" *Nitro,* 565 F.3d at 422 (quoting *Matsushita*, 475 U.S. at 586), and "'the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.'" *Bloom*, 440 F.3d at 1028-29 (quoting *Anderson*, 477 U.S. at 247-48).

In other words, in deciding "a motion for summary judgment, [the] 'facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.'" *Ricci v. DeStefano*, 129 S. Ct. 2658, 2677 (2009) (quoting *Scott v. Harris,* 550 U.S. 372, 380 (2007)).  Otherwise, where the Court finds that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party"—where there is no "genuine issue for trial"—summary judgment is appropriate. *Matsushita*, 475 U.S. at 587.

## DISCUSSION

### I. Motion for Summary Judgment

Although the SEC's Complaint presents eight causes of action, they all revolve around a common nucleus of facts, and the parties' briefs focus on the first and most pivotal cause of action—alleged acts of securities fraud in violation of § 10(b) of the

Exchange Act (15 U.S.C. § 78j(b)) and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5). The parties agree that the SEC must prove the following elements to support that claim: (1) a material misrepresentation or omission; (2) in connection with the purchase or sale of a security; (3) scienter; and (4) use of the jurisdictional means. *SEC v. Kluesner*, 834 F.2d 1438, 1439 (8th Cir. 1988). The parties also agree that the second and fourth elements are present. It is the first and third elements that are at issue.

With respect to the first element, Das and Dean argue that, for purposes of liability under Rule 10b-5 (1) they were not the "makers" of any "statements" contained in Forms 10-K and 10-Q, and the proxy materials; (2) the SEC has not defined what constitutes a "perquisite," so there is no standard to put a reasonable person on notice of what the law requires and, therefore, the documents could not contain "misstatements;" and (3) the alleged misrepresentations of Gupta's compensation were not material, in that they would not have been viewed by a reasonable investor as significantly altering the total mix of information available.

With respect to the third element of the SEC's 10b-5 fraud claim, Das and Dean contend that they did not act with the requisite "scienter," because (1) they did not have the intent to deceive, manipulate or defraud; (2) they did not have an unusual or heightened motive to defraud, in that they were not receiving concrete and personal benefits as a result of any fraud; and (3) they did not act with severe recklessness or an extreme departure from standards of ordinary care.

10

### A.  Material Misrepresentations or Omissions

### *1.  Statements Made by Das and Dean*

Part III, Item 11, of Form 10-K requires public companies to disclose information on "Executive Compensation" as defined by Item 402 of Regulation S-K ("Item 402").[3]  Item 402 requires disclosure of compensation awarded to, earned by, or paid to certain executives including the reporting entity's chief executive officer.   17 C.F.R. § 229.402(a)(2), (3).  Item 402 also requires reporting entities to disclose perquisites and other personal benefits paid to executives.  17 C.F.R. § 229.402(c)(2)(ix)(A).  Form 10-K also requires public companies to furnish information regarding certain relationships and related transactions in accordance with Item 404 of Regulation S-K ("Item 404").[4]  Item 404(a) of Regulation S-K requires a description of any transaction or series of transactions exceeding a certain amount[5] in which any director, officer, or immediate family member has a direct or indirect material interest.   17 C.F.R. § 229.404.   In 2006, a definition of "transaction" was added to Item 404, including "any financial transaction, arrangement or relationship . . . or any series of similar transactions, arrangements or relationships."  17 C.F.R. § 229.404, Instructions to Item 404(a)(2) (2007); 71 Fed. Reg. 53252 (Sept. 8, 2006).  Even absent a legal duty to make a disclosure, when a party "'discloses material facts in connection with securities transactions' . . . the law requires '[that] actor to provide complete and non-misleading information with respect to the subjects *on which he*

---

[3] Item 402 of Regulation S-K is found at 17 C.F.R. § 229.402.

[4]  17 C.F.R. § 229.404.

[5] Prior to December 2006, the amount was $60,000; the transaction threshold has since increased to $120,000.  *See* 71 Fed. Reg. 53158, 53252 (Sept. 8, 2006).

11

*undertakes to speak.*'"  *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 898 (8th Cir. 2002)

(quoting *Helwig v. Vencor, Inc.,* 251 F.3d 540, 561 (6th Cir. 2001) (en banc)).

Rule 10b-5, among other things, forbids "any person . . . [t]o make any untrue

statement of a material fact or to omit to state a material fact necessary in order to make

the statements made, in the light of the circumstances under which they were made, not

misleading" in connection with the purchase or sale of securities.  17 C.F.R. § 240.10b-5.

The proxy materials incorporated by reference in the Forms 10-K and 10-Q, disclosing

executive compensation, were "statements" under Rule 10b-5.

Das and Dean rely on the Supreme Court's decision in *Janus Capital Grp., Inc. v.

First Derivative Traders*, 131 S.Ct. 2296 (2011), for the proposition that they were not the

"makers" of the statements in the proxy materials and Forms 10-K and 10-Q.  In *Janus,*

the Court addressed the question of whether a mutual fund investment adviser could be

held liable in a private action under Rule 10b-5 for false statements included in mutual fund

prospectuses.  *Id.* at 2299-2301.  The Court held that the investment adviser did not

"make" the statements, although the adviser may have played a role in preparing,

approving, or disseminating the prospectuses.  *Id.* at 2305.  The Court said:

> For purposes of Rule 10b-5, the maker of a statement is the person or entity
> with ultimate authority over the statement, including its content and whether
> and how to communicate it.  Without control, a person or entity can merely
> suggest what to say, not "make" a statement in its own right.  One who
> prepares or publishes a statement on behalf of another is not its maker.

*Id*. at 2302.

Das and Dean argue that Info itself was the "maker" of the statements contained in

the proxy materials and incorporated by reference into the Forms 10-K and 10-Q, and they

12

merely prepared or published the materials on behalf of Info.  This Court disagrees.  As the CFOs who signed and certified the statements, Das and Dean were the persons with ultimate authority and control over the content of the statements and whether and how they were communicated.  As such, they were the "makers" of such statements.

### 2.  Definition of "Perquisite" or "Other Compensation"

Das and Dean argue that the expense reimbursements were not "compensation" within the meaning of Item 402 of SEC Regulation S-K.  Item 402 defines compensation, stating, "[t]his item requires clear, concise and understandable disclosures of all plan and non-plan compensation awarded to, earned by, or paid to the named executive officers . . . and directors . . . , by any person for all services rendered in all capacities to the registrant and its subsidiaries, unless otherwise specifically excluded from disclosure in this Item." 17 C.F.R. § 229.402(a)(2).

In the case of *Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662 (D. Colo. 2007), on which Das and Dean rely, an executive *took* compensation from a company, in the form of unauthorized use of aircraft, and was required to reimburse the company once the usage was discovered.  *Id.* at 670-71.  The *Red Robin* court found that the compensation was not "'awarded to, earned by, or paid to'" the executive by the corporation, and no violation of Regulation S-K had occurred.  *Id.* at 684-85 (quoting § 229.402(a)(2)).  Here, there *is* evidence from which a reasonable jury could conclude that the compensation was paid to Gupta and not merely "taken" by him without the knowledge and consent of Das and Dean.

The SEC has come forward with evidence that Gupta was engaged in a tax-evasion scheme, demanding that Info pay his personal expenses directly; and that Das and Dean knew of that scheme and concealed it from shareholders, either out of deference to Gupta and his success in developing Info's business, or out of a desire to maintain their jobs, or both. If the SEC meets its burden of proving those facts, it will have demonstrated that the payments made to Gupta were undisclosed "compensation."

Das and Dean object to much of the SEC's evidence, and also suggest that Gupta's expenses may have had some business-related aspect, or at least that Das and Dean reasonably believed so. The Court will rule on the Defendants' objections regarding the admissibility of each item of evidence as it is offered at trial, and the evidence admitted may be weighed by the jurors who are the finders of fact and the judges of the credibility of the witnesses. The Court notes that material evidence will be that which relates to Das's and Dean's knowledge at the time of their alleged misstatements or omissions, and *not* evidence that was unknown to Das and Dean at the time they made their certifications, but has since been revealed through subsequent investigations or by remedial measures.

### 3.  Materiality of any Misrepresentations

 To state an actionable claim for securities fraud, the alleged misstatements must be material. *In re AMDOCS Ltd. Sec. Litig.*, 390 F.3d 542, 547 (8th Cir. 2004). Materiality is generally a question of fact, but misrepresentations may be "immaterial as a matter of law where a court determines that no reasonable investor could have been swayed by the alleged misrepresentation." *Id.* The Supreme Court has "held a fact to be material 'if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.'" *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090 (1991)

(quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).  The Supreme Court has also said that a misrepresentation or omission is material if there is a "'substantial likelihood that the disclosure . . . would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quoting *TSC Indus.*, 426 U.S. at 449).  The issue of whether a statement or omitted fact is material is a mixed question of fact and law.  *TSC Indus.*, 426 U.S. at 450.

Das and Dean argue that the alleged undisclosed compensation and related-party transactions *were* included in Info's reports as travel and entertainment expenses and business-related transactions, and so any false characterization of the nature of these expenses and transactions would not have been *material* to investors, whose chief interest would have been Info's profitability.  Based on the undisputed facts, and the issues of fact remaining to be determined, the Court cannot conclude that the alleged misstatements and omissions were immaterial as a matter of law.   Investors may base their investment decisions, at least in part, on factors such as (1) reasonable and transparent executive compensation; (2) the company's history of independent arms-length transactions with third parties, made in the company's best interest; and (3) management ethics and accountability.

**B. Scienter**

The Supreme Court has defined scienter as "a mental state embracing intent to deceive, manipulate, or defraud."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).   The Eighth Circuit has stated that "[t]raditionally, there are three methods of

15

establishing scienter." *In re: K-Tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 893 (8ᵗʰ Cir. 2002). "First, scienter may be established from facts demonstrating 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Id.* (citing *Hochfelder*, 425 U.S. at 193 n.12). "Second, while allegations of negligent conduct are not sufficient . . . conduct which rises to the level of severe recklessness may be sufficient to meet the scienter requirement." *Id.* (citing *K&S P'ship v. Continental Bank, N.A.*, 952 F.2d 971, 978 (8ᵗʰ Cir. 1991) (internal citations omitted).  Conduct sufficient to meet the scienter requirement "is limited to 'highly unreasonable omissions or misrepresentations' involving 'an extreme departure from the standards of ordinary care, and . . . present[ing] a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id.* (quoting *K&S P'ship*, 952 F.2d at 978.)  Third, "facts giving rise to motive and opportunity may also support a 'reason to believe the defendant's misrepresentation was knowing or reckless.'" *Id.* at 894 (quoting *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 660 (8ᵗʰ Cir. 2001)).  "Generally, the issue of whether a particular intent existed is a question of fact for the jury." *Id.* (citing *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2ⁿᵈ Cir. 1999)).

The SEC has come forward with sufficient evidence from which a reasonable jury could conclude that Das and Dean signed certain of Info's Forms 10-K and 10-Q knowing that they incorporated by reference proxy materials that omitted material information regarding Gupta's compensation and related-party transactions.  While it does not appear that Das and Dean acted with the intent to defraud or manipulate investors, there is evidence from which a reasonable jury could conclude that Das and Dean knew that

investors would be deceived by the omissions, or that Das and Dean engaged in an extreme departure from the standards of ordinary care, presenting a danger of misleading investors so obvious that Das and Dean must have been aware of it.  Accordingly, it is not necessary to explore the third, alternative, basis for establishing scienter, "motive and opportunity," although the Court will note that the evidence does not appear to support any theory that Das and Dean acted for personal gain beyond their continued employment— which would be insufficient to support a finding of scienter based on the theory of "motive and opportunity."  *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 622 (4th Cir. 1999).

     **C.  Causes of Action II - VIII**

     The SEC's second cause of action alleges violations of Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rules 14a-3 and 14a-9, 17 C.F.R. §§ 240.14-3 and 14a-9.  Rule 14a-9 states that proxy solicitations may not contain any statement "which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading . . . ."  17 C.F.R. § 240.14a-9.  The term "solicitation" is construed broadly to include any "communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy."  17 C.F.R. § 240.14a-1(l)(1)(iii).

     The SEC's third cause of action is brought under § 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5), and Rule 13b2-1, 17 C.F.R. § 240.13b2-1.  Section 13(b)(5) of the Exchange Act states that "[n]o person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account described in [§ 13(b)(2)]."  15 U.S.C. § 78m(b)(5).

17

The SEC's fourth cause of action is brought under Rule 13a-14, 17 C.F.R. § 240.13a-14, alleging false certifications.  Rule 13a-14 requires an issuer's principal financial officer to certify to the best of his or her knowledge that there are no untrue statements of material fact or omissions of material fact in reports filed under Section 13(a) of the Exchange Act.  17 C.F.R. § 240.13a-14.

The SEC's fifth cause of action alleges that Das and Dean deceived auditors or accountants in connection with audits, reviews, or examinations of financial statements in violation of Rule 13b2-2, 17 C.F.R. § 240.13b2-2.

The SEC's sixth, seventh, and eighth causes of action allege that Das and Dean each aided and abetted Info's violations of Sections 13(a) and (b)(2) of the Exchange Act and Rules 12b-20, 13a-1, and (in the case of Das only) 13a-13, by filing materially false and misleading annual and quarterly reports, making and keeping false books and records, and failing to maintain internal accounting controls.  15 U.S.C. § 78m(a) and (b)(2); 17 C.F.R. §§ 240.12b2-20, 240.13a-1, 240.13a-13.

Liability for aiding-and-abetting violations of securities laws is codified in § 20(e) of the Exchange Act.  15 U.S.C. § 78t(e).  Section 20(e) states that for any action brought by the SEC for securities fraud, "any person that knowingly provides substantial assistance to another person in violation of [securities laws and regulations], shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided."  *Id.*

Genuine issues of fact remain for trial with respect to each of these claims.

**II. Motions in Limine**

    **A*. SEC's Motion in Limine***

    *1.  Testimony of John E. Moye*

    The SEC seeks to exclude the testimony of the Defendants' expert, John E. Moye, a lawyer, who has indicated his intention to testify about the duties of CFOs under Delaware law, and the burdens of proof applicable to the SEC's claims.  Assuming that proper foundation is laid, and the opinions have been disclosed in his report, Moye may testify about industry standards, i.e., practices and procedures generally used in corporate governance.  He may not testify about what law applies in this case, nor the applicable burdens of proof, nor may he refer to the law of any particular state as setting the industry standard for compliance with federal laws and regulations.[6]

    *2.  Testimony of David A. Hall*

    The SEC seeks to exclude the testimony of Defendants' expert, David A. Hall, to the extent that Hall intends to testify that Info's business development efforts caused its revenue to increase.  While the Court may question the relevance of Hall's testimony, and the reliability of the methodology he used to reach his conclusion, the Court will deny the motion in limine without prejudice to the SEC's reassertion of the motion, or specific objections to the testimony, at the time of trial.

---

    [6]  It is recognized that laws of the state of Delaware favor corporations in many respects, and that many corporations are registered under Delaware law regardless of the location of their principal places of business.  For similar reasons, ships that travel in international waters are often registered in the nation of Liberia.  A lawyer well-versed in the law of Liberia is not, by virtue of that fact, an expert on the industry standards for marine navigation, safety, and stewardship.

19

**B.  Defendants' Motion in Limine**

Defendants ask the Court to limit the testimony of SEC's expert witness, Steven L. Henning, Ph.D., C.P.A., in several respects.  Assuming that proper foundation is laid for his opinion, and assuming that the opinion has been properly disclosed in his report, Henning may testify about generally accepted accounting principles ("GAAP") and the accuracy and completeness of disclosures made on Info's Forms 10-K and 10-Q, and proxy statements.  He will not, however, be permitted to opine as to whether such disclosures or omissions were *materially* false or *misleading*.  Questions of whether or not disclosures or omissions were material and/or misleading are ultimate questions for the jury.[7]  Nor will he be allowed to testify as to the Defendants' legal duties and obligations; summarize the law, or the policies behind the law; or offer opinions as to the Defendants' state of mind or intent.  It is the responsibility of the Court to advise the jury of the law, and it is the province of the jury to determine whether the Plaintiff has met its burden of demonstrating that the Defendants breached their duties under the law.

## CONCLUSION

Genuine issues of material fact remain for a jury to determine, and this case will proceed to trial.  Accordingly,

IT IS ORDERED:

1.    The Motion for Summary Judgment (Filing No. 84) submitted by Defendants Rajnish K. Das and Stormy L. Dean is denied;

---

[7]  Dr. Henning's testimony would not aid the jury in making these determinates because his deposition reveals that he does not claim to have any expertise or training in determining what factors are significant to investors.  (Defendants' Index of Evidence, Filing No. 107, Exhibit B, Henning Deposition, 198:14-25.)

2.      The Motion in Limine (Filing No. 102) submitted by Plaintiff Securities and Exchange Commission is granted in part, as follows:

John E. Moye may not testify about what law applies in this case, nor the applicable burdens of proof, nor may he refer to the law of any particular state as setting the industry standard for compliance with federal laws and regulations;

and the motion is otherwise denied, without prejudice;

3.      The Motion in Limine (Filing No. 105) submitted by Defendants Rajnish K. Das and Stormy L. Dean is granted in part, as follows:

Steven L. Henning, Ph.D., C.P.A., will not be permitted to opine as to whether any disclosures or omissions of the Defendants were *materially* false or *misleading;* nor will he be allowed to testify as to the Defendants' legal duties and obligations; summarize the law, or the policies behind the law; or offer opinions as to the Defendants' state of mind or their intent;

and the motion is otherwise denied, without prejudice.

DATED this 20th day of September, 2011.

BY THE COURT:


s/Laurie Smith Camp
United States District Judge